THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

SOMERVILLE PUBLIC SCHOOLS,
167 Holland Street
Somerville, MA 02144

and

EASTHAMPTON PUBLIC SCHOOLS
50 Payson Avenue
Easthampton, MA 01027

and

AMERICAN FEDERATION OF TEACHERS,
555 New Jersey Avenue N.W.
Washington, D.C. 20001

and

AMERICAN FEDERATION OF
TEACHERS MASSACHUSETTS,
38 Chauncy Street
Suite 402
Boston, MA 02111

and

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 93
8 Beacon Street
Boston, MA  02108

and

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS
555 New Jersey Avenue NW, Suite 600
Washington, D.C. 20001

and

Civil No. _____

1

SERVICE EMPLOYEES INTERNATIONAL
UNION
1800 Massachusetts Ave, NW
Washington, D.C.  20036

      *Plaintiffs,*

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

and

LINDA MCMAHON, in her official capacity as
Secretary of Education,
400 Maryland Avenue S.W.
Washington, D.C. 20202

and

U.S. DEPARTMENT OF EDUCATION,
400 Maryland Avenue S.W.
Washington, D.C. 20202

      *Defendants.*

## **COMPLAINT**

1.      Defendants seek to eliminate the U.S. Department of Education. The first step: fire the people that do the work of the Department.

2.      On March 11, 2025, "[a]s part of the Department of Education's final mission," newly confirmed Secretary of Education Linda McMahon "initiated a reduction in force (RIF) impacting

nearly 50% of the Department's workforce."[1] Staff who will be fired have been placed on leave, and stopped working, beginning on March 21, 2025.

3. On March 20, 2025, the President signed an Executive Order confirming the purpose of these *en masse* terminations: to abolish the Department of Education.

4. The problem with Defendants' "final mission," and the President's Executive Order memorializing the same, is that they are unlawful and harm millions of students, school districts, and educators across the nation.

5. Established by Congress in 1979 to ensure equal access to education, the U.S. Department of Education administers over 50 statutes aimed at supporting diverse student populations, including those with disabilities, students in underfunded and rural schools, those seeking vocational training, and individuals requiring financial aid for higher education.

6. Because the Department of Education was created by Congress—and mandated by Congress to operate various programs for the benefit of America's students, parents, and schools—it cannot be eliminated by the President or the Secretary of Education.

7. Prior to January 20, 2025, the Department employed 4,133 employees. After Defendants' recent actions, just 2,183 will remain. The mass removal of the individuals who do the work of the Department means that the Department will be unable to perform its statutorily mandated duties, including effectively distributing funds for students with disabilities and providing support and technical assistance to parents, families, and states to ensure those services are provided most effectively; protecting students' civil rights; and providing financial aid for students seeking higher education.

---

[1] Nat'l Ctr. for Educ. Stats., *Public School Revenue Sources*, https://nces.ed.gov/programs/coe/indicator/cma/public-school-revenue [https://perma.cc/9WZM-D3L6] (last updated May 2024).

8.      And as the President's Executive Order makes clear, this is just the first step towards "the closure of the Department of Education." His further statements that he will unlawfully move pieces of the Department of Education to other agencies confirm that Defendants' actions are designed to permanently close the Department of Education.

9.      This suit seeks declaratory and injunctive relief against Defendants' unlawful effort to eliminate the Department of Education through the March 11, 2025, decision to fire half of the Department's staff and President Trump's Executive Order on March 20, 2025, seeking to abolish the Department as a whole.

## BACKGROUND

10.      The primary public responsibility for education in this country is reserved to the states, to local school systems, and to parents. The federal government's role in education has been to fill gaps in state and local capacity to ensure that no student is left behind for lack of knowledge, resources, or technical ability at the state or local level. In addition to providing substantial funds, support, and resources to teachers, instructional support aides, schools, school districts, administrators, state and local education agencies, and institutions of higher education, the federal government centralizes and distributes technical assistance that cannot be developed and maintained cost-effectively in every school district.

11.      While federal support for education dates back more than 150 years, Congress created the Department of Education as a cabinet-level agency to fulfill this mission more efficiently. *See* Department of Education Organization Act, 20 U.S.C. §§ 3401, *et seq.* Congress placed programs that had been scattered across several departments into a single Cabinet-level department to "support more effectively State, local, and private institutions, students, and parents in carrying out their educational responsibilities," *id.* § 3401(7), through increased funding and improved "management and

4

coordination of Federal education programs" led by a "single, full-time Federal education official directly accountable to the President, the Congress, and the people." *Id.* § 3401(7)-(10).

12.     Over the course of more than seven decades, Congress—popularly elected and expressing the will of its constituents—has established and defined the federal role in education. And since the modern Department of Education's creation in 1979, Congress has instructed the Department repeatedly, through numerous laws, to implement programs created by Congress, to ensure adherence to the requirements of those programs, to distribute funds appropriated by Congress, and to provide support, resources, and technical assistance as directed by Congress.

13.     The Department implements Congress' mandates by distributing funds to schools across the country: in the 2020-21 school year, the Department distributed $101 billion in federal funds to elementary and secondary schools across the country, in all 50 states.[2]  This represents, on average, 11% of all funding for elementary and secondary schools in the country, although in some states, federal funds account for as high as 20%.[3] The Department also supports higher education through loans and grants to students, parents, and schools.

14.     The Department also provides support, technical assistance, and resources to parents, students, educators, and schools in alignment with the mission that Congress has charged the Department with carrying out: to "promote student achievement and global competitiveness by fostering educational excellence and ensuring equal access to high-quality learning opportunities." 20 U.S.C. § 3402. It does this through many media: webinars and other online resources (such as how-to guides and FAQs), call centers, listening sessions, education-related publications, free site visits, and evidence-based recommendations for providing students with high-quality educations.

---

[2] *Id.*
[3] *Id.*

5

15.    For elementary and public education, two core areas of the Department of Education's work are to support local schools to serve low-income students and students with disabilities. Nearly 95% of all school districts, and 60% of all public schools, qualify for some funding designed to support low-income students. And through the Individuals with Disabilities Education Act, over 7 million students with disabilities across the country are served.

16.    On the higher education side, the Department of Education distributes $120 billion in loans and grants every year to students seeking a higher education, supporting nearly 10 million Americans annually. It manages the complex federal student aid program, including originating grants and loans, overseeing schools' participation in the program, managing repayment on the $1.6 trillion in outstanding federal student loans.

17.    Across all levels of education, the Department's Office for Civil Rights protects civil rights in schools, including protecting students with disabilities.

18.    In all of these areas and more, the Department's staff are vital to ensuring that the Department can do its work. Among other things, the Department of Education's workers help students with disabilities, and their families, teachers, school districts, and states to provide students the support they need to succeed in school; advise students and parents as to how they can pay for college (and process the grants, loans, and repayment programs that allow students to do just that); protect students from discrimination and harassment; help rural school districts that struggle to afford student transportation in large but sparsely populated far-flung areas; and support students from low-income families achieve a high-quality education. The Department's staff help grantees apply for much-needed funds, review and process applications, disburse money to support students and schools across the nation, and provide technical assistance to support students, families, schools, and states.

19.     Dismantling the Department of Education, including by firing half of the Department, will bring these and other activities to a halt, harming students, educators, and school districts across the country.

**PARTIES**

20.     **Plaintiff Somerville Public Schools ("Somerville")** is a public school district located in Massachusetts. Somerville operates eleven schools, which serve nearly 5,000 students and employ approximately 440 full-time teachers. Approximately 6% of Somerville's total budget comes from federal funding, including funds administered by the Department of Education. Of this, close to $3.5 million dollars comes in the form of federal grants administered by the Department.

21.     **Plaintiff Easthampton Public Schools ("Easthampton")** is a public school district located in Massachusetts. Easthampton operates two schools, which serve approximately 1,400 students and employs approximately 118 full-time teachers. During the 2024-25 school year, Easthampton received more than $800,000 in federal funding through the Department of Education.

22.     **Plaintiff the American Federation of Teachers (AFT)** an affiliate of the AFL-CIO, is a membership organization representing 1.8 million members, who reside in every U.S. state, the District of Columbia, Puerto Rico, and Guam, and the U.S. Virgin Islands, and who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities their members serve. AFT does so by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients and all those who use public services. Helping children

and students is at the core of AFT's mission. So too is the economic security and dignity of AFT's members and their families. AFT is headquartered in Washington, D.C.

23. **Plaintiff American Federation of Teachers Massachusetts (AFT Massachusetts)** is a labor union in Massachusetts. It is an independent nonprofit organization constituted under Section 501(c)(5) of the Internal Revenue Code. AFT Massachusetts is a strong voice for collaborative education reform that is good for students and fair to educators. AFT Massachusetts represents more than 25,000 public school employees, higher education faculty and staff, and public librarians. Approximately 22,500 of its members—including teachers, paraprofessionals, guidance counselors, school nurses, social workers, and other school employees— teach in public pre-K-12 school districts across Massachusetts, including Boston and Lynn.

24. **Plaintiff AFSCME Council 93**, affiliated with the American Federation of State, County and Municipal Employees, AFL-CIO, is a council of labor unions in Maine, Massachusetts, New Hampshire, and Vermont. AFSCME Council 93 is headquartered in Boston, Massachusetts. AFSCME Council 93 represents thousands of public-school employees in Massachusetts, including educators such as paraprofessionals and instructional aides, and other critical support personnel such as counselors, cafeteria workers, bus drivers, safety officers, and maintenance and administrative staff. Council 93's Massachusetts paraprofessional/instructional support members are employed in at least twelve school districts in Massachusetts. More than 6,000 AFSCME Council 93 members work at 27 public university, state and community college campuses in Massachusetts in one of the most respected and effective public higher education systems in the world.

25. **Plaintiff the American Association of University Professors ("AAUP")** is a nonprofit membership association that represents more than 43,000 faculty, librarians, graduate students, and academic professionals with members at institutes of higher education across the United States, including members in every state. AAUP is committed to advancing academic freedom and

shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of academic workers, and ensuring higher education's contribution to the common good. AAUP is incorporated in Washington, D.C.

26.     **Plaintiff the Service Employees International Union (SEIU)** is a labor union of approximately two million workers who provide public services, healthcare, and property services throughout the United States, Canada, and Puerto Rico. Nearly 300,000 of SEIU's members work for public school districts or institutions of higher education. SEIU represents public school employees in K-12 districts across the country, including professionals, paraprofessionals, administrative employees, janitors, bus drivers, food service employees, and other educational support staff, and higher education employees, including faculty, librarians, counselors, student workers, administrative employees, and janitors. In Massachusetts, SEIU represents approximately 7,000 education workers, including K-12 paraeducators, therapists, and other support staff who work with students with disabilities, as well as graduate student workers and other professional employees who rely on federal student aid. SEIU is committed to providing quality public services and ensuring that all students receive equitable access to education.

27.     **Defendant Donald J. Trump** is the President of the United States. He is sued in his official capacity.

28.     **Defendant Linda McMahon** is the Secretary of Education. She leads the Department of Education. She is sued in her official capacity.

29.     **Defendant U.S. Department of Education** is an agency of the United States. It is headquartered in Washington, D.C.

