## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOMERVILLE PUBLIC SCHOOLS, EASTHAMPTON PUBLIC SCHOOLS, AMERICAN FEDERATION OF TEACHERS, AMERICAN FEDERATION OF TEACHERS MASSACHUSETTS, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, and SERVICE EMPLOYEES INTERNATIONAL UNION, | Case No. 1:25-cv-10677 |
|     Plaintiffs, | |
|   v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, LINDA MCMAHON, in her official capacity as Secretary of Education, and U.S. DEPARTMENT OF EDUCATION, | |
|     Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS ................................................................................................ viii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 3

I.    Congress Created the Department and the Core Offices and Programs within the
      Department to Support State and Local Education ............................................................ 3

II.   Defendants Are Destroying the Department ..................................................................... 5

      A.    The President Directed His Administration to Dismantle the Department ............. 6

      B.    Secretary McMahon Has Carried Out President Trump's Directive
            Through the Mass Termination Order ................................................................... 7

      C.    Defendants' Actions Will Degrade the Department's Functioning,
            Engendering Substantial Financial Uncertainty, Delaying Distribution of
            Funds, and Undermining the Provision of Technical Assistance and
            Guidance ............................................................................................................... 8

III.  Defendants Have Gutted the Offices on Which Plaintiffs Depend for Funding,
      Guidance, and Expertise ................................................................................................. 12

ARGUMENT ............................................................................................................................. 16

I.    Plaintiffs Are Likely to Succeed on the Merits .............................................................. 16

      A.    The Mass Termination Is Arbitrary and Capricious. ........................................... 17

      B.    The Mass Termination Order Exceeds the Secretary's Authority. ...................... 20

      C.    The Mass Termination Order Is Contrary to Law. .............................................. 21

      D.    The Mass Termination is Contrary to Constitutional Separation of Powers
            Principles ............................................................................................................ 23

II.   Plaintiffs Face Irreparable Harm Absent Injunctive Relief ........................................... 24

      A.    Defendants' Mass Termination Order Will Engender Financial
            Uncertainty and Delay, Undermining Plaintiff School Districts' Missions
            and Irreparably Harming Student Learning .......................................................... 25

      B.    Federal Funding Delays and Uncertainty Will Irreparably Harm Educators
            and Education Workers, Including Union Plaintiffs' Members ............................ 28

i

C.    Defendants' Mass Termination Order Causes Irreparable Harm by
Impeding Access to Vital Resources and Expertise on Which Students,
Districts, Educators, and Education Workers Rely...............................................29

D.    The Mass Termination Order's Decimation of Federal Financial Aid
Programs Will Harm Plaintiffs ...........................................................................30

E.    Defendants' Decimation of the Office for Civil Rights Will Irreparably
Harm Students, Districts, and Educators. ............................................................31

III.    The Balance of Equities and the Public Interest Favor a Preliminary Injunction............33

CONCLUSION.................................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
No. CV 25-00400 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025) ...................................26

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.).......................................................................23

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*,
No. C 25-01780 WHA, 2025 WL 660053 (N.D. Cal. Feb. 28, 2025)....................................17

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ........................................................................................18, 19

*Asseo v. Pan Am. Grain Co., Inc.*,
805 F.2d 23 (1st Cir. 1986)......................................................................................................3

*Blackman v. Dist. of Columbia*,
185 F.R.D. 4 (D.D.C. 1999).....................................................................................................26

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)..........................................................................................................17, 18

*California v. U.S. Dep't of Educ.*,
No. 25-1244, 2025 WL 878431 (1st Cir. Mar. 21, 2025)........................................................28

*California v. U.S. Dep't of Educ.*,
No. CV 25-10548, 2025 WL 760825 (D. Mass. Mar. 10, 2025)............................................33

*Clinton v. City of New York*,
524 U.S. 417 (1998)................................................................................................................24

*Colon-Vazquez v. Dep't of Educ. of Puerto Rico*,
46 F. Supp. 3d 132 (D.P.R. 2014)..........................................................................................33

*Coquico, Inc. v. Rodriguez-Miranda*,
562 F.3d 62 (1st Cir. 2009)....................................................................................................16

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)..........................................................................................................17, 19

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)....................................................................................................................17

*E.E.O.C. v. Astra USA, Inc.,*
   94 F.3d 738 (1st Cir. 1996) ........................................................................16, 24, 33

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ..............................................................................................18

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ..............................................................................................20

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ..............................................................................................17

*G.G. ex rel Grimm v. Gloucester Cnty. Sch. Bd.,*
   822 F.3d 709 (4th Cir. 2016) ..................................................................................3

*INS v. Chadha,*
   462 U.S. 919 (1983) ..............................................................................................24

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) .............................................................................26, 33

*Loving v. United States,*
   517 U.S. 748 (1996) ..............................................................................................23

*Maryland v. USDA,*
   __ F. Supp. 3d __, 2025 WL 800216 (D. Md. Mar. 13, 2025) ..............................17

*Michigan v. EPA,*
   576 U.S. 743 (2015) ..............................................................................................18

*Mistretta v. United States,*
   488 U.S. 361 (1989) ..............................................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ..........................................................................................18, 19

*N.D. v. Reykdal,*
   102 F.4th 982 (9th Cir. 2024) ...............................................................................30

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
   595 U.S. 109 (2022) ..............................................................................................20

*Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.,*
   337 U.S. 582 (1949) ..............................................................................................23

*Comfort ex rel. Neumyer v. Lynn Sch. Comm.,*
   100 F. Supp. 2d 57 (D. Mass. 2000) .....................................................................33

iv

*New York v. McMahon,*
    No. 1:25-cv-10601 (D. Mass.) ...................................................................3, 8, 10

*Nken v. Holder,*
    556 U.S. 418 (2009)...................................................................................16, 33

*NTEU v. Vought,*
    No. CV 25-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025)......................26, 29, 30

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
    217 F.3d 8 (1st Cir. 2000)..................................................................................24

*San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ............................................................................23

*Tirrell v. Edelblut,*
    No. 24-cv-251 (D.N.H. Mar. 13, 2025) ...............................................................10

*United Steelworkers of Am., AFL-CIO v. Textron, Inc.,*
    836 F.2d 6 (1st Cir. 1987).................................................................................28

*Univ. of Texas v. Camenisch,*
    451 U.S. 390 (1981)..........................................................................................3

*Vaqueria Tres Monjitas, Inc. v. Irizarry,*
    587 F.3d 464 (1st Cir. 2009)........................................................................16, 24

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001).........................................................................................16

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008).............................................................................................24

**Statutes**

5 U.S.C. § 704....................................................................................................17

5 U.S.C. § 706...............................................................................................17, 20

5 U.S.C. § 706(2)(A)......................................................................................17, 21

5 U.S.C. § 706(2)(B)...........................................................................................23

20 U.S.C. § 1018..................................................................................................5

20 U.S.C. §§ 1018-1018b....................................................................................5, 7

20 U.S.C. §§ 1018, 1087a(a), 1087b(a), 1087b(c)....................................................5

20 U.S.C. §§ 1018, 1087a(a), 1087b(a), 1087b(c), 3441(2)(C)......................................22

20 U.S.C. § 1087e(m) ..................................................................................................15

20 U.S.C. § 1400(d)(1) ................................................................................................21

20 U.S.C. §§ 1400 *et seq.*............................................................................................1

20 U.S.C. § 1402 ............................................................................................7, 20, 2

20 U.S.C. § 1681, *et seq.*, Section 504 of the Rehabilitation Act of 1973......................4

20 U.S.C. §§ 2301–2414 .............................................................................................5

20 U.S.C. § 3401(10) ....................................................................................................1

20 U.S.C. §§ 3401-3510, Pub. L. 96-88, 93 Stat. 668 (1979).........................................4

20 U.S.C. § 3413 .................................................................................. *passim*

20 U.S.C. § 3414 ........................................................................................................21

20 U.S.C. § 3416 ................................................................................................4, 20, 5

20 U.S.C. § 3417 ............................................................................................7, 20, 2

20 U.S.C. §§ 3417, 1402, 1406 .....................................................................................4

20 U.S.C. §§ 3419, 9511(a), 9531(a), 9541(a), 9561(a), 9567(a)...................................5

20 U.S.C. § 3420 ........................................................................................................4

20 U.S.C. § 3421 ........................................................................................................2

20 U.S.C. § 3423d.......................................................................................................23

20 U.S.C. § 3473(a) ...............................................................................................7, 21

20 U.S.C. § 3473(a)(1)-(3).........................................................................................21

20 U.S.C. §§ 6801-7014 ..............................................................................................3

42 U.S.C. §§ 12131 *et seq.*.........................................................................................4

**Other Authorities**

5 C.F.R. § 351.806 .....................................................................................................18

34 C.F.R. §§ 100.6(a), 100.12(b) ................................................................................5

34 C.F.R. § 100.7 ...................................................................................................22

U.S. Const. art. I, § 1 ...........................................................................................23

U.S. Constitution Article I .....................................................................................23

**TABLE OF ABBREVIATIONS**

Administrative Procedure Act.................................................................................................. APA

American Association of University Professors .......................................................................AAUP

American Federation of State County and Municipal Employees Council 93 ................. AFSCME

American Federation of Teachers...............................................................................................AFT

Career and Technical Education ................................................................................................CTE

Department of Education Organization Act ........................................................................... DEOA

Division of Educational Equity..................................................................................................DEE

Division of Elementary, Secondary, Adult, and Vocational Education ...........................DESAVE

Elementary and Secondary Education Act of 1965 ................................................................ESEA

Federal Student Aid .................................................................................................................. FSA

Free Application for Federal Student Aid..............................................................................FAFSA

Free Appropriate Public Education...........................................................................................FAPE

Human Resources ........................................................................................................................HR

Individuals with Disabilities Education Act ........................................................................... IDEA

Institute for Education Sciences..................................................................................................IES

Office for Civil Rights ............................................................................................................. OCR

Office of Elementary and Secondary Education.....................................................................OESE

Office of English Language Acquisition, Language Enhancement, and Academic
    Achievement for Limited English Proficient Students ......................................................OELA

Office of General Counsel ....................................................................................................... OGC

Office of Special Education and Rehabilitative Services ......................................................OSERS

Office of Special Education Programs.......................................................................................OSEP

Public Service Loan Forgiveness ............................................................................................. PSLF

Service Employees International Union ....................................................................................SEIU

## INTRODUCTION

The Department of Education (the "Department") was created by statute: in 1979, Congress established a separate, cabinet-level agency with a "single, full-time, Federal education official directly accountable to the President, the Congress, and the people." 20 U.S.C. § 3401(10); *see id*. § 3411 (establishing the Department of Education). The Federal government's role is to "support … [s]tate, local, and private institutions, students, and parents" in educating children. *Id.* § 3401(7). Congress and the Department know that the primary responsibility for education – by law – is reserved to the States, local school systems, and parents. The Department's fills gaps in state and local capacity to ensure that no student is left behind for lack of knowledge, resources, or technical ability at the state or local level. And so, for nearly half a century, the Department has carried out its statutory mandate by providing essential services to the more than 50 million children that attend over 97,000 public schools across the country. In addition to its organic statute, the Department also administers more than 50 other statutes aimed at supporting diverse student populations, including students with disabilities, students in underfunded and rural schools, those seeking vocational training, and individuals requiring financial aid for higher education.

