IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **STATE OF NEW YORK**, *et al.* , <br><br> *Plaintiffs*, <br><br> v. <br><br> **LINDA McMAHON, in her official capacity as Secretary of Education,** *et al.*, <br><br> *Defendants*. | No. 1:25-cv-10601-MJJ |
| **SOMERVILLE PUBLIC SCHOOLS,** *et al.* , <br><br> *Plaintiffs*, <br><br> v. <br><br> **DONALD J. TRUMP, in his official capacity as President of the United States,** *et al.*, <br><br> *Defendants*. | No. 1: 25-cv-10677-MJJ |

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

I.      Statutory Background ......................................................................................... 1

II.     Factual Background ............................................................................................ 2

                1.      The Department's Support for Higher Education ...................................... 4

                2.      Department's Support for Birth to Grade 12 Education ........................... 5

                3.      Department's Support for Vocational Education and Rehabilitation .......... 6

                4.      Department's Enforcement of Civil Rights Laws in Education................. 6

                5.      Department's Responsibility to Study Education in the U.S. and
                        Maintain Data......................................................................................... 7

III.    Procedural History ............................................................................................. 7

        A.      The States' Complaint and Motion for a Preliminary Injunction........................... 7

        B.      The Somerville Plaintiffs' Complaint and Motion for a Preliminary
                Injunction ........................................................................................................ 8

LEGAL STANDARDS ................................................................................................. 9

ARGUMENT ................................................................................................................ 9

I.      Plaintiffs are Unlikely to Succeed on the Merits of Their Claims. ..................... 9

        A.      Plaintiffs Lack Standing...................................................................................... 9

        B.      The CSRA Provides the Exclusive Remedy for Plaintiffs' Claims .................... 10

        C.      Claims Relating to any "Closure" of the Department of Education Are Not
                Ripe ................................................................................................................. 13

        D.      Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of
                a Discrete Final Agency Action. ..................................................................... 15

        E.      Plaintiffs' Constitutional Claims are Unlikely to Succeed................................. 18

        F.      Because the Executive Order Expressly Directs the Department to
                Continue All Actions Required by Law, the Executive Order Does Not
                Infringe on the Department's Statutory Obligations.......................................... 22

i

G.      Defendants Are Making Reasonable Judgments that Are Committed to
        Agency Discretion by Law.................................................................... 23

II.      Plaintiffs Cannot Irreparable Harm Justifying Extraordinary Relief. .............................. 25

III.     The Equities and the Public Interest Weigh Against a Preliminary Injunction. ................ 26

IV.      Any Injunction Should Be Narrowly Tailored .................................................... 27

V.       Any Injunction Should Be Stayed, and Plaintiffs Should Be Required to Post a
         Bond If an Injunction is Entered .............................................................. 27

CONCLUSION ................................................................................ 28

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) .................................................................................... 14

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ................................................................... 17

*Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ..................................................................... 12

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ............... 11, 12

*Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*,
367 F.3d 932 (D.C. Cir. 2004) ..................................................................... 13

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ..................................................................... 11, 12

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................... 17, 18

*Boston's Children First v. City of Boston*,
62 F. Supp. 2d 247 (D. Mass. 1999) ............................................................ 25

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ..................................................................................... 27

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ..................................................................................... 18, 21

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) ....................................................................... 14

*City of Olmsted Falls v. Fed. Aviation Admin.*,
292 F.3d 261 (D.C. Cir. 2002) ..................................................................... 24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..................................................................................... 10

*Clinton v. Jones*,
520 U.S. 681 (1997) ..................................................................................... 22

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ..................................................................... 15

*Common Cause R.I. v. Gorbea,*
    970 F.3d 11 (1st Cir. 2020)................................................................................... 26

*Cousins v. Sec'y of the U.S. Dep't of Transp.,*
    880 F.2d 603 (1st Cir. 1989) ............................................................................... 17

*Dalton v. Specter,*
    511 U.S. 462 (1994) ..................................................................................... 19, 21

*de Feyter v. Fed. Aviation Admin.,*
    No. 10-CV-358-JL, 2011 WL 1134657 (D.N.H. Mar. 25, 2011) ............................ 25

*Drake v. FAA,*
    291 F.3d 59 (D.C. Cir. 2002)........................................................................24-25

*Elgin v. Dep't of the Treasury,*
    567 U.S. 1 (2012)........................................................................................11, 12

*Ernst & Young v. Depositors Econ. Prot. Corp.,*
    45 F.3d 530 (1st Cir. 1995) ................................................................................. 14

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021)........................................................................................... 23

*Fed. Express Corp. v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ............................................................................. 20

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.,*
    423 U.S. 326 (1976)........................................................................................... 24

*Fed. Trade Comm'n v. Standard Oil Co. of Cal.,*
    449 U.S. 232 (1980)........................................................................................... 14

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985)........................................................................................... 25

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010)........................................................................................... 22

*Greater Bos. Legal Servs. v. United States Dep't of Homeland Sec.,*
    No. 21-CV-10083-DJC, 2022 WL 138629 (D. Mass. Jan. 14, 2022)..................... 15

*Gulf Oil Corp. v. Brock,*
    778 F.2d 834 (D.C. Cir. 1985)............................................................................ 27

*Heckler v. Chaney,*
    470 U.S. 821 (1985).............................................................................. 20, 25, 26

*In re James R. Jones, House of Representatives,*
　　B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981) ............................................. 21

*Karahalios v. NFFE, Local 1263,*
　　489 U.S. 527 (1989) ........................................................................................................ 13

*Kim v. FINRA,*
　　698 F. Supp. 3d 147 (D.D.C. 2023),
　　*appeal dismissed,* 2025 WL 313965 (D.C. Cir. Jan. 27, 2025) ................................................. 26

*Lincoln v. Vigil,*
　　508 U.S. 182 (1993) ..................................................................................................... 23, 25

*Littlefield v. U.S. Dep't of the Interior,*
　　85 F.4th 635 (1st Cir. 2023), *cert. denied,* 144 S. Ct. 1117 (2024) ........................................ 23

*Lujan v. Defs. of Wildlife,*
　　504 U.S. 555 (1992) ........................................................................................................ 21

*Lujan v. Nat'l Wildlife Fed'n,*
　　497 U.S. 871 (1990) ..................................................................................................... 15, 16

*Marbury v. Madison,*
　　5 U.S. (1 Cranch) 137 (1803) ............................................................................................ 21

*Markland v. OPM,*
　　140 F.3d 1031 (Fed. Cir. 1998) ......................................................................................... 24

*Mazurek v. Armstrong,*
　　520 U.S. 968 (1997) .......................................................................................................... 9

*McInnis-Misenor v. Me. Med. Ctr.,*
　　319 F.3d 63 (1st Cir. 2003) ............................................................................................... 14

*McKenna v. Dep't of Interior,*
　　996 F.2d 1235 (Fed. Cir. 1993) ......................................................................................... 10

*Mississippi v. Johnson,*
　　71 U.S. (4 Wall.) 475 (1867) ............................................................................................ 21