## JURISDICTION AND VENUE

30.     This Court has subject-matter jurisdiction because this action arises under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because the Defendants are

9

United States officials. 28 U.S.C. § 1346(a)(2). Jurisdiction is also proper under the judicial review

provisions of the APA. 5 U.S.C. §§ 702, 704, and the Court may grant declaratory relief, injunctive

relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705, 706.

31.     This Court has the authority to enter a declaratory judgment and to provide

preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil

Procedure, under 28 U.S.C. §§ 2201–2202, and under the All Writs Act.

32.     Venue lies with the District of Massachusetts because multiple Plaintiffs (namely,

Somerville, Easthampton, AFT Massachusetts, and AFSCME Council 93) reside in this judicial

district, and because other Plaintiffs (AFT, AAUP, and SEIU) have members that reside in this

judicial district, and because a substantial part of the events or omissions giving rise to this action

occurred in this District. 28 U.S.C. § 1391(e).

### LEGAL FRAMEWORK

33.     The Department of Education is an essential support for American families. It

reflects a near half-century commitment from the American people, by and through their elected

members of Congress, to support American students, parents, and communities. The programs it

operates have been established by Congress and support crucial services for students with

disabilities, students in rural school districts, students from low-income backgrounds, students

attending college or university, and numerous other populations.

34.     For the past 46 years, Congress has repeatedly appropriated funds for the

Department to provide services to students, parents, schools, states, colleges, and more.

Furthermore, Congress has repeatedly rejected efforts to shut down the Department. President

Trump and Secretary McMahon, through their unlawful actions, seek to overrule 46 years of

congressional decision-making.

35.    The Department is not simply a cash-dispensing machine. It is an active partner to the states and every school district in America, staffed by experts to help them—as well as students, parents, teachers, and schools—obtain and effectively use funds through programs that have been established by Congress and deliberately placed within the Department.

36.    Congress established the Department of Education by statute in 1979 through the Department of Education Organization Act ("DEOA"). *See* Pub. L. No. 96-88, 93 Stat. 668 (1979) (codified at 20 U.S.C. §§ 3401, *et seq*).

37.    The DEOA was passed by a majority of each house of Congress on a bipartisan basis, enrolled, and signed by the President. It is the law of the land.

38.    Congress found that: "education is fundamental to the development of individual citizens and the progress of the Nation," and that "there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality." 20 U.S.C. § 3401(1), (2). Congress acknowledged and reaffirmed that "in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States," *id.* § 3401(4), but that the need to "support" states and local authorities necessitated an "improvement in the management and coordination of Federal education programs." *Id.* § 3401(7).

39.    To that end, Congress "declare[d] that the establishment of a Department of Education is in the public interest." *Id.* § 3402.

40.    The new Department was vested, by Congress, with authority, obligations, and Senate-confirmed personnel. Offices created by the DEOA include the Department's Office for Civil Rights, *id.* § 3413; the Office for Elementary and Secondary Education, *id.* § 3414; the Office of Postsecondary Education, *id.* § 3415; the Office of Special Education and Rehabilitative Services, *id.* § 3417; and the Office of English Language Acquisition, *id.* § 3420. Further, DEOA requires that

each of these offices be led by an Assistant Secretary appointed by the President and confirmed by the Senate. *Id.* § 3412(b)(1).

41.     The DEOA does permit the Secretary of Education some limited authority to reorganize or discontinue offices within the Department that were not created by statute or were not transferred to the Department of Education from the Department of Health, Education, and Welfare (or other departments) by the DEOA. *Id.* § 3473. This authority to reorganize or abolish offices, by its very terms, does not extend to the offices created by statute, nor does it create any authority to violate subsequent statutes that require the Department (or specific offices within the Department) to carry out particular programs. Congress did not authorize the Secretary to eliminate or disrupt functions required by statute, or to cease performing the functions of the Department through mass terminations of Departmental staff.

42.     In the DEOA, Congress generally authorized the Department to prescribe rules and regulations necessary to carrying out its responsibilities, *id.* §§ 1221e-3, 3474, and provided subsequent additional authorizations in specific statutes.

43.     Congress also authorized the Secretary to provide technical assistance to state education agencies,[4] local education agencies, and institutions of higher education, in addition to the specific technical assistance authorized by particular programs. *Id.* § 1231c.

44.     Throughout the years since the Department's creation, Congress has assigned it the responsibility to operate numerous programs that have a profound, positive impact on American families. These programs ensure that students with disabilities, school systems that lack financial means, schools in sparsely populated counties, students who want practical career training rather

---

[4] Most statutes that authorize or require the Department of Education to provide funds to states also include other entities that administer public school systems, such as the District of Columbia, Puerto Rico, or Guam, as eligible to receive funds. For convenience, we collectively refer to such entities as "states" throughout this complaint. *See, e.g.*, 20 U.S.C. § 1411(a)(1) (including "States, outlying areas, [and] freely associated States" as eligible to receive funds).

than advanced degrees, and students who need financial assistance to pursue higher education, are all not left behind. Responsibility for these programs is vested—by Congress—in the Department, which is obligated by statute to carry out each of them.

## FACTUAL ALLEGATIONS

### Defendants Seek to Dismantle the Department of Education

45.     President Trump has long championed abolishing the Department of Education. For example, in a September 2023 campaign video, Trump vowed: "One thing I'll be doing very early in the administration is closing up the Department of Education in Washington, D.C."[5] As the campaign continued, he promised to "ultimately eliminate the federal Department of Education."[6] Following the election, Trump told Time magazine that he intended "[a] virtual closure of [the] Department of Education."[7]

46.     From the Oval Office on March 12, 2025, Trump committed: "We're going to move the Department of Education, we're going to move education into the states . . . so that the states can run education."[8]

47.     In nominating Secretary McMahon to lead the Department, President Trump directed her to "put [her]self out of a job."[9]

48.     Secretary McMahon has wholly embraced the President's goal of abolishing the Department. As part of her confirmation process, Secretary McMahon affirmed that she

---

[5] Graham Kates, *Can Trump Dismantle the Department of Education? It Won't Be Easy, Experts Say*, CBS News (Feb. 4, 2025), https://www.cbsnews.com/news/trump-dismantle-education-department/.
[6] Katie Lobosco, *Trump Wants to Shut Down the Department of Education. Here's What That Could Mean*, CNN (Dec. 12, 2024), https://www.cnn.com/2024/09/20/politics/department-of-education-shut-down-trump/index.html.
[7] *Time Staff, Read the Full Transcript of Donald Trump's 2024 Person of the Year Interview with TIME, Time* (Dec. 12, 2024), https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript/.
[8] Kayla Jimenez, *Trump defends decision to cut nearly half of Education Department staff*, USA Today (Mar. 12, 2025), https://www.usatoday.com/story/news/education/2025/03/12/trump-education-department-layoffs/82312467007/.
[9] Ryan King, *Trump says education secretary's goal will be to 'put herself out of a job' as he pushes to abolish DOE*, New York Post (Feb. 4, 2025), https://nypost.com/2025/02/04/us-news/president-trump-lays-out-goal-for-education-secretary-i-want-her-to-put-herself-out-of-a-job/.

"wholeheartedly support[s] and agree[s]" that "the bureaucracy in Washington should be abolished."[10]

49.     Defendants now seek to do just that.

50.     Shortly after the Senate confirmed her on March 3, 2025, Secretary McMahon issued a memorandum instructing the entire Department of Education that their "historic final mission" would be the "elimination" and "transfer of educational oversight" out of the Department.[11]

51.     Defendants' strategy to dismantle the Department of Education is a simple one: fire the people who do the work. Like all federal agencies, the Department of Education relies on its staff to serve the public and fulfill the mandates set by Congress.

52.     On March 11, 2025, "[a]s part of the Department of Education's final mission," McMahon began the process of terminating more than half of the Department's staff.[12]

53.     On information and belief, these terminations were implemented pursuant to the Department's Agency RIF and Reorganization Plan.[13]

54.     Ordering these terminations, McMahon asserted that these mass firings were intended to bolster "efficiency, accountability, and ensuring that resources are directed where they matter most."[14]

---

[10]  Kara Arundel, *McMahon confirmed as education secretary*, K-12 Dive (Mar. 3, 2025), https://www.k12dive.com/news/mcmahon-confirmed-as-education-secretary/741114/; Linda McMahon, *Post-Hearing Questions for the Record*, Elizabeth Warren (Feb. 14, 2025), warren.senate.gov/imo/media/doc/kim_warren_qfrs_for_mcmahon.pdf [https://perma.cc/5Z65-RNEE].
[11] Linda McMahon, *Secretary of the Dep't of Education, Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission, [https://perma.cc/T3LT-CELR].
[12] Press Release, Dep't of Education, U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force [https://perma.cc/3D77-T8KF].
[13] *See* Memorandum from Russell T. Vought, Dir. of OMB, on Guidance on Agency RIF and Reorganization Plans to the Heads of Exec. Dep'ts and Agencies (Feb. 26, 2025),https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf [https://perma.cc/T3VU-4KCR].
[14]Sareen Habeshian, *Education secretary says mass layoffs first step toward shutting down DoE*, Axios (Mar. 11, 2025), https://www.axios.com/2025/03/11/education-department-workforce-cuts.

55.     Likewise, President Trump claimed that "[w]hen we cut—we want to cut—but we want to cut the people that aren't working or not doing a good job. We're keeping the best people. And Linda McMahon is a real professional, very, actually very sophisticated business person. She cut a large number, but she kept the best people, and we'll see how it all works out." Trump also baselessly accused Department employees of "not showing up to work" and "not doing a good job."[15]

56.     But even if President Trump's purported rationale of poor performance were the basis of Defendants' actions, that could not justify the mass terminations imposed on March 11. Agencies may only lawfully conduct a reduction in force (RIF) for certain specified reasons, including "lack of work; shortage of funds; insufficient personnel ceiling; [or] reorganization"—not for performance reasons. 5 C.F.R. § 351.201(a)(2).

57.     In any event, these purported rationales—efficiency, poor performance—are pretext for Defendants' real and frequently-stated goal: to dismantle the Department of Education.

58.     Indeed, McMahon already admitted the real purpose of the cuts—to begin shutting down the Department. As McMahon explained, these terminations are intended to dismantle the Department, per the "president's mandate." She said: "His directive to me, clearly, is to shut down the Department of Education."[16]

59.     According to Secretary McMahon, this mass firing, along with other recent efforts to remove Department staff, constitutes half of the entire staff of the Department. Prior to January 20,

---

[15] Alex Gangitano, *Trump says McMahon made decisions on mass layoffs at Education Department*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5191191-trump-says-mcmahon-made-decisions-on-mass-layoffs-at-education-department/.

[16] Sareen Habeshian, *Education secretary says mass layoffs first step toward shutting down DoE*, Axios (Mar. 11, 2025), https://www.axios.com/2025/03/11/education-department-workforce-cuts.

2025, the Department employed 4,133 employees; after Defendants' recent actions, just 2,183 will remain.[17]

60.    These cuts followed the Department's February termination of 65 probationary employees, although at the time of filing (and after McMahon ordered the March 11 mass firings), the Department had been ordered to reinstate probationary employees.