Instead of faithfully executing the laws establishing the Department and its mission, Defendants have set out to destroy the Department by executive fiat. They have indiscriminately fired so many Department employees that the Department will no longer be able to perform its statutorily required duties. Secretary McMahon—whom President Trump instructed to "put herself out of a job"[1]—announced on March 11 that she was terminating nearly half of the Department's workforce, including entire teams and divisions (the "Mass Termination Order").

---

[1] Zachary B. Wolf, *Trump and Musk Are Moving To Smother These Three Pieces of the Government*, CNN (Feb. 5, 2025), https://www.cnn.com/2025/02/05/politics/donald-trump-elon-musk-agencies/index.html.

Secretary McMahon did so without reasoned explanation as to why these employees were being terminated and without regard for whether the Department would still be able to perform its statutory mandates. She placed all terminated employees on administrative leave within a mere ten days of her March 11 announcement, rendering any transition of their responsibilities impossible and making disruption in the crucial services that the Department provides inevitable. Indeed, she openly acknowledged the goal of the Mass Termination Order: to "shut down the Department of Education." Defendants' actions will not only destroy the Department, they will hurt the very people Congress intended to help: schoolchildren, their parents, and their teachers.

Congress has evidenced no inclination to abolish the Department of Education. In fact, the last time such an action was proposed, it failed by an overwhelming margin. Defendants have neither the constitutional nor statutory authority to dismantle an agency established and funded by Congress. Nor do they have the authority to arbitrarily and capriciously impose a mass firing so enormous that the Department will not be able to function as Congress has required. For these reasons and more, the Mass Termination Order is unlawful and must be enjoined.

The casualties of Defendants' lawlessness include school districts like Plaintiffs Somerville Public Schools and Easthampton Public Schools (the "School Districts"); teachers, professors, and support staff who are members of Plaintiffs American Federation of Teachers ("AFT"), American Federation of Teachers Massachusetts ("AFT Massachusetts"), American Federation of State County and Municipal Employees Council 93 ("AFSCME"), American Association of University Professors ("AAUP"), and Service Employees International Union ("SEIU") (the "Union Plaintiffs"); and the students who Plaintiffs seek to ensure have access to a quality education. These students, school districts, teachers, and support staff rely on the Department for funding, technical assistance, civil rights enforcement, student loans, and other resources that allow them

to access and provide essential educational services—including services that are mandated by Congress. Because the Mass Termination Order will prevent Plaintiffs from accessing the resources they need to fulfill their legal and ethical responsibilities as educators, Plaintiffs will be irreparably harmed in the absence of an injunction. And for the same reasons, the balance of equities and public interest also weigh in Plaintiffs' favor.

Plaintiffs thus respectfully request that this Court enter a preliminary injunction setting aside the Mass Termination Order and enjoining Defendants from taking further steps to implement that Order.

In support of this request, Plaintiffs rely upon public statements by Defendants and related public reporting, facts set forth in Plaintiffs' declarations (submitted herewith), an opinion by an expert in public policy and management (submitted herewith), and declarations submitted by the attorneys general of several states in *New York v. McMahon*, No. 1:25-cv-10601 (D. Mass.), a related matter before the Court.[2]

## BACKGROUND

**I.    Congress Created the Department and the Core Offices and Programs within the Department to Support State and Local Education**

Congress established the Department through the Department of Education Organization

---

[2] Citations to evidence before the Court in a similar proceeding are appropriate and necessary here because of the relatedness of the cases and posture and urgency of this Motion. "A preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Therefore, "[b]ecause preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016); *see also Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986).

Act ("DEOA") of 1979.  20 U.S.C. §§ 3401-3510.[3]  Over the decades since the DEOA, Congress has assigned numerous and unique statutory obligations exclusively to the Department.  For example, the Elementary and Secondary Education Act of 1965 ("ESEA"), amended as recently as 2024, is the primary federal support for K-12 education.  *See* H.R. 8070, 118th Cong. (2024). The Department's largest K-12 grant program is Title I, which provides funds to school districts for the education of children from low-income families.[4]  The second-largest federal funding source for K-12 education is the Individuals with Disabilities Education Act ("IDEA").  IDEA is administered by the Office of Special Education Programs ("OSEP") within the Office of Special Education and Rehabilitative Services ("OSERS"), both of which are statutorily mandated offices at the Department that work to implement programs to support students with disabilities and the schools, parents, and teachers who serve them.[5]  *See, e.g.*, 20 U.S.C. §§ 3417, 1402, 1406.  The DEOA also created a host of other offices, including the Office of English Language Acquisition, Language Enhancement, and Academic Achievement for Limited English Proficient Students ("OELA"), which administers grants and invests in research to prepare teachers to support English learners, *see* 20 U.S.C. § 3420; an Office of Career, Technical, and Adult Education ("OCTAE"), *id.* § 3416; and subsequent statutes created the Department's Career and Technical Education ("CTE") grant programs.[6]

---

[3] Pub. L. 96-88, 93 Stat. 668 (1979).

[4] *See generally* Rebecca R. Skinner & Isobel Sorensen, Cong. Rsch. Serv., R47702, ESEA Title I-A Formulas: A Primer (2023), https://www.congress.gov/crs-product/R47702.

[5] *See generally* Cong. Rsch. Serv., R44624, The Individuals with Disabilities Education Act (IDEA) Funding: A Primer (Aug. 29, 2019), https://www.congress.gov/crs-product/R44624.

[6] *See* Carl D. Perkins Career and Technical Education Act of 2006, Pub. L. No. 109-270, 120 Stat. 683 (2006), as amended by the Strengthening Career Education for the 21st Century Act, Pub. L. No. 115-224, 132 Stat. 1563 (2018) (collectively, known as "Perkins V").

The Department's Office of Federal Student Aid ("FSA") is statutorily mandated to administer the federal student aid program, which FSA has the unique expertise to manage. *See, e.g.*, 20 U.S.C. §§ 1018, 1087a(a), 1087b(a), 1087b(c). No other agency can lawfully implement the federal student aid programs. *See, e.g.*, *id.* § 3441(2)(C) (transferring all functions under the Higher Education Act and others to the Secretary of Education); *id.* §§ 1018-1018b (establishing FSA as responsible for managing all student financial assistance programs); *id.* §§ 1087a(a), 1087b(a), 1087b(c); *see generally id.* §§ 1001-1161aa-1 (the Higher Education Act).

Congress also requires the Department to maintain "an Office for Civil Rights, to be administered by the Assistant Secretary for Civil Rights …." 20 U.S.C. § 3413. The Office for Civil Rights ("OCR") is charged by Congress with enforcing numerous federal statutes prohibiting discrimination. OCR also provides significant technical assistance to support recipients of Department funds in complying with the requirements of these statutes. *See, e.g.*, 34 C.F.R. §§ 100.6(a), 100.12(b) (requiring OCR to provide assistance, guidance, and detailed instructions to implement civil rights protections).

Congress also established within the Department the Institute for Education Sciences ("IES"), the non-partisan statistics, research, and evaluation arms of the Department. *See* 20 U.S.C. §§ 3419, 9511(a), 9531(a), 9541(a), 9561(a), 9567(a) (establishing various centers for research and statistics in the Department).

Each fiscal year, Congress has appropriated funds to the Department to carry out its functions. In the most recent budget, Congress appropriated $79 billion to the Department. Comm. on Appropriations, H.R. Rep. No. 118-585, Title III, at 208 (2024).

## II.    Defendants Are Destroying the Department

While campaigning for President in 2024, Donald Trump promised that one of his first acts

in office would be "closing up the Department of Education."[7]  Since taking office, he has tried to

do so—but unlawfully, through executive fiat, rather than seeking Congressional authorization.

    **A.**        **The President Directed His Administration to Dismantle the Department**

There is no ambiguity about the objective of Defendants' actions—they have openly

acknowledged their goal of eliminating the Department.  On the day of her confirmation, Secretary

McMahon issued a memo titled "Our Department's Final Mission," the implementation of which

would result in the "elimination" of the Department.[8]

To effectuate this goal, Secretary McMahon issued the Mass Termination Order at the

President's directive: "[The President's] directive to me, clearly, is to shut down the Department

of Education …."[9] And she began executing this mission by eliminating nearly half of the

Department's workforce.  *See* Ex. 1, Press Release, U.S. Department of Education Initiates

Reduction in Force (Mar. 11, 2025) ("Mar. 11, 2025 Press Release").