*Montplaisir v. Leighton,*
　　875 F.2d 1 (1st Cir. 1989) ................................................................................................ 13

*Morrison v. Olson,*
　　487 U.S. 654 (1988) ........................................................................................................ 22

*N.Y.C. Transit Auth. v. Beazer,*
　　440 U.S. 568 (1979) ........................................................................................................ 20

v

*Nat'l Fed'n Emps., Local 1319 v. Dep't of the Interior,*
    526 U.S. 86 (1999) ................................................................................................. 13

*Nat'l Treasury Emps. Union v. Trump,*
    --- F. Supp. 3d ----, 2025 WL 561080 (D.D.C. Feb. 20, 2025) ............................. 12

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................... 26

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ........................................................................................ 15, 16-17

*Patel v. Johnson,*
    2 F. Supp. 3d 108 (D. Mass. 2014) ........................................................................ 17

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs,*
    87 F.3d 1242 (11th Cir. 1996) ............................................................................... 17

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................................................... 22

*Reno v. Cath. Soc. Servs., Inc.,*
    509 U.S. 43 (1993) ................................................................................................. 14

*Roman Cath. Bishop of Springfield v. City of Springfield,*
    724 F.3d 78 (1st Cir. 2013) ................................................................................... 14

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012) .............................................................................. 22

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981) .............................................................................. 22

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................... 10

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ............................................................................................... 12

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................................................. 9

*Union of Concerned Scientists v. Wheeler,*
    954 F.3d 11 (1st Cir. 2020) ................................................................................... 25

*United States v. Fausto,*
    484 U.S. 439 (1988) ............................................................................................... 11

*United States v. Nixon*,
    418 U.S. 683 (1974)............................................................................. 20

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978)........................................................................ 24, 25

*Water Quality Ins. Syndicate v. United States*,
    632 F. Supp. 2d 108 (D. Mass. 2009) ............................................... 24

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)............................................................................. 10

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................. 9, 10

**STATUTES**

5 U.S.C. § 701 ....................................................................................... 24

5 U.S.C. § 704 ................................................................................. 17, 18

5 U.S.C. § 706 ................................................................................... 7, 17

5 U.S.C. § 1204 ..................................................................................... 11

5 U.S.C. §§ 7101–35 ............................................................................ 11

5 U.S.C. § 7105 ............................................................................... 11, 13

5 U.S.C. § 7117 ..................................................................................... 13

5 U.S.C. § 7123 ............................................................................... 11, 13

5 U.S.C. § 7512 ..................................................................................... 11

5 U.S.C. § 7701 ..................................................................................... 11

5 U.S.C. § 7703 ..................................................................................... 11

20 U.S.C. § 1018 ..................................................................................... 4

20 U.S.C. § 1057 ..................................................................................... 5

20 U.S.C. § 1070 ..................................................................................... 4

20 U.S.C. § 1101 ..................................................................................... 5

20 U.S.C. § 1400 ..................................................................................... 5

20 U.S.C. § 1402 ..................................................................................... 5

20 U.S.C. § 1407 .................................................................................................... 5

20 U.S.C. § 2301 .................................................................................................... 6

20 U.S.C. § 3402 .................................................................................................... 2

20 U.S.C. § 3413 .................................................................................................... 6

20 U.S.C. § 3416 .................................................................................................... 6

20 U.S.C. § 6301 .................................................................................................... 5

20 U.S.C. § 6302 .................................................................................................... 5

20 U.S.C. § 6303 .................................................................................................... 5

20 U.S.C. § 6311 .................................................................................................... 5

20 U.S.C. § 6361 .................................................................................................... 5

20 U.S.C. § 9511 .................................................................................................... 7

28 U.S.C. § 1295 ...................................................................................................11

29 U.S.C. § 3271 .................................................................................................... 6

Department of Education Organization Act,
    Pub. L. No. 96-88, 93 Stat. 668 (1979)............................................................ 1

**FEDERAL RULES**

Fed. R. Civ. P. 65 ................................................................................................. 27

**REGULATIONS**

5 C.F.R. pt. 2420 ..................................................................................................11

5 C.F.R. § 1201.34 ............................................................................................... 12

5 C.F.R. § 1201.36 ............................................................................................... 12

5 C.F.R. § 2423.22 ...............................................................................................11

34 C.F.R. § 100.7 .................................................................................................. 6

Improving Education Outcomes by Empowering Parents, States, and Communities,
    Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025)....................... 2, 4, 22

**OTHER AUTHORITIES**

Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*,
    The Hill (Mar. 12, 2025),
    https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-
    mass-layoffs/ ................................................................................................................ 3

Ingraham Angle, *Education secretary says department took first steps to eliminate
    'bureaucratic bloat'*, Fox News (Mar. 11, 2025),
    https://www.foxnews.com/video/6369901522112 ...................................................... 3

Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*,
    The Hill (Mar. 4, 2025),
    https://thehill.com/homenews/education/5175086-linda-mcmahon-education-department-
    trump-musk/ .................................................................................................................. 3

U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025),
    https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission ... 2

U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025),
    https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-
    force ................................................................................................................... 2, 3, 23

## INTRODUCTION

President Trump ran on the promise to close the Department of Education ("Department"). After he was elected, he entrusted Secretary of Education Linda McMahon with reducing the bureaucratic excess in the Department in anticipation of ultimately closing it. But both President Trump and Secretary McMahon have been unequivocal that it will take an act of Congress to ultimately shutter the Department. In the meantime, Secretary McMahon has used her congressionally granted discretion to reduce the headcount at the Department and streamline its operations.

In seeking preliminary injunctions, Plaintiffs would have this Court superintend the United States' education system and its authority as an employer. There is no legal basis justifying the extent and breadth of the requested preliminary injunctions. If granted, those injunctions would eliminate the discretion entrusted to the Secretary. Instead of the Executive Branch faithfully executing the laws of Congress, a cabinet-level agency would instead be put under the control of this Court.

This Court should deny relief. Plaintiffs have not explicitly identified each statutory duty the Department is required to perform, and Plaintiffs have not tied the reduction-in-force to the inability to perform those duties. Rather, many of the programs they identify are within the discretion of the Secretary, not statutorily mandated. Nor can Plaintiffs show irreparable harm. Finally, the balance of the equities and public interest tip in Defendants' favor.