61.    Defendants' decision to hobble the Department of Education by slashing the Department's staff in half is a final agency action subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 704.

62.    The mass removal of the hardworking individuals who do the work of the Department will effectively dismantle the agency. Absent adequate staffing, the Department will be unable to perform its statutorily mandated duties, including effectively distributing funds for students with disabilities and providing support and technical assistance to parents, families, and states to ensure those services are provided most effectively; protecting students' civil rights; and providing financial aid for students seeking higher education.

63.    On March 20, 2025, President Trump took the next step of unlawfully abolishing the Department by signing an Executive Order to dismantle the Department, entitled "Improving Education Outcomes by Empowering Parents, States, and Communities."[18] By its own terms, the Executive Order seeks to "clos[e]" the Department by directing the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education."

---

[17] Press Release, Dep't of Education, U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force [https://perma.cc/3D77-T8KF].
[18] Donald J. Trump, *Improving Education Outcomes by Empowering Parents, States, and Communities*, The White House (Mar. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities/[https://perma.cc/ETD3-GUF6].

64.     At the same time, the Executive Order claims it will close the Department only "to the maximum extent" "permitted by law" and—acknowledging the importance of the Department's work—instructs the Secretary of Education to take steps to ensure "effective and uninterrupted delivery of services, programs, and benefits on which Americans rely." But this empty language provides no clarity, because it is not lawful to close the Department of Education, nor is it possible to do so without leading to the interruption in the delivery of the services, programs, and benefits on which Americans rely and are entitled to by law.

65.     The Department of Education was already the smallest of the 15 cabinet-level executive Departments in terms of staff (compare just over 4,000 employees at the Department of Education with the approximately 80,000 employees at the Department of State, for example).

66.     These mass firings cut entire offices, not simply specific staff whose roles were being eliminated or reorganized. For example, upon information and belief:

a.    More than half of all enforcement staff for Office for Civil Rights were eliminated, including seven out of twelve regional offices;

b.    The entire staff of the Office of English Language Acquisition were terminated;

c.    Within the Office of Special Education and Rehabilitative Services, the entire staff that provides policy and legal guidance to states and other grantees about how to implement IDEA, as well as the entire communications staff that ensures that key information gets out to students, parents, schools, and states, were terminated.

d.    The entire staff of the offices that manage the operations of grants and fiscal risk for grants across the entire Department, and that manage the contract procurement office for the entire Department, were fired.

e.    The entire staff in the office of State and Grantee Relations in the Office of Elementary and Secondary Education were terminated.

f.    Virtually all staff of the Institute of Education Sciences have been eliminated.

g.    The entire staff of the Office of International and Foreign Language Education, which runs the well-known Fulbright-Hays program, were terminated.

h.    Within the office of Federal Student Aid, the entire team that supervises the Free Application for Federal Student Aid (FAFSA) and the entire team that supervises the contractors who collect student loan repayments (loan servicers) were terminated. In addition, the vast majority of the office that certifies and recertifies schools as eligible to participate in the Federal Student Aid Program—which all institutions of higher education must do on a regular basis for their students to continue to receive loans and grants—were fired, reducing the staff from approximately 400 to approximately 25.

i.    Within the Office of the General Counsel, every single division except for the division of post-secondary education was abolished. That is, all attorneys who review and advise on all regulations or informal guidance, all attorneys who advise on any aspect of elementary and secondary education (including Title I of the Elementary and Secondary Education Act), all attorneys who advise on civil rights (including civil rights for students with disabilities), all attorneys who advise on legislation or how legislation would apply to the Department, all attorneys who advise on government officials' ethics obligations (including the Hatch Act), and all attorneys who advise on general legal matters—such as contract matters (including contracts to manage FAFSA and loan servicers), privacy issues (including the Privacy Act and the Federal Educational Rights Privacy Act), the Freedom of Information Act, and employment and labor matters—were all fired *en masse*.

67.    These drastic cuts will interfere with the Department's ability to carry out its statutorily required functions. This will harm students, parents, teachers, schools, colleges and

universities, and states. The Department's staff are integral to ensuring that it functions—there is no Department without its staff.

68.    The harms to the Department—and to the students, teachers, schools, and communities the Department serves—will be compounded by the speed at which Defendants are operating.

69.    Defendants informed staff on March 11, 2025, that they would be relieved of all duties and placed onto administrative leave on March 21, 2025—a mere ten days after the announcement of the mass terminations, but months before the employees are actually terminated in June pursuant to the RIFs.

70.    The abrupt removal of so many staff from their duties cannot be squared with applicable regulatory requirements. Rather, when conducting a RIF, agencies are directed that they shall, when possible, "retain the employee[s] on active duty status" following the issuance of the notice of termination. 5 C.F.R. § 351.806.

71.    Nor can the March 21 deadline be squared with orderly decision-making and continued effective government operations.

72.    To the extent it would even be possible to effectively hand off statutorily required functions from the half of all staff who were laid off to the remaining skeleton crew, this short time frame would hamper any serious effort to do so.

73.    The Executive Order makes it clear that these March 11, 2025, mass firings were only the first step in an ongoing, unlawful effort to dismantle a Department created by Congress.

74.    President Trump's statements, made the day after the Executive Order was signed, further confirm that the mass firings and Executive Order are the beginning of a wide-ranging, unlawful effort to fully abolish the Department of Education.

19

75.     On March 21, 2025, President Trump gave an interview where he announced plans to move key functions from the Department of Education to other Departments.

76.     He stated that "the student loan portfolio" will be "coming out of the Department of Education immediately" and will be moved to the Small Business Administration.[19]

77.     He further stated that the Department of Health and Human Services, not the Department of Education, "will be handling special needs."[20]

**Defendants' Actions Will Prevent the Department From Providing Critical and Statutorily Required Support For Students, Parents, Teachers, and Schools**

78.     Congress has charged the Department of Education alone with the authority and responsibility to implement numerous programs that, collectively, distribute billions of dollars to every state in the country. The Department's elementary and secondary programs annually serve nearly 18,200 school districts and over 50 million students attending roughly 98,000 public schools and 32,000 private schools, while the Department's higher education programs provide services and support to more than 12 million postsecondary students.

79.     Schools, educators, and students all depend on federal programs. In Somerville, where federal funds comprise nearly 6% of their budget, federal funds help to pay for at least 28 staff. These funds also allow Somerville to keep class sizes lower, run summer schools to ensure that students do not lose learning gains over the summer, deliver services to children with disabilities, offer free preschool, pay for low-income students to take advanced placement classes, and much more. Without reliable federal funds, and without certainty that allows Somerville to budget and plan with those funds, Somerville will need to make hard programmatic choices that will harm their students and staff.

---

[19] The White House, *President Trump and Secretary of Defense Pete Hegseth Deliver Remarks*, YouTube (Mar 21, 2025), https://www.youtube.com/watch?v=MVyVfkL7PwM.
[20] *Id.*

80.     As a smaller school district, Easthampton receives less money than Somerville—about $886,000 for the 2024-25 school year. But that money plays a role no less critical at Easthampton. The federal funds administered by the Department of Education allow Easthampton to pay for personnel, to keep class sizes low, and to pay for student transportation, among many other things.

81.     Funding uncertainty has a direct and disruptive impact on school districts (including Somerville and Easthampton) and their budgets, particularly when it comes to staffing and program planning. Districts must make many critical decisions months in advance, and without clear assurances about funding, districts are left in a precarious position.

82.     For Somerville's summer programs, including food nutrition services and city-run parks and recreation programs, decisions must be finalized as early as March to ensure smooth operations. By early May, schools must also determine summer staffing and programming, often relying on funds approved from the prior fiscal year (FY24). Without clarity on whether these funds will be available in a timely fashion, the district risks being unable to provide essential summer services.

83.     By May 15, decisions for the full academic year must be made, including staffing commitments. If funding remains uncertain, Reduction in Force notices may have to be issued, impacting educators and staff who provide vital student services. For example, uncertainty is particularly concerning for free preschool programs, which are contingent on Title I funding. If those funds are delayed or unavailable, early childhood education access is put at risk.

84.     Ultimately, without timely and predictable funding, Somerville would be forced to make premature cuts to staff and programs, disrupting services for students and families. This instability makes long-term planning nearly impossible and weakens the district's ability to provide high-quality education and support.

85.     Likewise, uncertainty would harm Easthampton. Without budget certainty, Easthampton would need to cut back staffing levels and programming. This would mean cutting personnel, increasing class sizes, and cutting discretionary spending, particularly arts, music, extracurricular activities, athletics and other programs.

86.     A few of these federal programs are described below. A common thread runs through them all: they demonstrate Congress' repeated instructions that the Department implement the federal government's efforts to give all schoolchildren access to a high-quality public education, and an opportunity for higher education—and to provide schools, educators, parents, and students with tools for achieving these goals. Defendants' hollowing out of the Department's staff will undermine these statutory mandates and harm Plaintiffs.

Individuals with Disabilities Education Act

87.     The Individuals with Disabilities Education Act (IDEA) makes a "free appropriate public education" available to all students, including those with disabilities. 20 U.S.C. § 1401(9). Congress was clear on the IDEA's purpose: "[I]t is in the national interest that the Federal Government have a supporting role in assisting State and local efforts to educate children with disabilities in order to improve results for such children and to ensure equal protection of the law." *Id.* § 1400(c)(6).

88.     Responsibility for the IDEA is vested in the Department of Education and cannot by law be transferred to another agency, including the Department of Health and Human Services. *See, e.g.*, 20 U.S.C. § 1402 (establishing the "Office of Special Education Programs" within the Department of Education as the "principal agency" to administer the IDEA); *Id.* § 3417 (establishing the same).

89.     Prior to the IDEA's enactment in 1975, "children with mental disabilities were labeled 'ineducable' and were categorically excluded from public schools to 'protect [non-disabled] children from them.'"[21]

90.     When Congress passed the IDEA, it required that states assure all children the right to a "free [and] appropriate public education." 20 U.S.C. § 1412(1).

91.     Under the IDEA, a core obligation of the Department of Education is supporting students with disabilities and the schools, parents, and teachers who educate students with disabilities.

92.     Congress designated a specific office within the Department of Education to administer the IDEA: "There shall be, within the Office of Special Education and Rehabilitative Services in the Department of Education, an Office of Special Education Programs, which shall be the principal agency in the Department for administering and carrying out this chapter and other programs and activities concerning the education of children with disabilities." 20 U.S.C. § 1402(a).

93.     This echoes the DEOA, which explicitly requires that "[t]here shall be the Department an Office of Special Education and Rehabilitative Services, to be administered by the Assistant Secretary for Special Education and Rehabilitative Services[.]" *Id.* § 3417.

94.     The Office of Special Education and Rehabilitative Services ("OSERS") directs, coordinates, and recommends policy for programs that are designed to:

    a.     Meet the needs and develop the full potential of children with disabilities through the provision of special educational programs and services;

    b.     Reduce dependency and enhance the productive capabilities of persons with disabilities through the provision of independent living and vocational rehabilitation services;

---

[21] *Toledo v. Sanchez*, 454 F.3d 24, 37 (1st Cir. 2006).

  c. Increase knowledge about, foster innovation in, and improve the delivery of services for persons with disabilities through the performance of rehabilitative and special education research and demonstration activities; and

  d. Disseminate information about services, programs, and laws affecting persons with disabilities.