On March 20, 2025, President Trump memorialized his instruction to dismantle the

Department of Education in an Executive Order.  Exec. Order No. 14242, 90 Fed. Reg. 13679

(Mar. 20, 2025) ("Executive Order").  The Executive Order seeks to "clos[e]" the Department by

directing the Secretary of Education to "take all necessary steps to facilitate the closure of the

---

[7] Steve Inskeep & Taylor Haney, *What Trump's Pledge to Close Dept. of Education Means for Students, GOP-led States*, NPR Morning Edition (Nov. 15, 2024 11:26 AM ET), https://www.npr.org/2024/11/14/nx-s1-5181966/a-look-at-the-potential-impact-of-shutting-down-the-department-of-education.

[8] Linda McMahon, Secretary, Dep't of Educ., Secretary McMahon: Our Department's Final Mission (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission, [https://perma.cc/T3LT-CELR] ("March 3, 2025 Secretary McMahon Speech").

[9] Sareen Habeshian, *Education Secretary Says Mass Layoffs First Step toward Shutting down DoE*, Axios (Mar. 11, 2025), https://www.axios.com/2025/03/11/education-department-workforce-cuts; *see also* Ingraham Angle: *Education Secretary Says Department Took First Steps to Eliminate 'Bureaucratic Bloat'* (Fox News television broadcast Mar. 11, 2025), https://www.foxnews.com/video/6369901522112 ("Fox News Interview").

Department of Education ...." *Id.*  In the days since, Defendants have made clear that the Mass

Termination Order is just one way in which they will dismantle the Department.  President Trump

stated on March 21, 2025, that he had "decided that the SBA, the Small Business Administration

… will handle all of the student loan portfolio."  Cory Turner, *Trump Says Education Department*

*Will No Longer Oversee Student Loans, 'Special Needs,'* NPR (Mar. 21, 2025),

https://www.npr.org/2025/03/21/nx-s1-5336330/trump-education-department-student-loans-

special-education-fsa.  He also stated that the Department of Health and Human Services would

handle "special needs." *Id.*[10]

### B.    Secretary McMahon Has Carried Out President Trump's Directive Through the Mass Termination Order

Coming after earlier government-wide efforts in January and February to indiscriminately

cull civil servants, Secretary McMahon's Mass Termination Order slashed the Department's

workforce to half its size. *See* Mar. 11, 2025 Press Release.  The Department's subsequent

organizational chart shows an agency left in ruin, with numerous offices wiped off the chart and

others with key leadership positions left vacant.  *See* Ex. 2 ("Department Organizational Charts")

(shading in red the offices eliminated by Secretary McMahon); *see also* Ex. 3 ("AFGE Terminated

Employees Excel") (documenting bargaining unit staff who were terminated).  While employees

subject to the Mass Termination Order were told they would be put on administrative leave on

---

[10] Any such executive actions are plainly contrary to law, as those functions are statutorily mandated to be performed by the Department. *See, e.g.*, 20 U.S.C. § 3473(a) (prohibiting the Secretary from, *inter alia*, discontinuing "organizational entities within the Department" that were created by, or transferred to, the Department by statute); *id.* § 3441(2)(C) (transferring all functions under the Higher Education Act to the Secretary of Education); *id.* §§ 1018–1018b (establishing FSA as responsible for managing all student financial assistance programs); *id.* § 1402 (establishing the "Office of Special Education Programs" within the Department as the "principal agency" to administer the IDEA); *id.* § 3417 (establishing OSERS).  To the extent that Agency Defendants actually seek to implement these directives without Congressional approval, or take other steps to unlawfully transfer agency functions or dismantle the Department, those efforts should be enjoined.

Friday, March 21, 2025, and would receive an "official" RIF notice on April 9, *see* State Ex. 68, at Ex. 1,[11] many employees were immediately locked out of Department computer systems. State Ex. 51 ¶ 7; State Ex. 52 ¶ 13; State Ex. 61 ¶ 11; State Ex. 67 ¶ 6. This rendered Department employees unable to hand off time-sensitive matters to surviving employees or to inform external partners of their termination prior to being placed on administrative leave. *See* State Ex. 51 ¶ 7; State Ex. 52 ¶ 13; State Ex. 61 ¶ 11; State Ex. 67 ¶ 6.

Notwithstanding this chaotic backdrop and absence of transition planning, the Department contended that the Mass Termination Order reflected a "commitment to efficiency, accountability, and ensuring that resources are directed where they matter most." *See* Mar. 11, 2025 Press Release. President Trump claimed that he just "want[ed] to keep the right people" and "cut the people that aren't doing the job," and Secretary McMahon emphasized her desire to simply cut "bureaucratic bloat."[12] But in a broadcast interview explaining her actions, Secretary McMahon made clear the true intention of the Mass Termination Order—to eliminate the Department.

> Laura Ingraham: Now, is this the first step on the road to a total shutdown?
>
> Secretary McMahon: Yes. Actually, it is, because that was the President's mandate as directed to me, clearly is to shut down the Department of Education ….

Fox News Interview at 1:10.

### C. Defendants' Actions Will Degrade the Department's Functioning, Engendering Substantial Financial Uncertainty, Delaying Distribution of Funds, and Undermining the Provision of Technical Assistance and Guidance

---

[11] Plaintiffs refer to the exhibits to ECF No. 71, Affidavit in Support re Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, in *New York v. McMahon*, No. 1:25-cv-10601 (D. Mass.) as "State Ex. [X]."

[12] *See* Fox News Interview at 0:50, 1:33.

By eliminating half of the Department's workforce, the Mass Termination Order will interfere with the Department's ability to perform the functions that are required by statute. As outlined above, Defendants have endeavored to dismantle the Department through mass terminations without any plans to ensure continuity, much less any reason to believe that the Department can perform essential, legally required functions with just half its staff and entire, key offices eliminated.

Indeed, expert testimony confirms the commonsense proposition that when an organization quickly fires a huge percentage of its workforce, including numerous units and offices, the remaining skeleton crew cannot carry out the work previously handled by the organization at the same capacity or with the same reliability. Here, "the abrupt and unprecedented nature of these cuts, especially when implemented without thorough analysis … will almost certainly reduce the government's ability to deliver essential services effectively." Ex. 5 ("Linos Decl."), at 2. Defendants' actions are unprecedented and bear no resemblance to prior reductions of the civil service workforce, which were orderly, planned, and gradual. Linos Decl., at 6-7.

The Mass Termination Order is also at odds with principles of effective management, which emphasize "the importance of gradual, incremental implementation of downsizing efforts as a critical precondition for organizational success post-downsizing …." Linos Decl., at 34. The Mass Termination Order will likely harm overall "organizational performance." *Id.* at 9. It is "very likely to decrease performance and morale among surviving employees, and increase the risk of mistakes or delays in fund disbursements." Linos Decl., at 11; *see also id.* at 7-8 (noting that mass terminations will likely reduce the quality of service in "processing grants or funding applications"); Ex. 4 ("U.S. Department of Education Contingency Plan for Lapse in FY 2018 Appropriation"), at 4 (Trump Department of Education stating in 2018 that a mass furlough would

9

result in a "potential delay in activities necessary to make competitive and formula grant awards later in the fiscal year").

The degradation in services has begun. Multiple states have *already* reported delays in federal education funding since the Mass Termination. State Ex. 13 ¶¶ 45-46 (California); State Ex. 22 ¶ 12 (Illinois); State Ex. 31 ¶ 7 (New York). The federal government has itself confirmed in another context the obvious proposition that "because of staffing reductions at the United States Department of Education," the government "expect[s] delay" in its operations. *See Tirrell v. Edelblut*, No. 24-cv-251 (D.N.H. Mar. 13, 2025), ECF No. 118 (motion by the United States to extend deadlines). And as set forth in the States' Memorandum and accompanying declarations, major cuts to offices administering, *inter alia*, Title I grants, special education funding, and grants for English learners will directly impede the Department's ability to timely and effectively disburse those funds. *See New York v. McMahon*, No. 1:25-cv-10601 (D. Mass.), ECF No. 70 at 15-20.

Even where some staff remain to carry out funding activities, the gutting of the Office of General Counsel ("OGC") will ensure that crucial federal funds are delayed, unallocated, or misused to Plaintiffs' detriment. OGC attorneys are vital to "virtually all aspects of the Department's work." Ex. 6 ("Leheny Decl.") ¶ 10. For instance, terminated attorneys in OGC's Division of Elementary, Secondary, Adult, and Vocational Education ("DESAVE") and Division of Educational Equity ("DEE") will no longer be able to advise states and school districts on Title I and IDEA funding. *See* Leheny Decl. ¶ 9 ("Without the technical assistance provided by OGC lawyers, these state agencies will be impeded in their ability to deliver federal funds, including funds appropriated in accordance with IDEA and ESEA, to local schools efficiently and on the correct bases."); State Ex. 66 ¶ 11 ("Without DESAVE attorneys providing accurate and centralized guidance, states will be left on their own to navigate this complicated legal landscape

and may end up not using funds to which they are entitled."). DEE attorneys review states' annual funding applications for IDEA, which is Somerville's largest source of federal funds. Leheny Decl. ¶ 6(b); Ex. 7 ("Carmona Decl.") ¶ 22. The application process for IDEA is ongoing as of this writing: IDEA grantees must submit applications in May, and DEE attorneys must review applications for funds to be disbursed by July 1 in order to make funds available for next school year. *See* Ex. 8 ("Neas Decl.") ¶ 17. And even if sufficient attorneys remained in the Department—which they do not—this work requires "deep subject matter expertise in areas of law specific to the Department and the many programs it operates," which "is not easily replaceable by generalist attorneys … [or] by attorneys in other parts of OGC or in other federal agencies." Leheny Decl. ¶ 8.