## BACKGROUND

### I.     Statutory Background

The Department of Education was established as part of the Department of Education Organization Act. Pub. L. No. 96-88, 93 Stat. 668 (1979). The purpose of the Department is principally to

> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual; (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public

and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education; (3) to encourage the increased involvement of the public, parents, and students in Federal education programs; (4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information; (5) to improve the coordination of Federal education programs; (6) to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and (7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

## II. Factual Background

On March 20, 2025, President Trump signed the "Improving Education Outcomes by Empowering Parents, States, and Communities" Executive Order. Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) ("Executive Order"). The Executive Order found that the "Department of Education has entrenched the education bureaucracy" that "is not working." *Id.* § 1. For example, the Order identified the Department of Education's "public relations office that includes over 80 staffers at a cost of more than $10 million per year." *Id.* Ultimately, the Order contemplates that the "[c]losure of the Department of Education would drastically improve program implementation in higher education" and "would provide children and their families the opportunity to escape a system that is failing them." *Id.*

Secretary McMahon is tasked with carrying out President Trump's policy to "eliminat[e] [the] bureaucratic bloat . . . at the Department of Education—a momentous final mission—quickly and responsibly." U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission. The Secretary has described this mission as "an overhaul" of the Department of Education. *Id.* After the overhaul, the Department "will continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking." U.S. Dep't of Educ.,

*U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("RIF Press Release"). The Secretary stated that she planned to keep 50% of the Department "related to expenditures and key programs" for which Congress has appropriated money. Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, Fox News (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112.

As part of the overhaul, the Department is implementing a reduction-in-force, which impacts "[a]ll divisions within the Department," and some divisions will require "significant reorganization to better serve students, parents, educators, and taxpayers." RIF Press Release. The purpose of the reduction-in-force is "efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." *Id.* It is "the first step of eliminating . . . bureaucratic bloat," Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/ ("Hill Article"); it is not intended to shutter the Department or end statutorily mandated programs. Instead, the Department intends to "ke[ep] all of the right people and the good people to make sure that the outward-facing programs . . . the grants, the appropriations that come from Congress, all of that are being met, and none of that's going to fall through the cracks." *Id.* As part of the reduction-in-force, any staff that may be separated will first be put on administrative leave. RIF Press Release.

Longer term, Secretary McMahon recognizes that shutting down the Department will require "work with Congress." Hill Article. To implement that longer-term goal, the Secretary plans to partner with Congress and other federal agencies to determine the best path forward to fulfill the expectations of the President and the American people. Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*, The Hill (Mar. 4, 2025), https://thehill.com/homenews/education/5175086-linda-mcmahon-education-department-trump-musk/. In the meantime, and pursuant to the Executive Order, the Secretary of Education was

ordered "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." Exec. Order No. 14,242 § 2(a). But while facilitating closure, the "Secretary of Education shall ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law." *Id.* § 2(b). And the Executive Order makes clear that it should "be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b).

The Department is currently undergoing a reorganization, which will streamline the Department and eliminate activities that fall under the discretion of the Executive. As is the case with any large-scale reorganization, this restructuring may impact certain services until the reorganization is finished. But the Department remains committed to fulfilling its statutory requirements. Unless and until Congress closes the Department, the only activities intended to be eliminated are functions left to agency discretion.

1. The Department's Support for Higher Education

The Department is committed to fulfilling its statutory requirements with respect to higher education. The Department is authorized by Title IV of the Higher Education Act to implement programs for the following:

> (1) providing Federal Pell Grants to all eligible students; (2) providing supplemental educational opportunity grants to those students who demonstrate financial need; (3) providing for payments to the States to assist them in making financial aid available to such students; (4) providing for special programs and projects designed (A) to identify and encourage qualified youths with financial or cultural need with a potential for postsecondary education, (B) to prepare students from low-income families for postsecondary education, and (C) to provide remedial (including remedial language study) and other services to students; and (5) providing assistance to institutions of higher education.

20 U.S.C. § 1070. The funds for these programs are appropriated annually by Congress.

With respect to financial aid, the Secretary is vested with "responsibility for the development and promulgation of policy and regulations relating to the programs of student financial assistance under subchapter IV." *Id.* § 1018(b). Under Title III of the Higher Education Act, the Secretary "shall carry out a program, in accordance with this part, to improve the academic

quality, institutional management, and fiscal stability of eligible institutions, in order to increase their self-sufficiency and strengthen their capacity to make a substantial contribution to the higher education resources of the Nation." *Id.* § 1057(a). And under Title V of that Act, the Secretary "shall provide grants and related assistance to Hispanic-serving institutions to enable such institutions to improve and expand their capacity to serve Hispanic students and other low-income individuals" 20 U.S.C. § 1101.

The Secretary has wide discretion in determining how to accomplish these statutory goals. Federal law does not require the Department to dedicate a particular number of employees to doing so. Nor does federal law require the Department to devote a particular threshold of resources to doing so.

   2.   <u>Department's Support for Birth to Grade 12 Education</u>

The Department is committed to fulfilling its statutory functions in supporting Title I of the Elementary and Secondary Education Act and Individuals with Disabilities Education Act (IDEA) funds. The purpose of Title I funding is to provide "all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." 20 U.S.C. § 6301. Title I also makes available funds for state assessments. *Id.* § 6361. Congress appropriates the funding for Title I. *Id.* § 6302. The statutes place strict requirements on States' use of such funds. 20 U.S.C. § 6303. States are also required to develop and submit plans for the use of the funds. 20 U.S.C. § 6311. The statutes invest the Secretary with significant discretion on the administration of those funds.

The IDEA is meant to improve the educational outcomes of children with disabilities. *Id.* § 1400. The Act mandates the presence of the Office of Special Education and Rehabilitative Services (OSERS) in the Department of Education. *Id.* § 1402. It also mandates an Office of Special Education Programs (OSEP) within OSERS. *Id.* Congress appropriates funds for IDEA programs. *Id.* § 1407. The statutory scheme for IDEA vests the Secretary with significant discretion on what programs to implement and how those programs are staffed to achieve the purposes of IDEA.

5

The Department also maintains an Office of Elementary and Secondary Education (OESE). Sanon's "Dear Education Stakeholders" Letter (States PI Ex. 6), ECF No. 71-6. The Department's employees with OESE "who oversee the allocation, monitoring, and management of the Elementary and Secondary Education Act's (ESEA) title formula funding and discretionary grant programs were not impacted by the reduction in force." *Id.* The Department has stated that the funds will flow normally, and program functions will not be disrupted. *Id.* The Department further stated that strengthening these programs are a top priority for the Department. *Id.*

### 3. Department's Support for Vocational Education and Rehabilitation

The Department is committed to fulfilling its statutory functions with respect to support for vocational education and rehabilitation under the Perkins V Act. The Perkins V Act is intended to "develop more fully the academic knowledge and technical and employability skills of secondary education students and postsecondary education students who elect to enroll in career and technical education programs and programs of study." 20 U.S.C. § 2301. To that end, Congress created an Office of Career, Technical, and Adult Education (OCTAE) in the Department of Education. *Id.* § 3416. Congress also passed a statute to "create a partnership among the Federal Government, States, and localities to provide, on a voluntary basis, adult education and literacy activities." 29 U.S.C. § 3271. OCTAE administers both programs. The Department has stated that the "critical functions for the Office of Career, Technical, and Adult Education (OCTAE) are not impacted by these reductions." Bergeron "Dear Education Stakeholders" Letter (States PI Ex. 7), ECF No. 71-7.