95. The Office of Special Education Programs ("OSEP"), within OSERS, is dedicated to improving results for infants, toddlers, children and youth with disabilities from birth through age 21 by providing leadership and financial support to assist states and local districts. The IDEA authorizes formula grants to states and discretionary grants to institutions of higher education and other non-profit organizations to support research, pilot programs, technology and personnel development, and centers to provide parents with training and information. OSEP distributes over $13 billion annually in IDEA formula grants to support early intervention (birth to age 2), preschool, K-12 education, and other services through age 21 (for students with disabilities who have not earned a regular diploma). OSEP also works with states to ensure that they understand how to comply with IDEA and provides technical assistance to states and localities so that they can meet their obligations and support students.

96. Through the IDEA, Congress has created a comprehensive approach to support children with disabilities. Part A of the IDEA lays out the overall program and explicitly requires the Secretary to issue necessary regulations to ensure compliance with the Act. *Id.* § 1406 ("The Secretary shall issue regulations . . . "). No other Department is authorized to issue regulations implementing the IDEA for our nation's public schools.

97. Part B of the IDEA establishes a grant program requiring the Department to provide funds to qualifying state and local educational agencies for the support of students with disabilities. *Id.* §§ 1411–19. Under the grant program for school-aged children, "[t]he Secretary shall make grants

24

to States" and other entities according to a particular formula. *Id.* § 1411(a) (emphasis added). Under the grant program for pre-school aged children, "the Secretary shall provide grants under this section to assist States" in accordance with a specified formula. *Id.* § 1419(a) (emphasis added).

98.    Part C of the IDEA authorizes a grant program to aid each state in implementing a system of early intervention services for infants and toddlers with disabilities and their families. Part C requires each state to implement a public awareness program and "child find" activities to identify infants and toddlers who may be eligible for early intervention services.

99.    Part D of the IDEA provides grants to states for the training and development of instructional staff able to support and teach students with disabilities. *See id.* §§ 1450–82. Such staff (including special education teachers, speech pathologists, occupational therapists, and others) are in short supply and require specialized training to meet the physical, mental, and emotional needs of students with disabilities and ensure that they are being afforded a free and appropriate public education in the least restrictive environment as required by the IDEA.

100.    IDEA funds are used by schools to support students with disabilities and ensure that they receive a free appropriate education in the least restrictive setting. For example, by using these funds to train and develop school staff's skills to support the instructional needs of students with disabilities, including certified teachers, paraprofessionals, teachers aids, speech therapists, physical therapists, occupational therapists, psychologists, and more; compensate special education staff to support students with disabilities being integrated into all classrooms; purchase modified supplies, services, and materials to address the needs of students with disabilities such as transportation vehicles for students in wheelchairs, specialized instructional supports, and assistive technology in the classroom such as accessible desks and physical environments.[22]

---

[22] *See, e.g.*, Office for Exceptional Children Resource Management Section, Idea Part B Use of Funds Guidance, Ohio Department of Education, https://tinyurl.com/bdz6tsrh [https://perma.cc/BT58-5TQJ] (last visited, Mar. 23, 2025.)

101.    In Fiscal Year 2024, IDEA funds supported at least 10% of the entire student population in every single state—and, in some states, as much as 20% of the entire student population.[23]

102.    Seven-and-half million disabled students ages 3-21 receive IDEA services nationwide. One in every five students educated in Massachusetts received services under the IDEA, through funds distributed by the Department, in the 2022-23 school year.[24]

103.    Importantly, Congress did not limit the Department's responsibilities to distributing funds. Rather, Congress required ongoing support to parents, students, and states in implementing the IDEA. Congress required that "[t]he Secretary shall . . . furnish technical assistance" to the states to implement the IDEA. 20 U.S.C. § 1417(a). The Department does this by providing substantial resources, support, and guidance to support schoolchildren, parents, families, educators, localities, and states to ensure a free and appropriate education for students with disabilities.

104.    This technical assistance is provided in many forms, including Technical Assistance Centers funded by IDEA to offer trainings to parents of children with disabilities regarding how to advocate for their children; professional development for teachers and caregivers of kids with disabilities that teach them how to adapt their teaching styles to a student's unique needs; and supporting school administrators' recruitment of early childhood education staff.[25] These programs prepare personnel with the skills and knowledge necessary to help students with disabilities succeed in school.

---

[23] Dep't of Educ., *Investments and Reach of the U.S. Department of Education* (Jan. 2025), https://media.the-learning-agency.com/wp-content/uploads/2025/02/10133556/ED-Fact-Sheet.pdf [https://perma.cc/RPS2-D9G4].
[24] *See* U.S. Dep't of Educ., *Report on the Condition of Education 2024*, at 16-17 https://nces.ed.gov/pubs2024/2024144.pdf [https://perma.cc/8CAT-Z5Q5] (last visited Mar. 23, 2025.
[25] *OSEP Early Childhood IDEA Centers and the network of Parent Centers*, Early Childhood Technical Assistance Ctr. (updated Jan. 31, 2025), https://ectacenter.org/about/osep-ec-centers.asp.

105.    The Department's employees are integral to ensuring that these funds are properly disbursed, troubleshoot issues when they arise, and are essential to ensuring that families, schools, teachers are able to benefit from these funds.

106.    In particular, OSEP staff—and the attorneys and other professionals they work with throughout the Department—are essential to ensuring that states and other grantees are able to receive, and effectively use, funds in a timely manner. To receive IDEA funds, states must submit annual applications that contain information required by statute. These applications are put together through an iterative process, involving collaboration between states and OSEP staff.

107.    Per statute, state grantees are also required to provide annual performance data, which are then revised in an iterative process with OSEP staff (in coordination with other staff throughout the Department).

108.    OSEP staff provide vital assistance to states and grantees with these applications and annual performance reports to allow these funds to be disbursed and ensure that state grantees effectively use IDEA funds to support students, parents, teachers, and schools.

109.    Throughout the year, OSEP staff (in coordination with attorneys and other professionals throughout the Department) also provide substantial technical assistance to states and other grantees to help them use these funds effectively. This support happens through site visits, phone calls, emails, public-facing guidance documents, webinars, and in other formats of technical assistance. Without these staff, states (and through them, schools, teachers, students, and parents) will not have the support, technical assistance, and legal advice that they need to provide necessary services to students, parents, teachers, and schools. That will harm the students and parents who rely on these services, the schools who receive funds from states to provide these services, and the entire community.

110.    IDEA also directly supports parents. Part D funds are used for Parent Information Centers, which provide parents with training and information to help parents most effectively work with professionals to meet the early intervention and special education needs of their children with disabilities. These Parent Information Centers have experienced a dramatic increase in demand for assistance and training from parents and families during and following the COVID-19 pandemic, which disproportionately impacted students with disabilities who receive services through their school.

111.    Upon information and belief, all employees in OSEP—the office that administers IDEA—who create policy and legal guidance on permissible and effective uses of funds, all communications staff who share this guidance with states, schools, and the public (including parents, students, and teachers), and all staff that ensure data quality throughout the IDEA process—have been fired. Only a skeleton staff remains in OSEP.

112.    Upon information and belief, every single attorney in the Office of the General Counsel (OGC) that advises on IDEA has been fired.

113.    Upon information and belief, every single attorney in OGC that advises on regulatory matters, including issuing regulations under IDEA and guidance about how states (and therefore schools) can spend their funds effectively, has been fired.

114.    Without these key staff in OSEP and OGC (and others throughout the Department), the Department will be unable to provide the technical assistance, guidance, and support that states (and through states, schools) and others need to be able to effectively and efficiently spend these funds.

115.    Nor is the Department able to issue regulations, or informal guidance, to implement and support the IDEA when every single attorney who advises on IDEA has been fired.

116.    Like the students they serve, AFT's and AFT Massachusetts' members rely on IDEA funding and the technical assistance and support provided by the Department of Education. Many of their members are special education teachers whose salaries are paid (in whole or in part) by IDEA funding. Others rely on IDEA-funded assistive technology to effectively teach their students, such as providing students with text-to-speech devices and word prediction devices, both of which facilitate communication between teacher and student, Braille displays, or talking calculators that support students with visual impairments. AFT and AFT Massachusetts members receive technical assistance—professional development as well as guidance on technology and instructional methods—provided by the Department of Education in order to most effectively teach and support their students with disabilities and provide the required free and appropriate public education. Loss of these supports will not only strip teachers of the tools they need to educate students with disabilities but will also put them in the impossible position of fulfilling IDEA's "free and adequate public education" requirement without the tools that IDEA is designed to provide.

117.    AFSCME Council 93's and SEIU's members similarly rely on IDEA funding. Across school districts in Massachusetts, Council 93 and SEIU represent paraprofessionals and other instructional aides who work with students with disabilities and specialize in special education and Applied Behavioral Analysis, and language support services. Each of the school districts that employ Council 93 and SEIU educators in special education settings receives IDEA funding. IDEA provides for these educators' salaries, professional development and continuing education, and critical classroom resources and technology.

118.    School districts, too, rely on IDEA funding and technical assistance to provide essential services for students with disabilities.

119.    For example, Somerville receives nearly $1.8 million dollars in federal IDEA funds, which support special education teachers, paraprofessionals, and other specialists. Somerville also

uses IDEA funds to provide special education students with summer school to prevent educational backsliding, smaller class sizes, and otherwise provide supports for students with disabilities. These funds also help fund professional development for staff; materials, supplies, and equipment for students receiving special education services; equitable services for private school and homeschool children who have disabilities; translation services; and systems that help Somerville manage students' individualized education plans. Even a small reduction in federal funds of $100,000 (the equivalent of approximately 1.25 full-time educators' salaries), or any delay in receiving those funds, could impair Somerville's ability to provide special education services to students.

120.    Easthampton receives more than $550,000 in IDEA funds. Easthampton uses its IDEA funds for many purposes, including paying staff, contracted services for providing direct services to students, providing summer programming, training staff on safety, and extended-year special education.

121.    If that funding were to be impaired, Somerville and Easthampton would not be able to provide the same level of services to their students with disabilities.

122.    School districts, including Somerville and Easthampton, also rely on technical assistance, guidance, training, and support from the Department of Education, much of which flows through states, to effectively implement IDEA. Easthampton relies heavily on OCR technical support in the form of translation assistance guidance to allow its educators to communicate effectively with those students' families.

123.    Likewise, students will be harmed by delays and halts in the flow of IDEA funds caused by the March 11 mass terminations, which will reduce and impair the vital special education services on which those students rely.

The Federal Student Aid Program

124.    Congress has charged the Secretary of Education with administering the federal student aid program, including issuing student loans and grants to support students' attainment of higher education. *See, e.g.,* 20 U.S.C. §§ 1018, 1087a(a), 1087b(a), 1087b(c). The Department's office of Federal Student Aid (FSA) is statutorily mandated to do so and has the unique expertise to manage the complex student aid program. The dramatic reduction in FSA's staff will impede its ability to carry out its statutorily mandated functions and will cause enormous harm to borrowers; students hoping to go to college; higher education institutions across the country; teachers and professors; and the entire economy.