The same dynamic applies to the provision of technical assistance, guidance, and support provided by the Department to districts and educators: hollowing out the workforce "will necessarily affect the ability of government agencies to function effectively." *See* Linos Decl., at 7. For example, slashing OCR "will lead to immediate delays in case resolution" and "impact the quality" of investigations due to "exhaustion and burnout." Linos Decl., at 11; *see also* Neas Decl. ¶ 46 (without "adequate staffing," students with disabilities and their parents "will have to let their complaints go unanswered or expend time and money litigating in federal court"); Leheny Decl. ¶ 12-13 (all attorneys who advise on civil rights have been terminated). Indeed, OCR already faces a substantial backlog of unresolved complaints because "all of OCR's regional offices have been understaffed" for years and "have also experienced an annually increasing backlog of complaints." State Ex. 53 ¶ 10. The mass firings of half of all OCR staff will lead to an increase from the "already … untenable" 50 cases per investigator to "as high as 120 cases per investigator." State Ex. 48 ¶¶ 22, 25-27.

Hollowing out the Department's lawyers will also undermine the provision of technical assistance, guidance, and support provided by the Department in all areas.  Leheny Decl. ¶ 9 ("Without the technical assistance provided by OGC lawyers, these state agencies will be impeded in their ability to deliver federal funds … State educational agencies rely on the continuous, nuanced, and expert advice of OGC attorneys to efficiently manage federal education funds); *see also id.* ¶ 10 ("The Department's key mandates, at their core, require legal analysis and ongoing legal support and advice.").  And cuts to offices that support services to students with disabilities, collect and disseminate information about best practices in education, and help students, families, and schools access the federal financial aid system will harm the provision of those vital services. Carmona Decl. ¶¶ 27-30, 33; Ex. 9 ("Binienda Decl.") ¶¶ 8, 13, 38-39; Ex. 10 ("Monarrez Decl.") ¶¶ 28-31, 33.

### III.    Defendants Have Gutted the Offices on Which Plaintiffs Depend for Funding, Guidance, and Expertise

As set forth in detail in States' Memorandum, Defendants have slashed offices and personnel that provide critical support to systems and programs that Plaintiffs rely upon.  These include nearly all OGC attorneys, including all attorneys in DESAVE and DEE, who facilitate timely, lawful Title I and IDEA funding; OCR, which helps foster a learning environment free from discrimination (and relies on the advice of DEE attorneys); FSA, which distributes financial aid to enable students to achieve their educational goals (and relies on contract advice from attorneys in the Division of Business and Administrative Law, all of whom have been terminated); and IES, which obtains, vets, and disseminates the findings of cutting-edge research for states and districts to improve the quality of education in America.  Plaintiffs have appended a table summarizing the cuts to these statutorily mandated offices as Appendix 1 to this memorandum.

**Funding.**  The School Districts rely on timely funding from these offices and others to provide quality education to their students.  For example:

- Districts use Title I and IDEA funding to pay for staff, including teachers, and for summer school programs for at-risk students and students with disabilities.  Carmona Decl. ¶ 9; Binienda Decl. ¶ 8; Monarrez Decl. ¶¶ 10-14, 18-20, 39.

- They use IDEA funds to provide special education students with summer school to prevent educational backsliding, pay staff (including specialists), reduce class sizes, and otherwise provide support for students with disabilities.  *See* Carmona Decl. ¶¶ 22-26; Binienda Decl. ¶ 12; Monarrez Decl. ¶¶ 18-20.

- Somerville and Worcester rely on Title III funding to pay for their English Language Learner programs, a summer program which services 1,200 students, to ensure continuity in their language learning for about 10 weeks during the summer.  Carmona Decl. ¶ 20; Monarrez Decl. ¶ 16.

The Union Plaintiffs and their members similarly rely on federal funding, including from Title I and IDEA, for salaries and resources to educate students.  Ex. 11 ("McNeil Decl.") ¶¶ 15-16, 25-29; Ex. 12 ("Tang Decl.") ¶¶ 9-17; Ex. 13 ("Ury Decl.") ¶¶ 8-9.  As examples:

- In Lynn Public Schools, where 2,174 AFT Massachusetts members work, nearly $4.6 million of the district's $7.7 million in Title I funds, and more than $4 million of the district's $5.1 million in IDEA funds, pay for salaries of teachers, paraprofessionals, and others.  Tang Decl. ¶ 16.

- In Hopkinton School District, where approximately 100 SEIU teaching assistants and paraprofessional members work, IDEA funding pays for five full-time positions to provide Applied Behavior Analysis therapy for students with disabilities.  Ury Decl. ¶ 8.

- These funds also support instructional technology, professional development, and other programs. Tang Decl. ¶ 20. For example, AFT members rely on IDEA-funded assistive technology to teach students, such as through text-to-speech devices, Braille displays, or talking calculators, without which they could not effectively educate certain students with disabilities. McNeil Decl. ¶ 37.

**Technical Support, Guidance, and Enforcement.** Aside from grant funding, Plaintiffs also rely on the Department for technical assistance, civil rights enforcement, and financial aid, among other functions.

Plaintiffs rely on technical assistance to maximize their eligibility for and use of Title I and IDEA grant money. Carmona Decl. ¶ 27; Monarrez Decl. ¶¶ 25-26; State Ex. 13 ¶ 67; State Ex. 14 ¶¶ 27, 28; *see also* State Ex. 31 ¶ 10; Neas Decl. ¶¶ 15-20; Leheny Decl. ¶ 9. They also seek technical assistance and research from IES to identify and adopt best practices that maximize learning and serve students. For example, Somerville Public Schools recently utilized a research guide from IES's What Works Clearinghouse to coach and professionally develop its teachers on behavioral interventions in elementary schools. Carmona Decl. ¶ 29. Easthampton Public Schools' Title I reading specialists select instructional methods and materials from What Works Clearinghouse. Binienda Decl. ¶ 8. Districts rely on this information to keep pace with the most recent scientific research in order to best serve their students during districts' "limited window of time to achieve results." Monarrez Decl. ¶¶ 28, 29; *see also id.* ¶ 30 (describing how technological changes require districts to access "independent, evidence-based assessments of new technology and pedagogical methods that integrate fast developing science and technology into individualized learning plans, classrooms, and educational systems"). AFT members similarly identify best practices to improve student learning through IES programs, statistics, and data, including the

What Works Clearinghouse and NAEP.  McNeil Decl. ¶ 78.  AAUP members constantly rely on data from IES to produce research on higher education.  Ex. 14 ("Wolfson Decl.") ¶ 11.

As to civil rights enforcement, the Union Plaintiffs' members may file complaints with OCR on behalf of themselves or students when faced with a discriminatory working or learning environment.  McNeil Decl. ¶¶ 59-60; *see* Tang Decl. ¶ 28; Ury Decl. ¶ 20.  OCR also assists Union Plaintiffs' members and the School Districts by working with their schools to develop best practices for civil rights compliance.  *See* Tang Decl. ¶ 28.  For example, with individualized guidance and technical assistance from OCR, Easthampton addressed a racial bias and discrimination issue in its high school; created a committee to address civil rights issues; and used published guidance for translation assistance to enable effective communication with families of students for whom English is a second language, which has made a "staggering difference in terms of parent-teacher communication."  Binienda Decl. ¶¶ 31-40.  Somerville similarly relies on OCR enforcement, guidance documents, FAQs, webinars, and other resources to safeguard civil rights in its schools.  Carmona Decl. ¶¶ 39-40.

Plaintiffs rely on FSA for a range of financial aid services.  The School Districts use FSA technical assistance to help their students apply for the financial aid that makes attending college possible.  Carmona Decl. ¶ 33; Monarrez Decl. ¶¶ 32-33.  The Union Plaintiffs' members and School Districts' staff also rely on FSA staff's effective operations in managing the student grant and loan programs, and the myriad forms of technical assistance that FSA provides to borrowers. Many of the Union Plaintiffs' members have student loans that are eligible for various loan repayment and forgiveness programs (including Public Service Loan Forgiveness ("PSLF")[13]), and they rely upon expertise from the Department to take advantage of those programs.  *See*

---

[13] FSA is required by statute to operate the PSLF program.  *See* 20 U.S.C. § 1087e(m).

McNeil Decl. ¶ 49 (describing the "nearly 12,000 AFT members" who are seeking to take advantage of loan forgiveness programs); *id.* ¶ 52-53 (describing how FSA staff have helped AFT members resolve errors in PSLF so that the members are able to benefit from PSLF); *see also* Ex. 15 ("Van Campen Decl.") ¶¶ 17-18 (AFSCME Council 93); Ury Decl. ¶¶ 18, 19, 23 (SEIU); Wolfson Decl. ¶ 14 (AAUP). Likewise, teachers in the School Districts benefit from the Teacher Loan Forgiveness program, which is "especially useful in recruiting teachers for hard-to-fill positions, such as special education, ESL, math and science." Carmona Decl. ¶ 34.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must show "(i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009). The final two requirements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, when "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) ("[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.").

Here, all four factors weigh in favor of issuing a preliminary injunction.

## I.    Plaintiffs Are Likely to Succeed on the Merits

The Administrative Procedure Act ("APA") directs courts to "hold unlawful and set aside"

final agency actions[14] that are (1) arbitrary, capricious, or an abuse of discretion; (2) in excess of

statutory authority; (3) contrary to law; or (4) contrary to constitutional right or power. *See* 5

U.S.C. § 706. While any one of these grounds alone would be sufficient for an injunction, the

Secretary's Mass Termination is unlawful under all four and should be set aside to restore the

*status quo ante.*

**A.    The Mass Termination Is Arbitrary and Capricious.**

The APA "requires agencies to engage in reasoned decisionmaking," *Dep't of Homeland*

*Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (cleaned up), so any action lacking

"genuine justification" based on the facts before the agency must be vacated as arbitrary and

capricious, *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). *See* 5 U.S.C. § 706(2)(A);

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962) (noting the reasoned-

explanation requirement is and must be "strict and demanding").