### 4. Department's Enforcement of Civil Rights Laws in Education

Congress established an Office for Civil Rights (OCR) within the Department of Education. 20 U.S.C. § 3413. As is typical with an executive enforcement function, the Secretary has wide discretion over the activities of OCR. OCR is required by regulations to review the practices of recipients of federal aid from time to time to determine compliance with applicable law. 34 C.F.R. § 100.7. OCR also receives complaints of prohibited discrimination according to its regulations. *Id.* The regulations require a "prompt" investigation whenever there is an indication

of a possible failure of compliance. *Id.*

     5.  <u>Department's Responsibility to Study Education in the U.S. and Maintain Data</u>

The Department is committed to fulfilling its statutory requirements with respect to collecting and maintaining data. Congress requires the Department to establish an Institute which will

> compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute and ensure that such activities-- (A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. § 9511(b)(2). The way these statistics are collected, researched, and disseminated is left to the Secretary's discretion.

## III.    Procedural History

### A.  The States' Complaint and Motion for a Preliminary Injunction

The States Plaintiffs filed a Complaint on March 13, 2025 seeking declaratory relief at the broadest level of generality; namely, that "President Trump's Directive to dismantle the Department of Education, and the Department of Education's implementation of the Directive are unlawful." Compl., *New York v. McMahon*, No. 25-cv-10601-MJJ, ECF No. 1 ("States Compl.").

The Complaint includes five counts. Count One requests a declaratory judgment and a permanent injunction of the President's Directive based on an alleged "Violation of the Separation of Powers Doctrine" for "Usurping Legislative Authority." States Compl. ¶¶ 149-159. Count Two seeks the same relief under the Take Care Clause. *Id.* ¶¶ 160-65. Count Three seeks *ultra vires* review of the President's Directive and acts taken pursuant to that Directive. *Id.* ¶¶ 166-61. Counts Four and Five invoke the APA. *Id.* ¶¶ 172-95. In Count Four, Plaintiffs claim that Defendants lack "authority to implement the Directive as it calls for actions that are not authorized by statute, and are in direct contravention of statutory authority governing the creation and operation of the Department of Education" and have thus violated 5 U.S.C. § 706(2)(C). *Id.* ¶ 179. And in Count Five, Plaintiffs claim that "the Agency Defendants' actions implementing the Directive violate the

APA because they are arbitrary and capricious." *Id.* ¶ 193.

The States Plaintiffs filed a motion for a preliminary injunction and memorandum in support on March 24, 2025. Mot. for a Prelim. Inj., *New York v. McMahon*, No. 25-cv-10601-MJJ, ECF No. 69; Mem. of Law in Supp. of Pls.' Mot. for a Prelim. Inj., *New York v. McMahon*, No. 25-cv-10601-MJJ, ECF No. 70 ("States PI").

**B.  The Somerville Plaintiffs' Complaint and Motion for a Preliminary Injunction**

The Somerville Plaintiffs filed a Complaint on March 24, 2025, seeking similarly broad relief; namely, "declaratory and injunctive relief against Defendants' unlawful effort to eliminate the Department of Education through the March 11, 2025, decision to fire half of the Department's staff and President Trump's Executive Order on March 20, 2025, seeking to abolish the Department as a whole." *Somerville Public Schools v. Trump*, 25-cv-10677-MJJ, ECF 1 (Somerville Compl.) ¶ 9.

The Complaint includes seven counts. Count One alleges that the President's actions to close the Department, move sections of the Department to other agencies, and implement reductions-in-force violate Separation of Powers principles. *Id.* ¶¶ 209-214. Count Two alleges that the President's actions to close the Department will interrupt funding required by statute, and thus violate the Take Care clause. *Id.* ¶¶ 215-219. Count Three seeks *ultra vires* review of the President's Directive and alleged acts to close the Department, move sections of the Department to other agencies, and implement reductions-in-force. *Id.* ¶¶ 220-27. Counts Four, Five, Six, and Seven invoke the APA. *Id.* ¶¶ 228-261. In Count Four, Plaintiffs allege that the President's actions to close the Department, move sections of the Department to other agencies, and implement reductions-in-force violate are actions contrary to a constitutional right. *Id.* ¶ 232. In Count Five, Plaintiffs allege that "Defendants lack authority to dismantle the Department, in whole or in part, including by effectuating mass terminations of the Department's staff or otherwise implementing the Executive Order's directive." *Id.* ¶ 239. In Count Six, Plaintiffs allege that "Defendants' actions to incapacitate the Department of Education are in contravention of numerous Congressional directives requiring federal support for education." *Id.* ¶ 250. In Count Seven, Plaintiffs allege that

the "effective dismantlement of the Department of Education is arbitrary and capricious." *Id.* ¶ 253.

The Somerville Plaintiffs filed a motion for a preliminary injunction and memorandum in support on April 1, 2025. *Somerville Public Schools v. Trump*, 25-cv-10677-MJJ, ECF No. 25; Mem. of Law in Supp. of Pls.' Mot. for a Prelim. Inj., *Somerville Public Schools v. Trump*, 25-cv-10677-MJJ, ECF No. 26 ("Somerville PI").

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

## ARGUMENT

## I.    Plaintiffs are Unlikely to Succeed on the Merits of Their Claims.

Plaintiffs cannot show they are likely to succeed on the merits of their claims, which have both threshold and substantive flaws.

### A.  Plaintiffs Lack Standing

As a threshold matter, Plaintiffs have failed to demonstrate standing. To establish Article III standing, a plaintiff must show that it has suffered a judicially cognizable injury that is fairly traceable to the defendant and likely redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.

Plaintiffs admit that they lack understanding of the Department's ongoing reorganization, *see New York v. McMahon*, No. 25-cv-10601-MJJ, ECF No. 70 at 14 (complaining that Department's "Dear Education Shareholder" letters "provided little detail"), but nonetheless argue that they have been or will be harmed by this reorganization. In an attempt to prove these speculative harms, Plaintiffs provide numerous declarations hypothesizing about harm that *may*

befall them *if* the Department is unable to provide a particular service or function. *See, e.g.*, *id.* ECF No. 71-12 (Mackey Declaration, ¶ 11) ("Discontinuation of these [federal technical] assistance centers **may** hinder RSA's functionality in each of these areas."); *id.* ECF No. 71-13 (Thurmond Declaration, ¶ 34) ("The reduction in workforce at the Department **could** significantly impact access to funds and services for special education students and programs in California."); *id.* ECF No. 71-15 (Paccione Declaration, ¶ 16) (predicting that reduction-in-force "will ***likely*** lead to delays and issues with the data collection, which could be used to withhold or eliminate federal funding to Colorado institutions"); *id.* ECF No. 71-19 (Halbert Declaration, ¶ 15) (Loss of guidance "***could*** divert critical resources away from direct educational services and create unnecessary compliance risks for the university.") (emphasis added for all).

This is precisely the sort of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see also Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (rejecting a standing theory premised on a speculative chain of possibilities); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990) (same).