125.    Nor can any other agency take over FSA's work. The federal student aid program (including student loans) is required by law to be implemented by the Secretary of Education. *See, e.g., id.* § 3441(2)(C) (transferring all functions under the Higher Education Act to the Secretary of Education); *id.* § 1018–1018b (establishing FSA as responsible for managing all student financial assistance programs); *id.* §§ 1087a(a), 1087b(a), 1087b(c); *see generally, id* § 1001 *et seq.* (the Higher Education Act). It cannot be transferred to the Small Business Administration absent authorization by Congress.

126.    Over 30% of all undergraduate students receive Pell grants, which are grants based on financial need, to attend college or university. About 45 million Americans have student loans, representing almost 17% of Americans aged 18 and over.[26] Across all 50 states, 70% of undergraduate students will have student loans by the time they graduate.[27] The Department is statutorily required to issue Pell grants and loans and to administer many of the programs for repayment of these loans.

---

[26] Cong. Rsch. Serv., R47196, Federal Student Loan Debt Cancellation: Policy Considerations (July 27, 2022), https://crsreports.congress.gov/product/pdf/R/R47196 [https://perma.cc/HL73-TQDC].

[27] *Parent Borrowing,* Urban Institute, https://collegeaffordability.urban.org/covering-expenses/borrowing/#/parent_borrowing (last visited Feb. 27, 2025).

127.    These loans and grants are part of the Federal Student Aid program of Title IV of the Higher Education Act, which requires the Department to carry out several essential functions to ensure that institutions of higher education are appropriately participating in the Federal Student Aid program. This requires FSA staff to ensure that institutions are meeting the statutory and regulatory requirements to participate in the program, including certifying eligibility, conducting a financial analysis, confirming independent audits, and other functions to protect students and prevent fraud, waste, and abuse of federal funds.

128.    Congress specifically created FSA to administer all federal student aid. FSA was established as a "Performance Based Organization," a discrete management unit within the Department, so that it could more effectively administer the student aid program. *See* 20 U.S.C. §§ 1018-1018b.

129.    FSA has multiple functions, each implemented by the Department's staff. The core functions include:

    a.    Originating federal student loans; managing repayment of federally-held student loans (including operating deferments and forbearance, income-based repayment programs, and loan forgiveness programs—and some of each of these programs are required by statute);

    b.    Managing the participation in the student aid program of institutions of higher education (that is, colleges, for example, must be a participant in the federal student aid program for its students to receive loans and grants; to participate, the college must meet certain legal requirements, such as being accredited);

    c.    Issuing student aid grants (such as Pell grants for low-income students, TEACH grants for students in programs training teachers in high-need fields);

      d.   Operating the Free Application for Federal Student Aid (FAFSA); and supporting students, parents, borrowers, and schools throughout the entire process.

130.     In fact, Congress has, over the years, further centralized student loan origination under the Department. Prior to 2010, the Department issued federal direct loans to students (and their parents), as well as subsidized and guaranteed at least partial repayment of private student loans that were issued by private lenders under the Federal Family Education Loan program (FFEL). In 2010, Congress determined that publicly subsidized and guaranteed but privately held student loans were costly, inefficient, and harmful to student borrowers, and ended the FFEL program, instead moving all new federal student loans to be directly originated and held by the Department of Education. *See id.* § 1087a.[28] The Congressional Budget Office estimated that this change would save $61 billion over 10 years.[29] In other words, Congress has repeatedly and explicitly assigned the responsibility to originate new federal student loans to the Department of Education.

131.     For students to receive federal student aid (whether loans or grants), the institution of higher education must be certified as a participant in the Federal Student Aid program. By statute, the certification process requires the Department to take certain steps, including ensuring the fiscal responsibility of the institution to guard against the potential loss of federal funds. Every institution of higher education—approximately 4,000 institutions, including nearly every public and private college and university in the country—is required to be certified at least every 5 years (sometimes more frequently based on specific events).

---

[28] *See also* Daniel T. Madzelan, Acting Asst. Sec'y of Postsecondary Educ., Dear Colleague Letter, *(GEN-10-05) (GEN-10-05) Subject: Enactment of the Student Aid Provisions of the Health Care and Education Reconciliation Act of 2010* (Apr. 2, 2010), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2010-04-02/gen-10-05-subject-enactment-student-aid-provisions-health-care-and-education-reconciliation-act-2010 [https://perma.cc/3UBN-Y4V2]; *see also* Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152.

[29] Letter from Douglas W. Elmendorf, Dir., Cong. Budget Off., to Nancy Pelosi, Speaker, U.S. House of Representatives (Mar. 20, 2010), https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/costestimate/amendreconprop.pdf [https://perma.cc/DUJ2-W6V9].

132.    FSA is also statutorily required to manage repayment of student loans. This is not simply collecting checks from borrowers, but rather, operating numerous repayment and forgiveness programs, some of which are required by statute. These include, for example, deferment and forbearance programs (when a borrower temporarily suspends payment due to short-term financial hardship, such as per 20 U.S.C. § 1078(c)(3)(A)), income-based repayment programs (such as is required by *id.* § 1098e(b)), and loan forgiveness programs (some of which are required by statute, such as Public Service Loan Forgiveness ("PSLF"), *id.* § 1087e(m)(1), or temporary and permanent disability discharge, *id.* § 1087(a)(1)).

133.    In operating these programs, FSA provides significant guidance and support to the public—especially current or former students and their families—on which repayment options are available and appropriate for them. For example, the FSA has more than a dozen public webinars providing specific financial aid advice, online videos explaining repayment options, an online loan simulator, booklets and brochures in English and Spanish, comprehensive entrance and exit counseling guides, and hosts an annual FSA Training Conference for Financial Aid Professionals, which provides detailed guidance to over 20,000 financial aid professionals across the country about the most recent developments in financial aid and repayment.

134.    FSA also issues grants to students pursuing higher education, including Pell Grants for low-income students, and Teacher Education Assistance for College and Higher Education (TEACH) grants for students enrolled in programs designed to train students to become K-12 teachers in high-need fields. 20 U.S.C. §§ 1070a, 1070b–b–4, 1070g-g–4. The effects of these programs are vast: more than 7.1 million students received Pell Grants in 2024-2025, with over 133.6 million recipients since the program began in 1980; and about 20,000 TEACH grants are distributed every year, with over 400,000 TEACH grants being disbursed since 2008.

135.    So that students are able to access this suite of federal student aid options, FSA is required by Congress to develop and maintain the Free Application for Federal Student Aid (FAFSA). *See id.* §§ 1087kk-1087vv.[30]

136.    The staff at FSA have been dramatically cut in a way that will impede FSA's ability to perform its statutorily required functions.

137.    For example, upon information and belief, all staff at seven out of nine offices that perform the required certifications (and recertifications) of all institutions of higher education have been terminated *en masse*, reducing the overall staff performing that function from over 400 to approximately 25.

138.    Upon information and belief, the only team qualified to perform the statutorily required financial analysis of institutions of higher education has been fired.

139.    Without these functions, FSA cannot timely and efficiently certify or recertify institutions of higher education for participation in the Federal Student Aid program as is required by statute. If the institution's certification lapses, its students will not be able to receive any grants or loans from the Department of Education and will not be able to enroll or complete degrees at their colleges and universities.

140.    As another example, upon information and belief, the entire office within FSA that oversees outside contractors has been laid off. These outside contractors operate FAFSA and the complex student loan repayment systems (known as loan servicers). Both of these are functions that FSA is required by law to perform (including through its vendors). FSA cannot perform its statutorily required function of operating the FAFSA and administering loan repayment programs if the contractors are not managed by the Department—which cannot happen with zero staff

---

[30] *See also Consolidated Appropriations Act*, Pub. L. No. 117-103, 139 Stat 49, div. R. (2022) (the FAFSA Simplification Act).

performing that function. Indeed, multiple reports from GAO in the last decade have stressed the importance of FSA closely supervising the FAFSA vendor and the student loan servicers.[31]

141.    School districts, including Somerville, rely on FSA services in helping to support their students to seek higher education—a core function and mission of their district and schools. Without FSA services, including the FAFSA and student loan and grant programs, college would be out of reach for the vast majority of their students. As part of their college counseling services, Somerville and Easthampton rely heavily on materials produced by FSA.

142.    AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members receive innumerable benefits from the many services that FSA provides. AFT, AFT Massachusetts, AFSCME Council 93, SEIU and their members, will be immediately harmed now that FSA will not be able to provide these services or is only able to provide them ineffectively.

143.    For example, thousands of AFT, AFT Massachusetts, and SEIU members have benefited from the student aid program through receiving federal student loans or grants. Thousands of their members currently have student loans. These members use repayment programs, such as income-based repayment programs, or deferments or forbearance, to manage repayment of their loans while serving as teachers and in other essential professions. Inefficiencies or ineffectiveness in the operation of those programs, including in receiving technical assistance from FSA (and the loan servicers, as FSA's agents), and delays in any aspect of loan administration, including processing repayments and applications for deferral or forbearance, will immediately harm

---

[31] *See*, e.g., Marisol Cruz, U.S. Gov't Accountability Off., GAO-24-107783, *Preliminary Results Show Strong Leadership Needed to Address Serious Student Aid System Weaknesses* (Sept. 24, 2024),  https://www.gao.gov/assets/gao-24-107783.pdf [https://perma.cc/6NBP-JR96]; U.S. Gov't Accountability Off., GAO-23-104832, *Department of Education Should Improve Enforcement Procedures Regarding Substantial Misrepresentation by Colleges*, (Dec. 2022), https://www.gao.gov/assets/gao-23-104832.pdf [https://perma.cc/8B8N-BJ2K].

these members. They rely on the guidance, webinars, and other technical assistance that FSA provides to understand which repayment options are best for them and their families.

144.    Many AFT, AFT Massachusetts, and SEIU members are enrolled in PSLF. Through the PSLF program, the student loans of borrowers who are employed by governments or nonprofits (such as teachers in K-12 public schools or at public or nonprofit universities) are forgiven after 10 years of payment.[32]

145.    For over a decade, AFT has assisted its members who are burdened by student debt to receive forgiveness through PSLF. For example, AFT hosts "student debt clinics" for its members to guide them through the PSLF application process. These debt clinics, which are led by AFT staff and are held in-person and virtually, are designed to educate members about income-driven repayment programs and loan forgiveness programs such as PSLF, address member questions, and educate members about how to manage their student loans. AFT has hosted hundreds of these clinics, reaching tens of thousands of its members since launching the clinics.

146.    SEIU has similarly assisted its members by educating them about student loan repayment options, providing guidance on the PSLF application process, and addressing member questions about federal student aid. SEIU's membership includes many essential professions that rely heavily on federal student aid, including educators, doctors, nurses, and social workers. SEIU has held student debt clinics in-person and online, including hosting national webinars at which Department of Education employees presented information directly to members.