It is a cardinal principle of administrative law that an agency "disclose the basis of its

order." *See Burlington Truck Lines*, 371 U.S. at 168. The public statement announcing the

Secretary's Mass Termination, however, lacks any reasoning. *See* Mar. 11, 2025 Press Release.

---

[14] Defendants cannot plausibly deny that the mass termination of thousands of Department employees is a "final agency action" reviewable under the APA. *See* 5 U.S.C. § 704. The Supreme Court has long held that the APA's use of "action" covers "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). As for finality, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The Mass Termination Order is neither tentative nor conditional, reflecting the consummation of the Secretary's decisionmaking, and undeniably affects legal consequences on the Department's continued functioning and its employees. *See Maryland v. USDA*, __ F. Supp. 3d __, 2025 WL 800216, at *11 (D. Md. Mar. 13, 2025) ("[A]ny agency's decision to dismiss an employee effects self-evident legal consequences for both parties and plainly marks the end of the agency's decisionmaking with respect to the employee involved."), *appeal docketed*, No. 25-1248 (4th Cir. Mar. 17, 2025); *accord Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025).

It contains only platitudes about "the Department of Education's commitment to efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." *Id.* It does not attempt to offer any explanation as to how shuttering the targeted offices would further these goals. Nor have Defendants offered any explanation for how an orderly transition or hand-off of work is possible, or why they directed employees to cease working just days (or less) after notifying them that they would be terminated in June. *Compare* 5 C.F.R. § 351.806 (directing agencies to maintain staff in "active duty status" during the RIF notice period). In short, "[t]here are no findings and no analysis," let alone a sufficiently "rational connection between the facts found and the choice made." *Burlington Truck Lines*, 371 U.S. at 167-68; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action."). The Secretary's "conclusory statements will not do." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

Further, the agency's "reasoned explanation" must reflect "consideration of the relevant factors," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), including "the advantages and the disadvantages of agency decisions," *id.* at 753, and the "serious reliance interests" engendered by prior agency policy, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also State Farm*, 463 U.S. at 43. Here, as recounted above and in the accompanying declarations, Plaintiffs, students, schools, colleges, and the American public at large have relied on a fully staffed Department of Education for decades. Before commencing the Mass Termination, the Secretary entirely failed to investigate or consider the substantial harm the sudden and immediate halving of the Department workforce—by her admission, affecting "[a]ll divisions within the Department," *see* Mar. 11, 2025 Press Release—would have on those reliance interests, the continued operations

of Departmental programs and services, or the maintenance of institutional knowledge and
expertise. *See*, *e.g.*, *Regents,* 591 U.S. at 33 (agencies are "required to assess whether there were
reliance interests, determine whether they are significant, and weigh any such interests against
competing policy concerns") (cleaned up).  Nor do the Department's communications recognize
or even attempt to address those concerns.[15]  Because the Secretary manifestly "failed to consider
… important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, the Mass Terminations are
necessarily arbitrary and capricious.

　　　Even if the platitudinous sentence fragment in the Secretary's public statement could
amount to a reasoned basis for her decision (and it does not), it is clearly "contrived."  *Dep't of
Commerce*, 588 U.S. at 785 (the APA requires "genuine justifications for important decisions,
reasons that can be scrutinized by courts and the interested public").  The Secretary has repeatedly
described her role as presiding over the Department's "final mission" of eliminating federal
oversight of the Nation's education, *see* March 3, 2025 Secretary McMahon Speech, and the
President has made obvious that the end result of that mission is "[c]losure of the Department of
Education," *see* Executive Order.  The Secretary's supposed "commitment to efficiency,
accountability," and her preferred resource allocation, *see* March 11, 2025 Press Release, is
therefore not genuine and "more of a distraction," "incongruent with what the record reveals about
the agency's priorities and decisionmaking process."  *Dep't of Commerce*, 588 U.S. at 785.  The
Court should not be deceived by this pretext.  *See id.* (courts are "not required to exhibit a naiveté

---

[15] The Court should give no weight to the press release's baseless assertion that the Department
"will continue to deliver on all statutory programs that fall under the agency's purview." March
11, 2025 Press Release; *see Amerijet*, 753 F.3d at 1350.  Beyond the inherent implausibility of the
conclusion that cutting the Department's workforce by half will still permit the delivery of
statutorily-required programs, the Secretary provided no reasoning or evidence that this assertion
is true.

from which ordinary citizens are free").

Moreover, the Secretary's purported goals are belied by her actions. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (the reasoned-explanation requirement further requires that the agency's decision be an objectively "reasonable" one). The Department's Office for Civil Rights ("OCR"), for example, has faced a long-running backlog of civil-rights investigations. *See supra* at 11. Rather than enhance the operation of OCR, the Department has shuttered most of OCR's regional offices and cut its staff to the point where each of its investigators' caseloads will more than double, reaching unsustainable levels. *See id.* It is entirely implausible—and objectively unreasonable—that this level of interference in OCR's operations and capacity supports efficiency or accountability; to the contrary, effective civil-rights investigations and enforcement will likely become impossible.

### B.    The Mass Termination Order Exceeds the Secretary's Authority.

"Administrative agencies are creatures of statute" that "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). Accordingly, analysis of an agency's statutory authority "must be shaped, at least in some measure, by … whether Congress in fact meant to confer the power the agency has asserted." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotations omitted). Where "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion" counsel hesitation, the Supreme Court has instructed that agency action unsupported by a clear congressional authorization must be set aside. *Id.* (internal quotations omitted); *see also* 5 U.S.C. § 706 (requiring vacatur of actions "in excess of statutory … authority"). The Secretary's unprecedented Mass Termination Order fits that description.

Defendants lack authority to abolish the Department, including through the Mass Termination Order. Congress has made clear that the Secretary lacks authority to abolish,

reorganize, or alter offices *within* the Department except in the narrow circumstances provided by the Department's reorganization statute—and has no authority to abolish the Department as a whole. *See* 20 U.S.C. § 3473(a)(1)-(3) (prohibiting reorganization authority from extending to, *inter alia*, "any office, bureau, unit, or other entity transferred to the Department and established by statute or any function vested by statute in such an entity or officer of such an entity" not specifically listed in subsection (b)). The Administration has grossly exceeded that authority by effectively disabling or abolishing multiple offices that are mandated by statute and that the reorganization provision *prohibits* the Secretary from altering or abolishing, including OESE, 20 U.S.C. § 3414; OSERS, 20 U.S.C. § 3417 (establishing OSERS), 20 U.S.C. § 1402 (requiring that OSEP, within OSERS, administer IDEA); OCTAE, 20 U.S.C. § 3416; OCR, 20 U.S.C. § 3413, and others, *see* Appendix 1. Moreover, while the DEOA permits the Secretary to take "necessary or appropriate" actions to implement her limited authority to reorganize, 20 U.S.C. § 3473(a), the indiscriminate firing of half of the Department is neither necessary nor appropriate. Defendants have therefore exceeded their statutory authority in issuing the Mass Termination Order.

### C. The Mass Termination Order Is Contrary to Law.

Plaintiffs are likely to succeed on the merits of their claim that the Mass Termination Order is contrary to law, as the Mass Termination Order decimates the Department's ability to perform functions required by numerous federal statutes. The APA requires that this Court "hold unlawful and set aside agency action … found to be … not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the Mass Termination Order is contrary to law in numerous respects. First, as outlined above, the Mass Termination Order is contrary to the DEOA, which mandates the creation—not the destruction—of the Department and places express limits barring the Secretary from altering or discontinuing many of the Department's programs.

The Mass Termination Order is also contrary to numerous, specific federal laws that

require the Department to undertake obligations that the Mass Termination Order makes impossible. For example, the IDEA requires Defendants to, *inter alia*, "ensure" that children with disabilities have access to educational opportunities, "ensure" that the rights of those children and their parents are protected, "assist" states, localities and other entities in providing effective and coordinated services to those children, "support[]" coordinated research, technical assistance, technology development, and other supports, and "assess, and ensure the effectiveness of, efforts to educate children with disabilities." 20 U.S.C. § 1400(d)(1). But by firing the essential staff required for effectively administering the IDEA, and decimating the Department's ability to perform these functions, Defendants' actions are contrary to the IDEA.

Likewise, Congress requires the Department to operate OCR. *See* 20 U.S.C. § 3413. OCR is charged with, among other tasks, "compliance and enforcement activities," "identifying significant civil rights or compliance problems," *id.* § 3413(b), and employing staff "necessary to carry out the functions" of OCR. *Id.* § 3413(c). OCR is required to accept complaints from students experiencing discrimination and must "make a prompt investigation" of such complaints. 34 C.F.R. § 100.7. But by shuttering more than half of OCR's regional offices and slashing more than half of the staff charged with investigating and enforcing civil rights laws, Defendants' actions will hobble their ability to investigate, protect, and enforce students' civil rights protections. *See supra* at 11. As such, Defendants' actions are contrary to the DEOA and to OCR's regulations.

For the same reasons, by devastating the Department's ability to perform its job, the Mass Termination Order is contrary to a host of other statutory mandates placed upon the Department, including statutes: vesting in the Department overarching responsibility for implementing federal student aid, *see* 20 U.S.C. §§ 1018, 1087a(a), 1087b(a), 1087b(c), 3441(2)(C); requiring the Department to administer mandatory formula funds for K-12 education and provide technical

assistance to grantees, *see  id.* §§ 6301, *et seq.*; and directing the Department to support English language learners, *see id.* § 3423d.

**D.    The Mass Termination is Contrary to Constitutional Separation of Powers Principles.**

The Administrative Procedure Act requires reviewing courts to set aside any agency action that is "contrary to constitutional right [or] power."  5 U.S.C. § 706(2)(B).  "The doctrine of separation of powers is fundamental in our system.  It arises, however, not from Art. III nor any other single provision of the Constitution, but because 'behind the words of the constitutional provisions are postulates which limit and control.'"  *Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 590-91 (1949) (quoting *Principality of Monaco v. State of Mississippi*, 292 U.S. 313, 322 (1934)).  Courts must intervene against actions "that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch."  *Mistretta v. United States*, 488 U.S. 361, 382 (1989).  The Mass Termination Order violates separation of powers principles by impinging on Congress's lawmaking and Spending Clause authority.