Even if Plaintiffs could show an imminent, actual harm—only one part of the chain they must show for standing—in many cases they cannot connect it to a statutory violation rather than an exercise of proper discretion. "The decision to undertake a reorganization necessitating a RIF is within the discretion of the agency," *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993). Yet Plaintiffs ask this Court to insert itself into this process, and, in the name of equity, issued a programmatic injunction freezing in place the Department's personnel and organizational structure. And Plaintiffs ask this Court to do so notwithstanding the Secretary's differing judgment about how the Department should operate. Having crossed—in Plaintiffs' mind—some threshold for organizational change that is as unarticulated as it is inarticulable, Plaintiffs ask this Court to step in and manage the Department's human resource processes. That is not the law

**B. The CSRA Provides the Exclusive Remedy for Plaintiffs' Claims**

The "extraordinary" relief that Plaintiffs seek is at its core a challenge to the Department

of Education's reduction-in-force. *Winter*, 555 U.S. at 24. Indeed, the first sentence of the State Plaintiffs' memorandum supporting its request for an injunction argues that "[t]he Executive Branch is unilaterally and unlawfully gutting the Department of Education." States PI at 1; *accord* Somerville Compl. ¶ 1 ("Defendants seek to eliminate the U.S. Department of Education. The first step: fire the people that do the work of the Department."). This Court lacks jurisdiction to adjudicate that challenge.

In passing the Civil Service Reform Act, and as relevant here, Congress made the Merit Systems Protection Board[1] and Federal Labor Relations Authority[2] the exclusive means for federal employees, labor unions, and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is required even when such disputes involve constitutional claims. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (finding "the decision in *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("AFGE") [] instructive" and dissolving the temporary restraining order and denying the preliminary injunction).

The scope of the reduction-in-force does not and cannot change the essential nature of Plaintiffs' challenge. Had the Department of Education eliminated, for example, a single program office or conducted a more limited reduction-in-force, any challenge to that action by aggrieved

---

[1] Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See* 5 U.S.C. § 1204(a)(1). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions to the Federal Circuit. *See id.* § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).
[2] As part of the CSRA, Congress passed the Federal Service Labor-Management Relations Statute ("FSMLRS"), codified at 5 U.S.C. §§ 7101–35, and established the FLRA to conduct hearings and resolve complaints of unfair labor practices, *see* 5 U.S.C. § 7105(a)(2)(G). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. *See id.* § 7123(a). FLRA regulations are set out at 5 C.F.R. pt. 2420. Among other things, the regulations allow persons or organizations who show that the outcome of the proceeding in likely to directly affect their rights or duties to intervene. *See* 5 C.F.R. § 2423.22.

agency personnel would inarguably have to be brought before the MSPB. MSPB regulations are adequate to entertain the sorts of claims that Plaintiffs allege here: they (i) allow persons or organizations who want to participate in a proceeding because they believe the proceeding, or its outcome, may affect their rights or duties to intervene, *see* 5 C.F.R. § 1201.34; and (ii) allow matters to be joined or consolidated, *see id*. § 1201.36. With limited exceptions, "[i]ntervenors have the same rights and duties as parties[.]" *Id.* § 1201.34(d). Finally, the regulations allow the participation of amicus curiae. *Id.* § 1201.34(e).

That Plaintiffs have framed their alleged injury in constitutional terms does not allow the Plaintiffs to sidestep CSRA's mandatory channeling regime. *Cf. State of Maryland et al. v. U.S. Dept. of Ag.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir.) (Apr. 9, 2025) ("The Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims, and the Government is unlikely to recover the funds disbursed to reinstated probationary employees"). Were Plaintiffs' theory correct, downstream users of government services could always go directly to court to raise challenges to agency reductions-in-force notwithstanding Congress's determination that the employees must themselves first pursue relief administratively. Courts have repeatedly rejected these sorts of end runs. In *Elgin*, the Supreme Court held that even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" 567 U.S. at 12. Similarly, in *AFGE v. Trump*, numerous federal unions asserted broad constitutional and statutory challenges to a set of three Executive Orders. *See* 929 F.3d at 752. The D.C. Circuit held that the FLRA provided the exclusive avenue through which unions could bring their claims. *See id*. at 754–61 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–16 (1994)); *AFL-CIO*, 2025 WL 470459, at *2 (finding "the decision in *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ('AFGE') . . . instructive" and dissolving the temporary restraining order and denying the preliminary injunction); *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636–39 (D.C. Cir. 2013); *Nat'l Treasury Emps. Union v. Trump*, --- F. Supp. 3d ----, 2025 WL 561080, at *7 (D.D.C. Feb. 20, 2025) (upholding channeling requirement and denying request for emergency relief).

Congress also provided the FLRA as the exclusive avenue by which labor unions representing federal employees must pursue their claims. Congress expressly delegated "rulemaking, adjudicatory, and policymaking powers" to the FLRA. *Nat'l Fed'n Emps., Local 1319 v. Dep't of the Interior*, 526 U.S. 86, 87 (1999). As the Supreme Court has held, "the congressional scheme . . . leave[s] the enforcement of union and agency duties under the [Statute] to the General Counsel and the FLRA and . . . confine[s] the courts to the role given them under the [Statute]." *Karahalios v. NFFE, Local 1263*, 489 U.S. 527, 536–37 (1989). The FLRA's powers include the power to "resolve issues relating to the duty to bargain," 5 U.S.C. § 7105(a)(2)(E), and the power to resolve disputes about whether the duty to bargain in good faith extends to a particular matter, *id*. §§ 7105(a)(2)(D), 7117(c). And if the labor union plaintiffs are dissatisfied by an FLRA decision, they may seek judicial review in the courts of appeals. *See* 5 U.S.C. § 7123.

The First Circuit has recognized that under the FLRA, "judicial oversight is 'both prescribed and proscribed' and the district courts are largely omitted from the equation." *Montplaisir v. Leighton*, 875 F.2d 1, 2–3 (1st Cir. 1989) (internal citation omitted). The fact that Plaintiffs "chose not to couch their complaint as an unfair labor practice cuts no mustard." *Id.* at 4. "Where labor-law preemption is an issue, creative labelling cannot carry the day." *Id.* "Rather, the needed reconnaissance focuses upon 'the conduct being regulated, not the formal description of governing legal standards . . . .'" *Id.* (citation omitted). Here, the conduct being regulated is plainly the employment at the Department of Education. Because "district courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA," this Court should reject Plaintiffs' effort to disrupt Congress's review scheme and to seek premature, improper review before this Court. *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004) (citing *Karahalios*, 489 U.S. at 533).

**C.  Claims Relating to any "Closure" of the Department of Education Are Not Ripe**

Counts I, II, and III of the States Plaintiffs' claims and Counts I-V of the Somerville Plaintiffs' claims are not ripe for review. That is because the Department of Education is not closed. And it will not be closing without congressional action. The ripeness doctrine requires a reviewing

court to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). Usually, a plaintiff must demonstrate both prongs to obtain review. *See Ernst & Young v. Depositors Econ. Prot. Corp*., 45 F.3d 530, 535 (1st Cir. 1995).