147.    To create the content for these clinics, AFT and SEIU rely heavily on technical assistance provided by the Department of Education—such as guidance documents, loan repayment calculators on the Department's website, instructions, and more—that are designed to advise

---

[32] Federal Student Aid, *Public Service Loan Forgiveness (PSLF)*, https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service [https://perma.cc/X7AC-YAWA] (last visited Mar. 14, 2025).

borrowers regarding which student loan forgiveness program to enroll in. Therefore, not only would AFT, AFT Massachusetts, and SEIU members be harmed by any impairment in FSA's ability to administer loan repayment and forgiveness programs and support borrowers in navigating these repayment programs, but AFT and SEIU themselves would be harmed.

148.    Similarly, AFSCME Council 93, whose membership is comprised of individuals who work in the public service such as special education paraprofessionals, and would be eligible to participate in the program, employees rely on federal student loans and grants to fund their education and training. Many members have student loans and use FSA programs and resources to find the right repayment options for them.

149.    These AFSCME Council 93 members, including its special education paraprofessionals members, rely on the PSLF program to afford their student loan repayment.

150.    Moreover, should the contractors who process PSLF payments not be properly supervised—a near certainty given that the entire office that performs this function was laid off— then AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members will not be able to benefit from the statutorily-required PSLF program.

Civil Rights Enforcement

151.    America's schools must be a place where civil rights are protected.

152.    Since the moment the DEOA was enacted, Congress has required: "There shall be in the Department an Office for Civil Rights, to be administered by the Assistant Secretary for Civil Rights[.]" 20 U.S.C. § 3413. The Assistant Secretary must be appointed by the President and confirmed by the Senate, *id.* § 3412; must collect particular data, *id.* § 3413(b)(2); must make annual reports, *id.* § 3413(b)(1); and has independent hiring authority, *id.* § 3413(2)(c).

153.    Through the DEOA, Congress also transferred to the new Office for Civil Rights ("OCR") in the Department of Education various functions that had previously been assigned to the

Department of Health Education and Welfare or other agencies prior to 1979. *See id.* § 3413. No other agency, including the Department of Health and Human Services, is authorized to oversee OCR.

154.     OCR is charged by Congress with ensuring equal access to education and to promote educational excellence by enforcing specific civil rights statutes with respect to entities that receive federal funds from the Department of Education. These statutes include:

a.     Title VI of the Civil Rights Act of 1965, 42 U.S.C. § 2000d, prohibiting discrimination on the basis of race, color, and national origin in any program or activity that receives federal financial assistance;

b.     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, prohibiting discrimination based on sex in any education program or activity that receives federal financial assistance;

c.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibiting discrimination based on disability in any program or activity that receives federal financial assistance;

d.     Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.*, prohibiting discrimination based on disability in state and local government services;

e.     The Age Discrimination Act of 1975, 42 U.S.C. § 6101, *et seq.*, which prohibits age discrimination in any program or activity that receives federal financial assistance; and

f.     The Boy Scouts of America Equal Access Act, 29 U.S.C. § 7905, which prohibits public schools that provide opportunities for outside organizations to meet on school premises to deny the same access to the Boy Scouts of America or any other youth group listed in Title 36 as a patriotic organization.

155.    The protections that OCR enforces are essential. OCR enforces the rights of students with disabilities to learn in their least-restrictive environments. OCR conducts investigations to ensure that schools properly address sexual harassment and sexual assault and to ensure that schools do not discriminate based on race.

156.    In addition to their enforcement and investigative work, OCR provides training and technical assistance to state and local educational agencies on civil rights laws, including trainings relating to accessibility for individuals with disabilities.

157.    OCR's public complaints have increased by 200% in the last five years leading to a substantial backlog. For example, in 2023, OCR received 19,201 complaints.[33] Disability claims make up a substantial and rising portion of OCR's docket. According to a former official who led OCR in two previous administrations, the level of firings has left OCR "effectively a shell of itself." She explained that staff caseloads would increase from 50 to 120 per person: "There's no civil rights investigator anywhere who could effectively investigate and resolve that high a number of cases."[34]

158.    On March 12, the Department closed seven of the twelve regional OCR offices,[35] including terminating at least 243 OCR employees.[36]

159.    The mass office closures and terminations will hinder the Department's ability to efficiently and effectively conduct investigations and enforcement. Moreover, it will hinder the

---

[33] U.S. Dep't of Education Off. for C.R., *Fiscal Year 2023 Annual Report to the President and Secretary of Education*, https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2023.pdf [https://perma.cc/EMH4-BFM2] (last visited Mr. 23, 2025).

[34] Michelle Diament, *Ed Department Cuts May Leave Students With Disabilities 'Little To No Recourse'*, Disability Scoop, (Mar. 18, 2025), https://www.disabilityscoop.com/2025/03/18/ed-department-cuts-may-leave-students-with-disabilities-little-to-no-recourse/31362/.

[35] Collin Binkley, *Education Department layoffs gut its civil rights office, leaving discrimination cases in limbo*, AP News (Mar. 12, 2025),

https://apnews.com/article/trump-education-department-layoffs-civil-rights-8cbf463cce765f497c10d688ab4d51e1.

[36] Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

Department's ability to provide clear, effective guidance to schools regarding how to meet their obligations under civil rights laws.

160.    Even as the Department has recently launched the administration's own investigations of universities regarding compliance with Title VI,[37] the drastic reduction in staffing will interfere with the Department's ability to review complaints filed by students, parents, and teachers. Without effective, efficient, and timely OCR enforcement of the protections that Congress requires the Department to effectuate, students will not have their rights protected and teachers will not be able to teach effectively. Without timely and effective intervention by OCR, students, parents, teachers, and schools might be propelled into costly litigation.

161.    Educators and staff (including AFT, AFT Massachusetts, AFSCME Council 93, AAUP, and SEIU members) benefit directly and indirectly from OCR's enforcement of civil rights laws. For example, an educator who faces retaliation because they acted as a whistleblower by reporting their school's non-compliance with civil rights laws protecting students, can file a complaint with OCR and is protected by OCR's authority to investigate and reach an agreement with the school to cease the retaliation. A teacher with a disability who uses a wheelchair and complains that he and his students cannot get to the auditorium because of physical barriers is protected by OCR.

162.    Likewise, graduate students—including AAUP and SEIU members—are protected by OCR. For example, a graduate student experiencing sexual harassment at a university may file an OCR complaint.

---

[37] Press Release, Dep't of Education, U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment (Mar. 10, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment [https://perma.cc/TR92-EU4L]; Karina Tsui & Elizabeth Wolfe, *Department of Education investigating 60 colleges and universities over antisemtism claims*, CNN (Mar. 11, 2025), https://www.cnn.com/2025/03/10/us/department-of-education-warning-universities-title-vi-antisemitism/index.html.

163.    Teachers and other school professionals (including AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members) also benefit from OCR's enforcement of their students' civil rights. Their work in the classroom, and throughout the schools, would be far less effective if, for instance, Black students were constantly subjected to a systemically hostile school environment, or if English learners were deprived of adequate language support to participate in their classrooms, or if students with disabilities did not have suitable transportation to their school.

164.    Students, particularly students with disabilities, will be harmed by increased delays in OCR's ability to resolve disability civil rights claims. With the gutting of OCR's workforce, OCR will not be able to timely and efficiently review complaints. Students rely on OCR's complaint resolution process to protect their (and their children's) civil rights. Absent an effective OCR process, students are faced with an impossible choice. They can either bring an OCR complaint that is unlikely to result in timely enforcement or incur the massive expenses of private litigation to obtain the services to which they are entitled under federal law.

165.    In addition to enforcement under each of these statutes, OCR provides significant technical assistance to support recipients of Department funds in complying with the requirements of these statutes. *See, e.g.*, 34 C.F.R. §§ 100.6(a), 100.12(b) (requiring OCR to provide assistance, guidance, and detailed instructions to implement civil rights protections). For example, OCR provides guidance documents, FAQs, pre-recorded webinars and webcasts, resources for drafting policies that comply with civil rights statutes, and many other resources.[38]

166.    Without the technical assistance provided by the Department, which will be dramatically curtailed by the mass layoffs, schools—and correspondingly, educators and staff – including AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members—will be harmed.

---

[38] U.S. Dep't of Educ., *Civil Rights Tutorials and Technical Assistance*, https://www.ed.gov/about/ed-offices/ocr/civil-rights-tutorials-and-technical-assistance [https://perma.cc/RP5N-E5K9] (last reviewed Jan. 14, 2025).

167.    Likewise, school districts—including Somerville and Easthampton—rely on guidance from OCR on civil rights issues. School districts like Easthampton directly rely on resources provided by OCR to help their students and their families. As the civil rights landscape evolves, and new directives are issued, OCR plays a vital role in providing guidance on how to comply with the law and safeguard civil rights in schools.

<u>Title I of the Elementary and Secondary Education Act</u>

168.    One of the Department's most significant functions is to support K-12 schools around the country through Title I of the Elementary and Secondary Education Act of 1965 (ESEA).

169.    Congress has explained that Title I's purpose "is to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." 20 U.S.C. § 6301. Title I represents by far the largest federal funding component of the ESEA. Congress has repeatedly reauthorized the ESEA, including as recently as 2024.[39]

170.    Through Title I, the Department fulfills Congress' instruction to provide critical funding to state and local education agencies that serve over 26 million students from low-income backgrounds. Title I is a grant program that entitles local education agencies (typically, school districts or charter school organizations) to federal funds based on the number of children from low-income families in that community.

171.    The majority of America's schools are eligible for Title I funds: in the 2021-22 academic year, 63% of traditional public schools and 62% of public charter schools were eligible for Title I funds.[40] In 2024, more than 26 million students were served by Title I funds. Often, Title I

---

[39] *See* H.R. 8070, 118th Cong. (2024).
[40] Nat'l Ctr. for Educ. Stats., *Fast Facts*, https://nces.ed.gov/fastfacts/display.asp?id=158 [https://perma.cc/8YAG-DCDR] (last visited Feb. 26, 2025).

funds are used for purposes that benefit all students in that community, regardless of their families'

income level (often known as schoolwide Title I programs).

172.    Schools use the vast majority of Title I funds for "instruction and instructional

support." This includes, for example, after-school tutoring programs for children who need help

reaching their math and reading goals; additional teaching personnel to give students more one-on-

one and small-group instruction during the school day; hiring more qualified educators to reduce

class size; hiring additional professional staff to help teachers personalize the learning experience in

response to the unique needs of every student; and routine assessments to help understand whether

students are learning.

173.    Title I funds are also used to support families, through family and parent

engagements so that caregivers can fully partner with educators at their child's school to support

their child's education; preschool programming to prepare young children for kindergarten; and

extended-day programs before and after school and during summers and vacations to continuing

accelerating students' academic engagement and achievement.

174.    The Title I program could not be efficiently or effectively implemented without the

staff who work on these programs. The Department's employees are essential for ensuring that

states receive Title I funds. To receive funds, states work with Department staff through an iterative

process to submit a state plan (or amendments to a pre-existing state plan), as required by statute. If

the Department does not have sufficient staff (or staff with the right expertise and sufficient time) to

support each state throughout this process, Title I funds cannot be distributed in a timely and

efficient manner, as is required by law.

175.    Throughout the year, states (and through them, schools) work with Department staff

to receive technical assistance, advice, and support on how to effectively spend those funds.