Article I of the U.S. Constitution vests Congress with "[a]ll legislative powers."  *See* U.S. Const. art. I, § 1.  "[T]he lawmaking function belongs to Congress."  *Loving v. United States*, 517 U.S. 748, 758 (1996) (citing U.S. Const., art. I § 1).  Likewise, the Constitution "exclusively grants the power of the purse to Congress, not the President."  *San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7).  It is a "settled, bedrock principle[] of constitutional law" that the Executive must spend the funds that Congress authorizes and appropriates.  *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).

Here, by removing the staff who do the work of the Department of Education, with the intention of dismantling the Department, Defendants seek to usurp Congress's lawmaking power

and disregard its spending appropriations. Congress created the Department by enacting the DEOA. Congress also mandated the functions of various offices and programs within the Department and issued appropriations to carry out the Department's work. *See supra* at 3-5. The Mass Termination Order illegally attempts to repeal Congress's enactment by functionally terminating the work of many offices and programs, resulting in a Department that is unable to fulfill its statutory obligations. *Id.* But the "repeal of statutes, no less than enactment, must conform with Art. I." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Neither Article I nor Article II gives the Executive Branch the power "to enact, to amend, or to repeal statutes." *Id.* (quoting *INS v. Chadha*, 462 U.S. 919, 954 (1983)); *see also Chadha*, 462 U.S. at 951 ("When the Executive acts, it presumptively acts in an executive or administrative capacity as defined in Art. II."). As such, the Mass Termination is contrary to the Constitution and the separation of powers, and must be set aside under the APA.

## II.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief

To obtain a preliminary injunction, a plaintiff must demonstrate that he is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "It is settled beyond peradventure that irreparable harm can consist of a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (internal quotation marks omitted). Additionally, when "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) ("[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.").

24

The Mass Termination will cause Plaintiffs irreparable harm.  As explained above, *see supra* at 8-12, delays and disruptions in the distribution of funds and availability of technical assistance connected to core Department programs will be inevitable.  The consequences will be experienced by school districts, educators, education workers, and their students.

School districts must make decisions about their budgets, and the delays and uncertainty caused by Defendants' actions will cause them to scale back or eliminate services.  Reductions in services means shedding personnel, which translates into less individualized and less effective instruction, gaps in continuity of learning, and increased workloads for remaining staff.

Delayed and lost technical assistance means that schools will not have timely advice and information.  Some of this advice and information—information related to Title I and IDEA funds (availability, applications, and reports) and student financial aid—is needed on very short time frames.  For Title I and IDEA grant questions and student loan applications, delayed advice may mean funding lost.  Other technical assistance—related to curriculum development, pedagogical methods, and teacher training—is critical to ongoing planning and innovation that school districts are regularly engaged in.

Against this backdrop, time is not on the side of students.  For them, each week, month, and semester present innumerable opportunities to learn material and skills that depend on cumulative, steady acquisition.  So, delays that might seem inconsequential in other settings matter tremendously in K-12 education.

The particular harms that Plaintiffs will experience are described below.

**A.    Defendants' Mass Termination Order Will Engender Financial Uncertainty and Delay, Undermining Plaintiff School Districts' Missions and Irreparably Harming Student Learning**

The chaos and uncertainty wrought by the Mass Termination Order will undermine the School Districts' mission—which is joined by the Union Plaintiffs—to provide the highest quality

education to their students.  "Actions by a defendant that make it more difficult for an organization to accomplish its primary mission provide injury for purposes both of standing and irreparable harm."  *NTEU v. Vought*, No. CV 25-0381 (ABJ), 2025 WL 942772, at *28 (D.D.C. Mar. 28, 2025) (cleaned up) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)); *Aids Vaccine Advoc. Coal. v. United States Dep't of State,* No. CV 25-00400 (AHA), 2025 WL 752378, at *7 (D.D.C. Mar. 10, 2025) (finding irreparable harm where federal action "directly affect[ed]" plaintiffs' "ability to fulfill their organizational missions").  As Plaintiffs' students fall behind, there will be a lasting and irreparable impact to their educational development.  Carmona Decl. ¶ 46; *Blackman v. Dist. of Columbia*, 185 F.R.D. 4, 7 (D.D.C. 1999) (finding irreparable harm because, "at the rate at which a child develops and changes, especially one at the onset of biological adolescence … a few months can make a world of difference" in harm to a child's educational development).  And because it is Plaintiffs' duty and mission to prevent such learning loss, the damage to Plaintiffs' mission is similarly irreparable.  *See League of Women Voters*, 838 F.3d at 9; *NTEU v. Vought*, 2025 WL 942772, at *55 (finding irreparable harm where agency dismantling harmed plaintiffs' ability to perform their mission).

The uncertainty and delays engendered by Defendants' actions will result in cuts to vital staff and services.  School districts depend on the reliability of federal funds, many of which filter through states, in order to make basic decisions that impact students and educators.  Districts like Somerville and Easthampton lack sufficient financial resources to weather delays in funding and cannot spend their own funds without reliable expectations as to when federal funding will be disbursed.  Carmona Decl. ¶ 42; Binienda Decl. ¶ 20; Monarrez Decl. ¶ 39.  Funding uncertainty has a "direct and disruptive" impact on school district budgets, "particularly when it comes to staffing and program planning," as "critical decisions must be made months in advance."  Carmona

Decl. ¶ 43; *see also* Binienda Decl. ¶ 22; Monarrez Decl. ¶ 40.  Indeed, these harms are already happening—Somerville and Easthampton do not know whether they can add staff for the 2025-26 school year, whether they can provide summer school for children who need it, or whether they can even retain their current complement of staff.  Carmona Decl. ¶ 48; Binienda Decl. ¶ 29; *see also* Monarrez Decl. ¶¶ 14, 40.  The current situation may force Somerville "to make cuts—including possibly premature cuts—to staff and programs, disrupting services for students and families."  Carmona Decl. ¶ 48; *see also* Binienda Decl. ¶ 29.  In Easthampton, without certainty around the flow of funds, Easthampton may have to make "several detrimental changes to its programming," including "cutting personnel"; "increasing class sizes"; cutting programs like arts, music, and athletics; and cutting professional development for staff.  Binienda Decl. ¶ 23; *see also* Linos Decl., at 11 (noting that "even simple delays in funding" lead to adverse effects on students, staff, and resources).

The impacts of funding uncertainty—fewer educators and support staff, worse services for students, and larger class sizes—harm students in ways that cannot be simply made up in the future.  *See*, *e.g.*, Binienda Decl. ¶¶ 24-26 (documenting the adverse effects of larger class sizes); Carmona Decl. ¶¶ 13-14.  For example, if Somerville must cut its summer program, low-income students would suffer learning losses and would also lose "access to healthy meals during a months-long period when they otherwise might not have such access." Carmona Decl. ¶ 16.  And when districts cut staff—and therefore harm students—because of funding uncertainty created by Defendants, districts cannot simply rehire educators or support staff or make up lost learning.  Binienda Decl. ¶¶ 27-28; Carmona Decl. ¶¶ 45-46; *see also* Ury Decl. ¶ 12 (delays in funding would "force[ staff] to do more with less, due to larger class sizes, larger caseloads, and more demands on their time"); McNeil Decl. ¶ 28 ("delays or problems disbursing IDEA funds" will lead to "workforce shortages

[and] increased workloads" which will lead to worse services for students with disabilities); *id.* ¶¶ 19-20 (delays or uncertainty in Title I funds would lead to "job losses" and therefore "larger classroom sizes" which "would harm … students"); *see also* Linos Decl., at 11 ("If delays in funding translate to workforce cuts at the state and local level, the literature suggests that this will also have a clear negative impact on educational outcomes, especially for traditionally underserved students.").

### B. Federal Funding Delays and Uncertainty Will Irreparably Harm Educators and Education Workers, Including Union Plaintiffs' Members

The funding disruptions and uncertainty caused by the Mass Termination threaten Plaintiffs' members jobs and employment-related benefits. Numerous AFT and SEIU members have jobs that depend upon federal funding. McNeil Decl. ¶¶ 10, 20, 28 (describing "job losses"); Ury Decl. ¶ 16 (explaining risk of job loss due to disruption to Department funding streams); Tang Decl. ¶ 11 ("Title I funds the salaries" of teachers in the "26 Massachusetts school districts that AFT Massachusetts members work in …."); *id.* ¶ 14 ("IDEA funds are used to pay … staff salaries"); Van Campen ¶ 8 (AFSCME "members who work … in []roles serving students with disabilities depend on" IDEA funding); *id.* ¶ 11. If such funding is delayed (thereby forcing school districts to lay off teachers and staff due to uncertainty), Union Plaintiffs' members would lose not only their salaries, but also other employment benefits like healthcare—harms for which there could be no feasible monetary compensation. McNeil Decl. ¶¶ 10, 20; Ury Decl. ¶ 16; Tang Decl. ¶¶ 18-19; *see also California v. U.S. Dep't of Educ.*, No. 25-1244, 2025 WL 878431, at *5 (1st Cir. Mar. 21, 2025) (citing staff layoffs and program disruptions as harms that "cannot be fully remedied with late-arriving funds"); *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) (loss of health insurance can constitute irreparable harm).

Even those who don't lose their jobs and benefits will experience harms from funding

disruptions and delay or loss of technical assistance. Cutting instructional positions and paraprofessional support causes less favorable teacher-to-student ratios and a corresponding rise in workload. Binienda Decl. ¶ 25; Tang Decl. ¶ 12. It can also shift attention in the classroom away from instruction toward classroom management, Binienda Decl. ¶ 25, and reduce funds available for teacher training and professional development, *id.* ¶ 23.