The ripeness doctrine reflects both "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc*., 509 U.S. 43, 57 n.18 (1993). The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision." *Abbott Lab'ys*, 387 U.S. at 148-49. Moreover, in making prong two determinations, courts consider pragmatic issues that would arise from considering the agency action to be reviewable. *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242-43 (1980) (considering that reviewing particular agency action would "interfere[] with the proper functioning of the agency" and turn "prosecutor into defendant before adjudication concludes"); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019) (considering "incursion into internal agency management").

Prudence restrains courts from intervening into matters that may be reviewed at another time, especially where constitutional issues are raised. *See Roman Cath. Bishop of Springfield v. City of Springfield,* 724 F.3d 78, 89 (1st Cir. 2013). "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citation omitted).

The Department of Education is not closed and cannot be closed absent action by Congress—something that both the President and Secretary McMahon have repeatedly stated. The Plaintiffs' claims that the Department of Education will be closed or is being closed flies in the face of the Executive's public statements and statutory requirements. Closure has not occurred and will not occur unless and until Congress acts.

Moreover, and as noted below, the harms identified by Plaintiffs are speculative or, at best,

transitory. At the moment, Plaintiffs have only been able to identify potential delays in the services the Department of Education has previously provided. It is entirely speculative that the Department will cease providing these services, especially as it is currently in the middle of its reorganization.

### D. Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete Final Agency Action.

Plaintiffs fail to satisfy the essential elements of their APA claims in States Plaintiffs' Counts Three and Four and Somerville Plaintiffs' Counts V-VII because they are not petitioning for judicial review of a circumscribed and discrete agency action. "Under the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All. ("SUWA")*, 542 U.S. 55, 62 (2004). Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted); *Greater Bos. Legal Servs. v. United States Dep't of Homeland Sec.*, No. 21-CV-10083-DJC, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022) ("[A] broad programmatic attack" is not a valid APA claim). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006).

Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. They do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of Defendants' management of the Department of Education. For example, they argue in their respective memorandums that they are seeking an injunction of the reductions-in-force, which they refer to as a "Mass Termination," and the Executive Order. States PI at 40; Mem. of Law in Supp. of Pls.' Mot. for a Prelim. Inj. at 34, *Somerville Public Schools v.*

*Trump*, No. 25-cv-10677-MJJ, ECF No. 26 ("Somerville PI"). But this so-called "Mass Termination" is in actuality a collection of several ongoing actions – elimination of some non-statutorily required organizational components, reassignments of tasks, transfers of functions, redirection of priorities, and reductions of staff in certain offices. In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93.

Just as in *Lujan*, Plaintiffs' APA counts seek to bring a collective, programmatic challenge to all of these individual actions, including actions yet to be taken when the Complaints were filed. The wholesale nature of the challenge is confirmed by Plaintiffs' pleadings. The APA counts involve claimed statutory violations, but they do not mention a specific statute that forms the basis of the challenge itself. Rather, Plaintiffs allege at the highest level of generality that Defendants lack "authority to implement the Directive as it calls for actions that are not authorized by statute, and are in direct contravention of statutory authority governing the creation and operation of the Department of Education." States Compl. ¶ 179; *see also* Somerville Compl. ¶ 232. But addressing that type of claim would require the Court to supervise all of the agency's activities and determine how the Department would accomplish each specific statutorily-mandated function—an even more extreme kind of supervisory claim than what was at issue in *Lujan* itself. But as the Court explained in *SUWA*, the purpose of the APA's discrete agency action requirement is:

> to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. . . . The

16

> prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

542 U.S. at 66-67. With those principles in mind, the across-the-board nature of Plaintiffs' challenge is also confirmed by the requested injunctions, which are breathtaking in scope in that they would require programmatic freezes at the Department.

Even more practically, a wholesale challenge like Plaintiffs' is impossible to litigate under the mechanics of judicial review that the APA contemplates. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *Patel v. Johnson*, 2 F. Supp. 3d 108, 117 (D. Mass. 2014) (in an APA case, "'the district judge sits as an appellate tribunal,' and '[t]he 'entire case' on review is a question of law.'") (alteration in original) (quoting *Am. Bioscience,* 269 F.3d at 1083)). Accordingly, "APA review typically takes place on the basis of a record compiled by the agency" consisting of the materials considered "in making the challenged decision." *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989). Wholesale challenges to programmatic decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete administrative record" for the agency action, *see Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), because there is no discrete agency action, as necessary for the parties to proceed to summary judgment. Nor is it possible for the Court to apply the applicable standard of review, *see* 5 U.S.C. § 706, to the agency action. Plaintiffs are unlikely to succeed on their APA claims because they are sweeping programmatic challenges unavailable under the APA.

Because the Complaints raise a wholesale challenge, Plaintiffs are not likely to succeed on the merits in this case. But out of an abundance of caution, Defendants address Plaintiffs' "final agency action" argument. *See* States PI at 25 n.30 (citation omitted); Somerville PI at 17. "Final agency action" has two components. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action[.]" 5 U.S.C. § 704. Second,

the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).

Plaintiffs' brief claims that the Department's reduction-in-force is the final agency action. States PI at 25; Somerville PI at 17. It is telling that Plaintiffs are unable to identify any concrete, final decision by the Department of Education to shut itself down. To the extent that Plaintiffs are relying on the reduction-in-force as the final agency action with respect to the reorganization of the Department, the reduction-in-force marks the initiation, not the consummation, of the agency's decision-making process. The reduction-in-force reflects a decision by Department leadership that agency functions need to be streamlined and reorganized. That decision is thus "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704. "It may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the reduction-in-force itself the "consummation of the administrative process" reevaluating the agency's priorities. *Id.* at 113. Indeed, while the Somerville Plaintiffs recognize the finality of the agency action in a reduction-in-force with respect to the interest of any specific employee, Somerville PI at 17, there is no argument that the reduction-in-force is final with respect to the reorganization or closure of the Department. Moreover, even if it is a final agency action, judicial review for a reduction-in-force is not available in district court. *See supra* at Section I.B.

### E.  Plaintiffs' Constitutional Claims are Unlikely to Succeed.

Plaintiffs' constitutional claims are barred at the outset because they are purely statutory. In Count One of both complaints, Plaintiffs allege that Defendants have violated the separation of powers because they have taken actions that "violate Constitutional and statutory mandates, contravene Congressional intent, and are unlawful." States Compl. ¶ 157; *see also* Somerville Compl. ¶ 214 ("Defendants' actions to close the Department of Education, including the March 11 mass termination, the Executive Order, the plan to move portions of the Department to other agencies, and any other related steps to implement that Order, exceed presidential and executive

18

authority and usurp legislative authority conferred by the Constitution, in violation of the separation of powers.")