Department staff use phone calls, emails, site visits, public-facing guidance documents, webinars,

and other media to support these efforts. This technical assistance is essential for states (and through them schools) to spend the funds in a manner that meets the state's educational goals.

176.    Upon information and belief, a substantial number of staff from the Office of Elementary and Secondary Education, which implements Title I, were fired as part of the March 11 terminations, including the entire office of State and Grantee Relations (which works with states). In addition, the entire division in the Office of the General Counsel that advises on all elementary and secondary education matters (including Title I) was fired. As a result, the Department cannot effectively and efficiently perform its statutorily required function of administering Title I, including supporting states applying for Title I funding, reviewing applications and advising on corrections, working with states to advise on the allowable uses of Title I funds, and more.

177.    Without adequate staff to administer Title I funds, there will be inevitable delays in releasing funds, an absence of necessary advice for states as to how to spend funds effectively, and barriers to obtaining timely waivers (which allow greater flexibility in how and when schools can spend the funds). At bottom, firing the staff responsible for administering the Title I program will undermine efficacy and efficiency of the program itself.

178.    This interference with the Department's ability to effectively administer the Title I program by removing the programmatic work done by the Department would diminish the impacts that AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members are able to make on the students they serve. It would also curtail access to training and development that AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members rely on in order to support the needs of their students.

179.    As funds, advice, and waivers are delayed or denied, states and schools will not be able to support teacher salaries and their students (including the nearly 50% of Massachusetts schoolchildren who attend schools supported by Title I) will be left in crowded classrooms with

larger class sizes, less instructional support, and reduced availability of interventions to support academic achievement. Educators, including AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members, will experience increased workloads and job losses. And without certainty about the availability and timing of federal funds, school districts like Somerville and Easthampton will be harmed, as they depend on the continuity and regularity of these funds for planning their budgets and paying their bills.

180.    Any impediment to timely and efficient distribution of Title I funds, and the substantial support and guidance that the Department provides on applying for those funds and how to effectively use those funds, will mean AFT, AFT Massachusetts, and AFSCME Council 93 will divert resources from existing purposes to instead provide the sorts of trainings and other supports that their members currently receive through Title I funding. And AFT, AFT Massachusetts, and AFSCMEC Council 93 members will shoulder more responsibilities for young people, if services are cut.

181.    Somerville receives $1.1 million dollars in Title I funding; Easthampton receives more than $250,000 in Title I funding. In Somerville, those funds support educators (ten reading teachers and three math interventionists are supported in part by these funds), pre-kindergarten educators, tutoring for at-risk students, and professional development designed to help staff maximize their effectiveness. Similarly, Easthampton uses its Title I funding for (among other things) paying for three full-time reading specialists, and all intervention services. Easthampton also is eligible to use Title I funds for its K-8 school-wide student body, so it relies on Title I funding to pay for schoolwide programming.

Slashing the Department in Half Will Undermine Numerous Other Programs

182.    The hollowing out of the Department will impair the Department's ability to carry out its numerous other statutorily required functions and in so doing, harm the students, schools, and teachers that benefit from those programs.

183.    For example, the Department is also charged by Congress with administering several programs to support rural education. This is primarily through Title V of the ESEA.

184.    Rural school districts often are located in areas that are more sparsely populated and (in the aggregate) less wealthy than urban and suburban school districts. As a result, those rural districts' local tax bases are usually unable to support their local schools at levels sufficient to provide their children the same high-quality education as districts with higher tax bases. For that reason, rural school districts are significantly more dependent on federal support.

185.    The Department supports rural education through numerous grant programs and technical assistance, such as the Rural Education Achievement Program, the Full-Service Community Schools Program, the Education Innovation and Research Program, the Promise Neighborhoods program, the Rural Postsecondary & Economic Development Grants Program, and the Regional Education Laboratory Program.

186.    Upon information and belief, a substantial number of staff from the Office of Elementary and Secondary Education, which implements these programs, were fired as part of the March 11 mass terminations. In addition, the entire division in the Office of the General Counsel that advises on all elementary and secondary education matters (which includes these programs) was fired, as was the entire division that issues regulations and guidance documents, such as guidance on the appropriate uses of these funds and the specific flexibilities that are available to rural schools under law. As a result, the Department cannot effectively and efficiently perform its statutorily required function of administering these programs.

187.    These actions will harm plaintiffs, including AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members who teach in rural districts.

188.    Likewise, the Department is also required by statute to support career and technical education. *See* 20 U.S.C. § 3416 (creating an office of Career, Technical, and Adult Education).

189.    Career and technical education ("CTE") is instruction for both youth and adult students that focuses on practical knowledge required for specific jobs or fields of work for which the economy has an immediate need. CTE programs teach skills like advanced manufacturing, health sciences, and information technology—all of which allow students to earn well-paying jobs without a college degree. It provides real-world training and educational experience to set students up for success in the workforce, especially focused on providing activities to prepare students for high-skill, high-wage, or in-demand industry sectors. CTE programs do this in numerous ways, including by providing work-based learning opportunities and providing opportunities to grain postsecondary education credit in a high school setting.

190.    For example, CTE students might learn computer programming skills for a career leading a company's information technology staff; medical coding or nursing procedures to work in hospitals; or graphic design and 3D printing to help a manufacturer test a new prototype.

191.    The Department administers CTE primarily through the statutorily required Perkins V grant program, which supports over 11 million students across all 50 states.[41]

192.    The severe cuts to the staffing across the Department, including to the Office of Career, Technical, and Adult Education—which administers this program—will interfere with the Department's ability to carry out its statutorily required duties for CTE. Upon information and belief, as with other programs, the Department will not be able to do the fundamental staff work of

---

[41] *See* Carl D. Perkins Career and Technical Education Act of 2006, Pub. L. No. 109-270, 120 Stat. 683 (2006), as amended by the Strengthening Career Education for the 21st Century Act, Pub. L. No. 115-224, 132 Stat. 1563 (2018) (collectively, known as "Perkins V").

administering the program, such as processing applications, providing technical assistance, and other functions that are necessary to ensure that the full amount of funds get distributed efficiently and effectively.

193.    This will harm CTE students, teachers, and support staff, including many AFT, AFT Massachusetts, AFSCME Council 93, and SEIU members. Classroom sizes would rise; schools would not be able to afford to replace or update existing equipment, depriving CTE students of the chance to learn on the same equipment that they would use in the professional world; and Congress' intention to "increase[] the employment opportunities for populations who are chronically unemployed or underemployed" would be thwarted. 20 U.S.C. § 2301(8).

194.    Likewise, school districts, including Somerville and Easthampton, who operate robust CTE programs funded and assisted by the federal government, will be harmed. Somerville's federal funding supports more than 17 programs designed to train and support students in careers like nursing and dental assistant fields, advanced manufacturing, and cosmetology. About 60% of Somerville high school students participate in the program. Likewise, Easthampton receives funding that supports technical training tracks for their students, including an early education & care track, engineering technology track, programming & web development track, and a graphic communications track.  Roughly one-quarter of Easthampton's high school students are on an in-district vocational training track or attending career technical programs in cooperating neighboring districts.

195.    In addition, the statutorily mandated Office of English Language Acquisition, Language Enhancement administers grants and invests in research to prepare teachers to support English learners, and disseminates information about best educational research, practice, and policies for English learners. *See* 20 U.S.C. § 3420.

196.    These programs benefit school districts like Somerville which—like most school districts in the country—serve English learners. Somerville serves more than 1,200 students (nearly a quarter of Somerville's total enrollment) who are English learners and depends on federal funds to provide adequate support, including summer programs to ensure that these students have continuity for their language learning.

197.    Likewise, Easthampton's enrollment includes a small but growing segment of schoolchildren with parents for whom English is not their first language.

198.    These programs also benefit teachers like AFT and AFT Massachusetts members who work with English learners.

199.    Yet, upon information and belief, Secretary McMahon functionally abolished this Office by laying off every single employee of that office.[42]

200.    Likewise, Defendants' cuts to the statutorily mandated Institute of Education Sciences (IES), the non-partisan, statistics, research, and evaluations arm of the Department of Education, will also harm Plaintiffs. The IES was established by the Education Science Reform Act of 2002, and helps evaluate federal education program efficacy, collect education statistics, and fund education sciences. *See* 20 U.S.C. §§ 3419, 9511(a) (establishing the Institute of Education Sciences); *id.* § 9531(a) (establishing a National Center for Educational Research); *id.* § 9541(a) (establishing the National Center for Education Statistics); *id.* § 9561(a) (establishing the National Center for Education Evaluation and Regional Assistance); *id.* § 9567(a) (establishing the National Center for Special Education Research).

201.    Among other statutorily mandated functions, the research centers of the IES compile "full and complete statistics" on the "condition and progress of education," including

---

[42] This office falls within the Secretary's limited authority to reorganize or discontinue offices, provided that she gives Congress 90-days notice. 20 U.S.C. § 3473(b)(1)(A). But it has been only 63 days since President Trump's inauguration and, on information and belief, no such notice has been provided.

through tracking student achievement data across the nation. IES conducts research and compiles guidance for educators and schools on evidence-based, effective practices to support teaching and learning. They publish practice guides and resources to support teachers and schools on issues like meeting academic standards, addressing bullying, and supporting students with significant behavioral issues, all designed to identify best practices and make those practices accessible to students, educators, and schools.

202.    The work of IES allows school districts like Somerville and Easthampton to identify effective curricula and practices to implement in their schools. For example, when Somerville adopted a new literacy program, Somerville used IES resources to help them choose a reliable and effective program.

203.    IES allows teachers, including AFT and AFT Massachusetts's members, to be more effective in their classrooms and more efficient in identifying practices that will actually improve student learning.

204.    IES promotes and disseminates evidence-based practices that help improve outcomes for students with disabilities and tracks data to reflect progress made on a host of metrics.

205.    IES also produces statistics relied on by University faculty and AAUP members in their research and for teaching in education programs.

206.    Faculty and faculty organizations, including AAUP members and chapters, also rely on data produced by National Center for Education Statistics (NCES) on things such as faculty salary, number of faculty at different institutions, and student tuition when negotiating faculty salary and determining which institution to seek employment.

207.    On information and belief, Defendants have fired virtually all of the IES's staff.

208.    These programs, and many others like them, benefit students, schools, and educators alike. Defendants' efforts to close the Department, including through mass terminations, will come at their expense.

## CAUSES OF ACTION

### COUNT ONE
### Violation of Separation of Powers
### (against all Defendants)

209.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

210.    Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires.

211.    The President has only the powers conferred upon him by the Constitution and federal statutes.

212.    Congress has the exclusive authority under Article I of the Constitution to pass laws creating government agencies, to assign their duties, and to appropriate funds for the effectuation of those duties.

213.    Congress has the exclusive authority under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds to the states for purposes defined by Congress.

214.    Defendants' actions to close the Department of Education, including the March 11 mass termination, the Executive Order, the plan to move portions of the Department to other agencies, and any other related steps to implement that Order, exceed presidential and executive authority and usurp legislative authority conferred by the Constitution, in violation of the separation of powers.

52

**COUNT TWO**
**Violation of Take Care Clause**
**(against Defendant Trump)**

215.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

216.    Article II of the Constitution confers upon the President the duty to "take care that the Laws be faithfully executed." U.S. Const., art. II § 3.