## C. Defendants' Mass Termination Order Causes Irreparable Harm by Impeding Access to Vital Resources and Expertise on Which Students, Districts, Educators, and Education Workers Rely

Resources that are created, maintained, and updated by (now-fired) Department staff are vital to ensuring that districts and teachers can most effectively serve their students. Districts like Somerville, Easthampton, and Worcester rely upon the Department to collect research-backed resources to identify best practices for schools and educators. *See* Monarrez Decl. ¶¶ 26-31; Carmona Decl. ¶¶ 29-30; Binienda Decl. ¶ 8. These resources are not static—best practices in education are constantly evolving. If Department resources are "not updated with the latest available research," districts' ability to educate students will be undermined. Carmona Decl. ¶ 28; Monarrez Decl. ¶¶ 28-31. Indeed, given the "limited window of time to achieve results," school districts are "continuously thinking about ways to improve"—the Department's up-to-date research helps districts "understand what types of innovation are effective," particularly given breaking changes in education driven by science and technology. Monarrez Decl. ¶¶ 29, 30; State Ex. 71-64 ¶ 15 ("Peer-reviewed educational research will no longer be available to everyone, but instead it will only be available to the elite who can pay to access it."); *see also* Wolfson Decl. ¶ 11 (AAUP members also rely on data maintained by the Department for research). Where, as here, Plaintiffs rely on information collected and updated by the Department, Defendants' actions that undermine those information streams by making them "go out of date and not be replaced" constitutes irreparable harm. *NTEU v. Vought*, 2025 WL 942772, at *55; *see also id.* at *30.

Likewise, technical assistance provided by Department staff is vital to helping districts and educators to effectively educate students with disabilities and English language learners. Where, as here, an agency fires the staff who deliver vital technical assistance, guidance, and support, Plaintiffs—who rely on that assistance—are irreparably harmed. *See NTEU v. Vought*, 2025 WL 942772, at *29, *55-56 (explaining that the loss of agency technical assistance irreparably harmed plaintiffs). Staff in OSERS, along with now-terminated attorneys in DEE, provide technical assistance and data to help school districts optimize their services for students with disabilities. Neas Decl. ¶¶ 13-21; Carmona Decl. ¶ 31; State Ex. 66 ¶ 12. Absent preliminary relief, Somerville and Easthampton schools and their teachers and support staff who educate students with disabilities will be deprived of the OSERS guidance and expertise essential to offering these students a quality education. *Cf. N. D. v. Reykdal*, 102 F.4th 982, 995 (9th Cir. 2024) ("It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm." (internal quotation marks and citation omitted)); State Ex. 48 ¶ 55 (former Assistant Secretary for Civil Rights stating, "I cannot imagine how students with disabilities served under IDEA can be effectively served without [the terminated OSERS] staff."). And the closure of OELA will likewise harm Plaintiffs' ability to serve their English language learners. *See* Monarrez Decl. ¶ 16; Carmona Decl. ¶ 20; Binienda Decl. ¶ 38.

### D. The Mass Termination Order's Decimation of Federal Financial Aid Programs Will Harm Plaintiffs

A "core function and mission" of school districts is to "help support students seeking higher education." Carmona Decl. ¶ 32; *see also* Monarrez Decl. ¶ 32. To accomplish this, school districts rely on the effective functioning of FSA. FSA staff operate the Free Application for Federal Student Aid ("FAFSA"), which allows students to apply for grants and student loans. "Without Federal Student Aid Services, including the FAFSA and student loan and grant

programs, college would be out of reach for the vast majority of Somerville's students." Carmona Decl. ¶ 32. Somerville college counselors and other staff "rely heavily on materials produced by FSA" to help guide and support their students (and students' parents and families) as they apply for federal student aid, including "guides, videos, checklists, and forms." Carmona Decl. ¶ 33; *see also* Monarrez Decl. ¶¶ 32-33. If FSA cannot effectively operate the FAFSA or administer student aid grants and loans, or can no longer provide the kind of technical assistance and support that school staff rely on, school districts like Plaintiffs will be harmed.

Furthermore, the degradation of FSA will jeopardize financial aid services for Plaintiffs' educators and members. The Union Plaintiffs and their members rely on materials produced by FSA to help their members understand loan repayment options. Tang Decl. ¶ 27; Ury Decl. ¶ 25. Union Plaintiffs' members who rely on FSA for processing applications for loans and repayment programs, as well as those who are enrolled in PSLF, will see those systems thrown into chaos by the Mass Termination, as described in further detail above. *See, e.g.*, Leheny Decl. ¶ 11 ("Without legal advice from specialized OGC attorneys … [FSA] will be impeded in its ability to effectively manage the contracts for the FAFSA and loan servicers, which must operate in accordance with highly specific federal authorities."). This, in turn, would force the Union Plaintiffs' members to forgo higher education, default on existing loans, or potentially opt out of careers in public service. *See, e.g.*, McNeil Decl. ¶¶ 10, 41-42; Ury Decl. ¶¶ 18-24; State Ex. 61 ¶¶ 7-12 (describing RIF of Product Management Division that oversees the technological architecture behind the FAFSA).

### E.    Defendants' Decimation of the Office for Civil Rights Will Irreparably Harm Students, Districts, and Educators.

The decimation of the Office for Civil Rights ("OCR") will undermine effective civil rights enforcement for Plaintiffs' students and members. With the average case load expected to increase by as much as 60% per OCR investigator, the Mass Termination will mean that OCR "will exist

in name but not in actual function." State Ex. 71-48 ¶¶ 27-30.

School districts—and their students, parents, and educators—rely on OCR and will be harmed by OCR becoming an ineffective shell. For example, "the training and information" that Easthampton has "gained from OCR has enabled the District to respond to issues with compassion and empathy, rather than punitive measures … creating a healthier school environment." Binienda Decl. ¶ 33. When Easthampton encountered an issue "related to racial bias and discrimination," OCR's help "investigating and rectifying the issue was invaluable." *Id.* ¶ 31; *see also* Neas Decl. ¶¶ 41-43 (describing the benefits of the OCR complaint resolution process). Easthampton continues to "rely on the guidance put out by the Department of Education to know how to respond legally and adequately." Binienda Decl. ¶ 34; *see also id.* ¶¶ 38-39 (describing reliance on OCR's "technical support," "technical assistance" and "guidance, funding, and training"); McNeil Decl. ¶ 62 (describing the "significant technical assistance to support school districts" that is provided by OCR); Neas Decl. ¶ 41 (OCR provides a "critical enforcement mechanism" for students and their families "to vindicate their rights"); *id.* ¶ 42 ("OCR offers critical resolution processes" that "allow issues to be resolved in a timely manner" and "frequently help[] restore the working relationship between the family and the school and school district.").

For Union Plaintiffs' members, a defanged OCR will make educators "less able to provide their students with the fair, high quality education they deserve" and may result in an unsafe learning and working environment for many. McNeil Decl. ¶¶ 47-49, 60; Tang Decl. ¶ 28. Likewise, Union Plaintiffs' members who are students would also lose the benefits of OCR. Ury Decl. ¶ 20. And teachers, too, "can file complaints with OCR on behalf of themselves and their students." McNeil Decl. ¶ 60. Such harms to civil rights and classroom environments cannot be remedied after the fact. *Cf. E.E.O.C. v. Astra U.S.A., Inc.,* 94 F.3d 738, 745 (1st Cir. 1996)

(irreparable harm where "ability to investigate charges of discrimination and to enforce anti-discrimination laws has been and continues to be impeded").

### III.    The Balance of Equities and the Public Interest Favor a Preliminary Injunction

The balance of the equities and the public interest weigh heavily in Plaintiffs' favor. *Nken*, 556 U.S. at 435 (explaining that these factors merge when the government opposes the preliminary injunction). As former Education Secretary Arne Duncan stated:

> From a national security perspective, the best defense is a strong military. A strong education is the best offense. The United States of America has a strong offense, in large part because of the Department [of Education]'s work.

State Ex. 46 ¶ 6. Ensuring continuity in critical Department of Education funding and resources, as outlined above, furthers the public interest. *See California v. U.S. Dep't of Educ.*, No. CV 25-10548, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025) (Joun, J.) (finding public interest served by TRO where state educational institutions would be harmed, and the Department of Education would "merely [] have to disburse funds that Congress has appropriated to the States and others" (quoting *New York v. Trump*, 25-cv-39, —— F.Supp.3d ——, 2025 WL 357368, at *4 (D.R.I. Jan. 31, 2025))); *Colon-Vazquez v. Dep't of Educ. of Puerto Rico*, 46 F. Supp. 3d 132 (D.P.R. 2014) ("The public interest lies in the proper enforcement of … the IDEA" (quoting *Petties v. District of Columbia*, 238 F.Supp.2d 114, 125 (D.D.C. 2002)). Indeed, given the stakes here—including student learning—"minimizing the number of potential disruptions to the educational process is surely in the public interest." *Comfort ex rel. Neumyer v. Lynn Sch. Comm.*, 100 F. Supp. 2d 57, 68 (D. Mass. 2000).

As demonstrated above, Plaintiffs are likely to succeed on the merits, and there is consequently "no public interest in the perpetuation of unlawful agency action," *i.e.*, the Mass Termination Order. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Accordingly, the public interest and the balance of the equities weigh in favor of preliminary

injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to a preliminary injunction of the Mass

Termination Order.