In Count Two of both Complaints, Plaintiffs allege that Defendants run afoul of the Take Care Clause when they "decline[] to execute or otherwise undermine[] statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes." States Compl. ¶ 162; *see also* Somerville Compl. ¶ 219 ("President Trump's actions to dismantle the Department of Education violate the Take Care Clause because they are directly contrary to the duly enacted statutes appropriating funds to the Department and directing the Department to distribute and use such funds to aid states, schools, and others in educating the children of the United States").

And in Count Three of both Complaints, Plaintiffs allege that "Defendants' conduct in issuing the Directive and the Department of Education's implementation of it is contrary to law and outside of Defendants' authority." States Compl. ¶ 169; *see also* Somerville Compl. ¶ 227 ("Defendant' actions to dismantle the Department, including the March 11 mass termination, the Executive Order, plans to transfer portions of the Department to other federal agencies, and subsequent steps to implement that Order, are outside of Defendants' authority to act").

These "constitutional" claims are nothing more than Plaintiffs' statutory objections dressed up in constitutional garb. But Plaintiffs cannot turn what is otherwise an amorphous statutory claim into a constitutional issue merely by alleging that Defendants' failure to comply with their statutory obligations (under the Department of Education Organization Act) constitute an unlawful abridgment of Congress's Article I powers, or an abdication of the President's constitutional responsibilities under Article II, Section 3. As the Supreme Court explained in *Dalton v. Specter*, permitting a party to assert a separation-of-powers claim like Plaintiffs' would "eviscerat[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." 511 U.S. 462, 474 (1994). The Court in *Dalton* thus rejected the proposition "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id*. at

471. Plaintiffs therefore cannot prevail on the merits of Counts I-III by equating putative statutory non-compliance with a constitutional infraction.

At any rate, because the Department of Education Organization Act does not foreclose Defendants' decision-making, *infra* Section I.G., Plaintiffs' separation of powers claim would lack merit even if properly pled. The Court should find Plaintiffs' claims unlikely to succeed on this ground alone. *See N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("Before deciding [a] constitutional question," a court must consider whether other "grounds might be dispositive."). Indeed, Plaintiffs' decision to invoke a non-statutory cause of action to raise these "ultra vires" claims means they must meet a heightened standard "confined to 'extreme'" errors. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763-64 (D.C. Cir. 2022) (emphasis omitted).

Moreover, to the extent Plaintiffs take issue with changes to the Office for Civil Rights, the Supreme Court has long recognized that agencies can permissibly decide what enforcement and supervision actions to take, if any, consistent with the statutory duties imposed on the agency by Congress. *See Heckler v. Chaney*, 470 U.S. 821 (1985) (agency enforcement discretion generally not subject to judicial review). Judicial deference to Defendant's decision-making about the priorities of the Department is especially warranted with respect to claims directed at the OCR, as "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also Heckler*, 470 U.S. at 832 ("[W]e recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (citation omitted)). As the Court explained in *Heckler*, agencies are "far better equipped" to evaluate "the many variables involved in the proper ordering of its priorities" than are the courts. 470 U.S. at 831-32.

Plaintiffs' subjective views about how to best implement the statutes governing the Department do not serve as a basis for the Court to reorder those priorities itself. The Government

Accountability Office (GAO), itself an entity within the Legislative Branch, has similarly approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15, 1981). Defendants' actions are directed toward determining how best to implement programs consistent with the President's policy objectives and underlying law, and therefore is not violative of separation of powers principles.

The implementation of such policy priorities is plainly within the purview of Defendants, acting on behalf of the President. In cases where the President must "exercise . . . Executive discretion," the duty "imposed on the President is in no just sense ministerial. It is purely executive and political." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498–99 (1867). Thus, "[a]n attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id*. (citation omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (finding it improper for courts "to assume a position of authority over" the President's duty to "take Care that the Laws be faithfully executed" (citations omitted)). To hold otherwise would itself upset the separation of powers by allowing judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *See Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"). While Defendants' policy priorities and enforcement decisions may differ from those preferred by Plaintiffs, Plaintiffs are unlikely to succeed in demonstrating that Defendants' decision-making amounts to a violation of the Constitution.

21

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is his responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge the actions of other Federal Defendants, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

**F.  Because the Executive Order Expressly Directs the Department to Continue All Actions Required by Law, the Executive Order Does Not Infringe on the Department's Statutory Obligations.**

Even if Plaintiffs could overcome the threshold defects of their claims, they are unlikely to succeed on the substantive merits of their claim that the Education Department's statutes foreclosed the President's Executive Order. Insofar as they are challenging the President's Executive Order, the claims fail because they rely on characterizations of that Order that are inconsistent with its terms. The Executive Order does not require the immediate shutdown of the Department. To the contrary, the Executive Order requires the Secretary of Education only to discontinues activities "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(a).

Definitionally, directing the Secretary to end functions *unless required by law* cannot be interpreted to violate the law. It is plainly lawful for the President to direct the Secretary to act within the agency's discretion to end programs not required by law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981). Plaintiffs argue that Defendants violate the law by

"implement[ing] the President's directive, memorialized in the Executive Order, to shut down the Department." States PI at 29; *see also* Somerville PI at 20 ("Defendants lack authority to abolish the Department, including through the Mass Termination Order"). But that argument proceeds from a premise that the Executive Order expressly rejects. Again, the notion that the agency is being dissolved is wholly inconsistent with Secretary McMahon's statement that the Department "will continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking." RIF Press Release.

### G. Defendants Are Making Reasonable Judgments that Are Committed to Agency Discretion by Law.

Plaintiffs are likewise unlikely to succeed on the merits of their arbitrary and capricious claim, which, as briefed, involves actions committed to agency discretion by law. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id*. "[T]he standard of review is highly deferential" in determining whether an action is arbitrary and capricious, *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 1117 (2024), and agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").

As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department of Education. This waste impacted the ability of the Department to perform its underlying mission, which is to support the States and

localities in providing education to their citizens. Based on these findings, the Secretary has taken the first steps in right-sizing the Department through a reduction-in-force.

Plaintiffs bear the burden of showing that the Department's reduction-in-force is arbitrary and capricious. *Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 113 (D. Mass. 2009) (quoting *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002)). They come nowhere close to meeting their burden. Their argument that "[a]ny purported commitment to 'efficiency' and 'accountability' is merely pretext for this goal of destruction [of the Department of Education]," States PI at 27, reflects a fundamental "lack of understanding" of "the nature" of the reduction-in-force, *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). Again, Secretary McMahon has not directed the immediate dissolution of the Department. Indeed, the reduction-in-force retains approximately half of the agency, a far cry from a complete shutdown. Moreover, the Department has stated its commitment to performing its statutory obligations. Courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee*, 435 U.S. at 545 (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and enjoin agency leadership from exercising control over their own staff to ensure that staff is carrying out statutory obligations or otherwise implementing agency leadership's policies would be an extraordinary violation of the separation of powers.