217.    The Take Care Clause is judicially enforceable against presidential action that violates or undermines statutes duly enacted by Congress.

218.    Defendants' actions to dismantle the Department of Education, including the March 11 mass termination, the Executive Order, the plans to move portions of the Department of Education to other Departments, and any subsequent steps to implement that Order, violate the Take Care Clause because they are directly contrary to the duly enacted statutes establishing the Department; establishing offices and programs within the Department; and establishing the Department's duties.

219.    President Trump's actions to dismantle the Department of Education violate the Take Care Clause because they are directly contrary to the duly enacted statutes appropriating funds to the Department and directing the Department to distribute and use such funds to aid states, schools, and others in educating the children of the United States.

**COUNT THREE**
**Ultra Vires Action**
**(against all Defendants)**

220.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

221.     Neither the President nor an agency may take any action that exceeds the scope of their constitutional and/or statutory authority.

222.     Only Congress has the authority to abolish federal executive agencies or to enact, amend, or repeal statutes.

223.     The statutes authorizing the Department of Education permit or require Defendants to take numerous actions. For example, pursuant to those statutes, Defendants are obligated to administer Title I of the ESEA; a series of programs to support rural schools under ESEA Title V; administer the IDEA, including providing assistance to states to adhere to the requirements of the IDEA and providing assistance to parents in advocating for their children to receive a free and appropriate education; enforcing civil rights; supporting career and technical education; and providing federal student aid to students pursuing higher education.

224.     But these statutes do not authorize Defendants to dismantle the Department that Congress has created.

225.     Nor do the operative statutes and regulations governing reductions-in-force permit Defendants to gut the Department for this unlawful purpose. *See* 5 C.F.R. § 351.203.

226.     Defendants lack authority to dismantle the Department, in whole or in part, including by issuing the Executive Order, effectuating mass terminations of the Department's staff, or transferring portions of the Department to other federal agencies.

227.     Defendant' actions to dismantle the Department, including the March 11 mass termination, the Executive Order, plans to transfer portions of the Department to other federal agencies, and subsequent steps to implement that Order, are outside of Defendants' authority to act.

**COUNT FOUR**
**Administrative Procedure Act – 5.U.S.C. § 706(2)(B)**
**Actions Contrary to Constitutional Right**
**(against Defendants McMahon and the Department of Education)**

228.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

229.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B).

230.     Congress has the exclusive authority under Article I of the Constitution to pass laws creating government agencies, to assign their duties, and to appropriate funds for the effectuation of those duties.

231.     Congress has the exclusive authority under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds to the states for purposes defined by Congress.

232.     Defendants' actions to dissolve the Department of Education, including by effectuating mass terminations of the Department's staff and planning to transfer portions of the Department to other federal agencies, usurp legislative authority conferred by the Constitution to Congress, in violation of the separation of powers.

**COUNT FIVE**
**Administrative Procedure Act – 5 U.S.C. § 706(2)(C)**
**Excess of Statutory Authority**
**(against Defendants McMahon and the Department of Education)**

233.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

234.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

235.    Only Congress has the authority to abolish federal executive agencies or to enact, amend, or repeal statutes.

236.    The statutes authorizing the Department of Education permit or require Defendants to take numerous actions. For example, pursuant to those statutes, Defendants are obligated to administer Title I of the ESEA; a series of programs to support rural schools under ESEA Title V; administer the IDEA, including providing assistance to states to adhere to the requirements of the IDEA and providing assistance to parents in advocating for their children to receive a free and appropriate education; enforcing civil rights; supporting career and technical education; and providing federal student aid to students pursuing higher education.

237.    But these statutes do not authorize Defendants to dismantle the Department that Congress has created.

238.    Nor do the operative statutes and regulations governing reductions-in-force permit Defendants to gut the Department for this unlawful purpose. *See* 5 C.F.R. § 351.203.

239.    Defendants lack authority to dismantle the Department, in whole or in part, including by effectuating mass terminations of the Department's staff or otherwise implementing the Executive Order's directive.

**COUNT SIX**
**Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**
**Actions Not in Accordance with Law**
**(against Defendants McMahon and the Department of Education)**

240.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

241.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

242.    Defendants' actions are contrary to law in numerous respects.

243.    First, the Department of Education is created by statute and cannot be abolished, dismantled, or closed by the President or Secretary. That is equally true whether this closure is accomplished by an Executive Order, by mass firings of the Department's employees (without staff, there is no Department; just a building), by transferring Department functions to other agencies, or by any other means. Thus, Defendants' dismantlement of the Department of Education is contrary to the DEOA, which created the Department of Education in order to "coordinate," "strengthen," and "supplement and complement" efforts to improve the quality of education. 20 U.S.C. § 3402.

244.    Second, they are contrary to the IDEA. The IDEA requires Defendants to, inter alia, "ensure" that children with disabilities have access to educational opportunities, "ensure" that the rights of those children and their parents are protected, "assist" states, localities and other entities in providing effective and coordinated services to those children, "support[]" coordinated research, technical assistance, technology development, and other supports, and "assess, and ensure the effectiveness of, efforts to educate children with disabilities."  20 U.S.C. § 1400(d)(1).

245.    By mass firing the essential staff required for effectively administering the IDEA, and thereby decimating the Department's ability to perform these functions, Defendants' actions are contrary to the IDEA.

246.    Third, these actions are contrary to the many other specific laws requiring offices to perform different functions.

247.    For example, pursuant to the DEOA, Defendants must operate OCR. OCR is charged with, among other tasks, "compliance and enforcement activities," "identifying significant civil rights or compliance problems," 20 U.S.C. § 3413(b), and employing staff "necessary to carry

out the functions" of OCR. *Id.* § 3413(c). Defendants are required to accept complaints from students experiencing discrimination and must "make a prompt investigation" of such complaints. 34 C.F.R. § 100.7.

248.    By shuttering more than half of OCR's offices, and upon information and belief, slashing more than half of the staff charged with investigating and enforcing civil rights laws, Defendants' actions will hobble their ability to investigate, protect, and enforce students' civil rights protections. As such, Defendants' actions are contrary to the DEOA and to OCR's regulations.

249.    Fourth, Defendants' destruction of the Department of Education is also contrary to statutes vesting in the Department overarching responsibility for implementing federal student aid. By law, FSA is required to undertake a variety of functions. As described above, some of the offices required for FSA to perform its statutorily required functions—including managing student loan repayment (by overseeing the contractors who collect repayments), administering the FAFSA (which also requires overseeing contractors), and certifying institutions of higher education to participate in the student loan program—have been gutted by mass firings affecting the vast majority of the relevant staff.

250.    In sum, Defendants' actions to incapacitate the Department of Education are in contravention of numerous Congressional directives requiring federal support for education.

**COUNT SEVEN**
**Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(against Defendants McMahon and the Department of Education)**

251.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

252.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

253.     Defendants' effective dismantlement of the Department of Education is arbitrary and capricious in numerous respects.

254.     For example, the Department failed to consider the effects of mass terminations on effective provision of government services and the continued operations of Departmental programs and failed to articulate a reasoned explanation for entirely shuttering numerous divisions. Nor did the Department consider the impact of an injunction ordering reinstatement of probationary employees on the March 11 terminations, including how reinstatement may effect RIF processes that relate to seniority and other issues.

255.     Defendants' decision to put staff on administrative leave as of March 21, 2025 – just ten days after issuing the mass termination notices—is likewise arbitrary and capricious. Defendants have proffered no reason why they disregarded regulations requiring agencies to maintain staff in "active duty status" during the RIF notice period, 5 C.F.R. § 351.806, nor any explanation as to how orderly shutdown and transfer of activities and duties are possible with just ten days of notice.

256.     Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of the Department.

257.     To the extent Defendants seek to transfer Department functions to other agencies, Defendants have failed to consider the impact on institutional knowledge, technical expertise, continuity of services, and other potential harms attendant to such transfers.

258.     Nor did Defendants consider more limited alternatives designed to improve government efficiency and operations, or offer a reasoned explanation for their actions.

259.     Defendants' decision is inconsistent with the evidence before the agency. For example, students subject to discrimination who seek to file complaints with OCR already face a

backlog of more than 12,000 pending investigations. But Defendants nonetheless decimated OCR's staff—exacerbating problems rather than fixing them.

260.    Defendants' actions are arbitrary and capricious because they impede—rather than enhance—their ability to perform the Department's functions.

261.    And finally, Defendants' stated rationale—to cut so-called "bureaucratic bloat" and allocate resources efficiently—is inconsistent with facts and mere pretext for their openly acknowledged true goal: the elimination of the Department.

<u>PRAYER FOR RELIEF</u>

Wherefore, the Plaintiffs pray that the Court will grant the following relief:

a)    Issue a declaratory judgment that President Trump's Executive Order directing the dismantlement of the Department of Education is unlawful because it violates the Constitution;

b)    Issue a declaratory judgment that the March 11, 2025 reduction in force and other implementations of President Trump's directive to close the Department by McMahon and the Department of Education (the "Agency Defendants") are unlawful because they violate the Constitution and the Administrative Procedure Act;

c)    Declare unlawful and set aside the Agency Defendants' March 11, 2025 reduction in force as contrary to the Constitution under 5 U.S.C. § 706(2)(B), not in accordance with law under 5 U.S.C. § 706(2)(A), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C), and arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A);

d)    Declare unlawful and set aside the Agency Defendants' implementation of the Executive Order's directive to close the Department as contrary to the Constitution

under 5 U.S.C. § 706(2)(B), not in accordance with law under 5 U.S.C. § 706(2)(A), in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right

under 5 U.S.C. § 706(2)(C), and arbitrary, capricious, or an abuse of discretion under

5 U.S.C. § 706(2)(A);

e)  Issue preliminary and permanent relief against the Agency Defendants, including a

stay under 5 U.S.C. § 705, barring Defendants, their officers, employees, and agents

from continuing to carry out the March 11, 2025 reduction in force;

f)  Issue preliminary and permanent relief against the Agency Defendants, including a

stay under 5 U.S.C. § 705, barring Agency Defendants, their officers, employees, and

agents from further implementing the Executive Order's directive to dismantle the

Department of Education;

g)  Award the Plaintiffs reasonable costs and attorney's fees; and

h)  Any other further relief that the Court deems fit and proper.


RESPECTFULLY SUBMITTED this 24th day of March 2025.

By: /s/ Mark B. Samburg

Mark B. Samburg (MA State Bar No. 680099)
Will Bardwell* (DC Bar No. 90006120)
Elena Goldstein* (NY State Bar No. 4210456)
Rachel F. Homer +* (MA State Bar No. 693642)
Victoria Nugent* (DC Bar No. 470800)
Adnan Perwez* (DC Bar No. 90027532)
Kali Schellenberg +* (MA State Bar No. 694875)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Facsimile: 202-796-4426
msamburg@democracyforward.org
wbardwell@democracyforward.org
egoldstein@democracyforward.org
rhomer@democracyforward.org

vnugent@democracyforward.org
aperwez@democracyforward.org
kschellenberg@democracyforward.org
Counsel for Plaintiffs

+ Application for full admission pending
*pro hac vice pending