Dated: April 1, 2025                                 Respectfully submitted,


                                                      /s/ Rachel F. Homer

                                            ***Counsel for Plaintiffs***
                                            Mark B. Samburg (MA State Bar No. 680099)
                                            Rachel F. Homer (MA State Bar No. 693642)
                                            Kali Schellenberg* (MA State Bar No. 694875)
                                            Will Bardwell* (DC Bar No. 90006120)
                                            Elena Goldstein* (NY State Bar No. 4210456)
                                            Victoria Nugent* (DC Bar No. 470800)
                                            Adnan Perwez* (DC Bar No. 90027532)
                                            Democracy Forward Foundation
                                            P.O. Box 34553
                                            Washington, D.C.  20043
                                            Telephone: 202.448.9090
                                            Facsimile: 202.796.4426
                                            msamburg@democracyforward.org
                                            rhomer@democracyforward.org
                                            kschellenberg@democracyforward.org
                                            wbardwell@democracyforward.org
                                            egoldstein@democracyforward.org
                                            vnugent@democracyforward.org
                                            aperwez@democracyforward.org


                                            * admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and will be provided to the following counsel for the defendants by email:

Brad Rosenberg
Special Counsel
Federal Programs Branch
U.S. Department of Justice
Brad.Rosenberg@usdoj.gov

*/s/ Rachel F. Homer*
Rachel F. Homer

**Appendix 1**

| Office | Functions | Impact of Mass Termination | Statutory Authorizations |
|---|---|---|---|
| Office of Elementary and Secondary Education ("OESE") | OESE administers funds to state and other grant recipients for at least 89 different programs, including numerous K-12 grant programs, such as Titles I, II and IV of the ESEA.[16]<br><br>OESE staff also provide support and technical assistance to applicants and grant recipients to enable the continuous and efficient distribution of necessary funds.  State Ex. 6; State Ex. 13 ¶ 65; State Ex. 18 ¶ 7. | Three of four offices within OESE's Office of Administration have been eliminated. *See* Department Organizational Charts.<br><br>The entirety of the Office of State and Grantee Relations, which provided support to all OESE grantees and administered COVID relief funds—funds which are still being relied upon—have been eliminated, without any contingency plan. *See* Department Organizational Charts; State Ex. 13 ¶¶ 39-46, 65, 75; State Ex. 6. | The Elementary and Secondary Education Act of 1965 ("ESEA"), Pub. L. No. 89-10.<br><br>The Department of Education Organization Act ("DEOA"), Pub. L. No. 96-88 (1979), 20 U.S.C. § 3413 (establishing OESE) |
| Office of Special Education and Rehabilitative Services ("OSERS") | OSERS administers the Individuals with Disabilities Education Act ("IDEA"), *see* 20 U.S.C. §§ 1400 *et seq.*, and other statutes.<br><br>OSERS provides policy and legal guidance to states and other grantees about how to implement IDEA.  *See* | At a minimum, the entire career staff within the Office of the Assistant Secretary have been fired, except one person. This includes "all policy staff who provide technical assistance," "the communications staff" and the "data collection and analysis." Neas Decl. ¶ 21; *see also* Department | DEOA, 20 U.S.C. § 3417 (establishing OSERS).<br><br>IDEA, 20 U.S.C. § 1402 (establishing the Office of Special Education Programs ("OSEP") within OSERS) |

---

[16] *See Offices/Programs by Office*, U.S. Dep't Educ., https://www.ed.gov/about/ed-offices/oese/offices-programs-by-office [https://perma.cc/J859-QBYL].

| | | | |
|---|---|---|---|
| | Neas Decl. ¶¶ 13-21; State Ex. 66 ¶ 12; State Ex. 48 ¶ 55.<br><br>OSERS staff provide technical assistance and data to help school districts optimize their services for students with disabilities.  Neas Decl. ¶¶ 13-21; State Ex. 66 ¶ 12. | Organizational Charts; State Ex. 14 ¶ 23 (describing cuts at OSERS). | |
| Office of General Counsel ("OGC") | OGC staff provide legal assistance to the Secretary concerning all programs and policies of the Department. 20 U.S.C. § 3421.<br><br>Attorneys in OGC's Division of Educational Equity ("DEE") review annual IDEA grant applications and provide technical assistance in the grant application process, as well as ongoing technical assistance to grantees throughout the year. State Ex. 66 ¶ 12; Leheny Decl. ¶¶ 6-7, 9. DEE attorneys also advise on all OCR matters. Leheny Decl. ¶ 6.<br><br>Attorneys in OGC's Division of Elementary, Secondary, Adult, and Vocational Education ("DESAVE") provide legal guidance on ESEA grant applications, including proper use and allocation of funds. State Ex. 66 ¶ 11; Leheny Decl. ¶¶ 6-7, 9. | *All* OGC attorneys in all subject areas except higher education have been terminated, including *all* attorneys specializing K-12 grants, IDEA grants and enforcement, equity grants, all OCR matters, all contract matters (including higher ed contract matters, like loan servicing) have been terminated. The only remaining staff in OGC is the Division of Post secondary education. The only remaining career leadership is one Deputy General Counsel who oversees Regulations, Legislation, and Ethics (and all attorneys in those divisions have been terminated); plus appointees. *See* State Ex. 66 ¶¶ 6-7; Leheny Decl. ¶¶ 12-13; Department Organizational Charts. | DEOA, 20 U.S.C. § 3421 (establishing OGC) |

| Office of English Language Acquisition, Language Enhancement, and Academic Achievement for Limited English Proficient Students ("OELA") | OELA administers grants (including Title III), invests in research, and provides technical support to teachers supporting English learners. *See* 20 U.S.C. § 3423d. | All employees have been terminated except the Deputy Assistant Secretary and one employee who plans to retire at the end of the month. State Ex. 60 ¶ 9; *see* Department Organizational Charts. | DEOA, 20 U.S.C. § 3423d (establishing OELA)<br><br>ESEA, Title III, 20 U.S.C. §§ 6801-7014 (establishing support for English language learners). |
|---|---|---|---|
| Federal Student Aid ("FSA") | FSA administers federal student aid programs. *See* 20 U.S.C. §§ 1018-1018b.<br><br>Within FSA, the Office of Institutions of Higher Education ("IHE") Oversight & Enforcement exists within FSA and provides oversight of schools participating in FSA programs. *See* State Ex. 52 (Miller Decl.) ¶¶ 3-4.<br><br>The Vendor Performance Division oversees federal student loan servicers and error correction in data in the student loan systems. *See* State Ex. 68 ¶¶ 3-6; State Ex. 69 ¶ 4(d).<br><br>The Product Management Division manages the FAFSA and applications for Public Service Loan | 16 of 19 total divisions under the Chief Operating Officer (who leads FSA) have been eliminated, and 8 of 10 divisions under the Deputy Chief Operating Officer have been eliminated. *See* Department Organizational Charts. Among these, the Mass Termination eliminated:<br><br>(1) Six of eight School Participation Sections within IHE Oversight & Enforcement, State Ex. 63 ¶¶ 5, 12-13; State Ex. 52 ¶¶ 6-7, 11-13; ; (2) The Vendor Performance Division, State Ex. 68 ¶¶ 7-9; State Ex. 69 ¶¶ 6, 9–10, 13–16; State Ex. 62 ¶¶ 5, 6; (3) The Product Management Division, (though the Department was later forced to reinstate key employees), State Ex. 61 ¶¶ 10-12; State Ex. 69 ¶ 16; t(4) | Higher Education Act of 1965, specifically, 20 U.S.C. §§ 1018 (establishing FSA at the Department and giving it responsibility for managing all aspects of the federal student aid program); *see also id.* §3441(2)(C). |

3

| | | | |
|---|---|---|---|
| | Forgiveness (PSLF), ensures technologies facilitating FSA loans function properly and comply with federal law. *See* State Ex. 61 ¶¶ 5-7.<br><br>The Human Capital Management Division supports FSA's HR, facilities, IT and administrative needs. *See* State Ex. 67, ¶ 4.<br><br>The Office of the Ombudsman FSA is a direct resource for student loan borrowers who have problems with their loans. *See* State Ex. 58 ¶¶ 2, 7. | The Human Capital Management Division State Ex. 67, ¶4-6; (5) The Office of the Ombudsman Federal Student Aid, (RIF from 25 analysts to 10), State Ex. 58 ¶¶ 19-20. | |
| Office for Civil Rights ("OCR") | Responsible for enforcing civil right statutes, including Title VI of the Civil Rights Act of 1965, 42 U.S.C. § 2000d, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131 *et seq.*, and the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101, *et seq.*<br><br>OCR also provides significant technical assistance to support recipients of Department funds in complying with the requirements of these statutes. State Ex. 48 ¶ 14. | More than half of OCR's regional offices have been eliminated, including all staff in Boston, Dallas, New York, Chicago, Cleveland, San Francisco, and Philadelphia. *See* Department Organizational Charts.<br><br>The closed offices account for 208 full-time investigators and 4 part-time investigators, meaning roughly 55% of all OCR investigators were terminated. State Ex. 59 ¶¶ 17–19. | DEOA, 20 U.S.C. § 3413 (establishing OCR). |

| Office of Career, Technical and Adult Education ("OCTAE") | OCTAE supports career and technical education programs through several grant programs. *See* 20 U.S.C. §§ 2301–2414. | The Executive Office, and two branches within the Division of Adult Education and Literacy responsible for reviewing and approving mandatory state plans and policies regarding grant funds, were eliminated. *See* Department Organizational Charts; State AG Ex. 54 ¶¶ 15, 16. | DEOA, 20 U.S.C. § 3416 (establishing OCTAE). |
|---|---|---|---|
| Institute of Education Sciences ("IES") | IES compiles and vets education science research and disseminates reliable findings and recommendations to schools, researchers, and policymakers.  State Ex. 64 ¶¶ 7-8.  Among its key functions, IES manages the What Works Clearinghouse and the Nation's Report Card. *Id.* ¶¶ 16-17. | Following the Mass Termination Order, among the IES's four centers, NCES has three remaining employees, NCER has only the Commissioner, NCSER has fewer than ten employees, and NCEE has only the Commissioner.  State Ex. 64 ¶ 12; *see* Department Organizational Charts. | Education Sciences Reform Act of 2002 ("ESRA"), 20 U.S.C. §§ 3419, 9511(a), (b)(2), 9543(a). |