At bottom, the reduction-in-force incorporates the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a reduction-in-force; absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency decision.") (cleaned up). "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and the structure of the statute that applies the applicable legal standards for reviewing that action." *Drake*

*v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002); *see also de Feyter v. Fed. Aviation Admin.,* No. 10-CV-358-JL, 2011 WL 1134657, at *4 (D.N.H. Mar. 25, 2011); *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, staffing decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (citation omitted). After all, the very point of the reduction-in-force is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. Similarly, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler*, 470 U.S. at 831. The reduction-in-force reflects the Administration's effort to realign the Department to provide better service to the American people. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*. at 831-32.

Second, Plaintiffs cannot point to a particular statute limiting the agency's inherent discretion to reduce headcount. Again, agencies generally have broad discretion to determine how to implement a statute. *See Vt. Yankee*, 435 U.S. at 543.

To be sure, the letter from Secretary McMahon includes only a cursory explanation—unsurprising given the traditionally unreviewable nature of the decision it reflects. But even if this Court were to conclude that the explanation provided is insufficient for judicial review, that would in no way justify a preliminary injunction. Rather, "the proper course" would be "to remand to the [Department of Education] for additional . . . explanation," not any type of injunction. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## II.    Plaintiffs Cannot Demonstrate Irreparable Harm Justifying Extraordinary Relief.

Plaintiffs bear the "substantial burden" to show that the "extraordinary equitable remedy" that they seek is warranted. *Boston's Children First v. City of Boston*, 62 F. Supp. 2d 247, 253 (D. Mass. 1999). Claims of irreparable harm must be correct as a matter of theory but also as a matter

of fact and reality. *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020). Plaintiffs fail in both respects. In many cases, Plaintiffs do not connect alleged harms to recognizable causes of action or any specific statutory duty of the Department. Moreover, as set forth in detail in Part IA, *supra*, many of the injuries Plaintiffs describe are wholly speculative, based on "what if" predictions of what may happen in the future. Thus, even if Plaintiffs have standing, these alleged harms fail to meet the higher standard necessary to show irreparable harm.

### III.    The Equities and the Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors cut decisively against granting a preliminary injunction. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).

The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for the Department of Education. A preliminary injunction would displace and frustrate the President's decision about how to best address those issues, and the Court must give deference to the Executive Branch. *Heckler*, 470 U.S. at 831-32. Further, the Government will be harmed should it be forced to compensate employees for unneeded and unnecessary services. *See State of Maryland et al. v. U.S. Dep't of Agriculture.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir.) (Apr. 9, 2025) ("The Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims, and the Government is unlikely to recover the funds disbursed to reinstated probationary employees."). Because the public has an interest in the Executive Branch effectuating its policies, these final factors tip in favor of Defendants.

**IV.    Any Injunction Should Be Narrowly Tailored**

For all the foregoing reasons, it would be inappropriate for the Court to issue relief in any form. However, should the Court choose to do so, "an injunction must be narrowly tailored to remedy the harm shown." *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985). Here, Plaintiffs' requested orders go far beyond that principle. Not only do they fail to "describe in reasonable detail . . . the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)(C), they also are not tailored to remedying any particular harms shown.

At most, Plaintiffs have attempted to show that they would be injured by the dismissal of certain (unidentified) employees required to perform certain (vaguely identified) functions. It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, the Court should limit any relief to a prohibition on the termination of employees performing specific statutory functions where Plaintiffs have shown specific irreparable harm.

**V.    Any Injunction Should Be Stayed, and Plaintiffs Should Be Required to Post a Bond If an Injunction is Entered**

Particularly in light of the extraordinary breadth of Plaintiffs' motions, to the extent the Court issues injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

Moreover, if the Court enters a preliminary injunction, Defendants are entitled to a bond pursuant to Fed. R. Civ. P 65(c). Under that rule, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The proposed preliminary injunctions seek to require the Department to continue employing—and paying—thousands of individuals whose services Defendants determined they no longer require. The cost to the United States is the

salary and benefits for every employee that would have otherwise been separated. Plaintiffs should be required to post a bond in an amount proper to cover those expenses.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for preliminary injunctions.

DATED: April 11, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         ERIC J. HAMILTON
                                         Deputy Assistant Attorney General
                                         Civil Division

                                         BRAD P. ROSENBERG
                                         Special Counsel

                                         */s/ Michael Bruns*____
                                         Michael Bruns
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, N.W.
                                         Washington, DC 20005
                                         michael.bruns@usdoj.gov

                                         *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and will be provided to the following counsel for the plaintiffs by email:

Karyn L. Bass Ehler
Illinois Attorney General's Office

Gina Bull
NYS Office of The Attorney General

Elizabeth C. Carnes Flynn
Office of the Attorney General

Caitlyn Babington Carpenter
State of Hawaii - Department of the Attorney General

Elleanor H. Chin
Oregon Department of Justice

Lucia Choi
Office of The Attorney General

Spencer Wade Coates
State of Washington Attorney General's Office

David Dana Day
State of Hawaii - Department of the Attorney General

Katherine B. Dirks
Office of the Attorney General

Kalikoonalani Diara Fernandes
Department of the Attorney General, State of Hawaii

Clinten N. Garrett
Arizona Attorney General's Office

Charlotte Gibson
Wisconsin Department of Justice

Neil Giovanatti
MI Department of Attorney General

Kathryn Gradowski
RI Department of Attorney General

Kathleen Ann Halloran
Michigan Department of Attorney General

Nathaniel J. Hyman
Massachusetts Attorney General's Office

Keith Jamieson
Office of the Attorney General- State of Maryland

Elizabeth C. Kramer
Minnesota Attorney General's Office

Sean D. Magenis
Office of the Maine Attorney General

Andrew Charles Mendrala
Office of the Attorney General for the District of Columbia

Amanda I. Morejon
New Jersey Attorney General's Office

David Moskowitz
Colorado Department of Law

Rabia Muqaddam
NYS Office of The Attorney General

Jessica L Palmer
NJ Office of the Attorney General

Ewan Christopher Rayner
State of Hawaii - Department of the Attorney General

Natasha Adriana Reyes
Office of the Attorney General California

Patrick Ring
Connecticut Attorney General

Katharine Pinckney Roberts
Illinois Attorney General

Jonathan T Rose
Office of the Attorney General

Cristina Sepe
Washington State Office of the Attorney General

Andrew Simon

Panchalam Seshan Srividya
Office of the Attorney General - State of California

James Edward Stanley
California Department of Justice

Heidi Parry Stern
Nevada Attorney General's Office

Molly Thomas-Jensen
NYS Office of The Attorney General

Will Bardwell
Democracy Forward Foundation

Elena Goldstein
Democracy Forward Foundation

Rachel F. Homer
Democracy Forward Foundation

Victoria S. Nugent
Democracy Forward

Adnan Perwez
Democracy Forward Foundation

Mark Samburg
Democracy Forward Foundation

Kali J. Schellenberg
Democracy Forward Foundation

/s/ Michael Bruns
Michael Bruns